# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

JANE DOE,                                    Case No.

    Plaintiff,                              Hon.

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA, and
individuals TAMIKO STRICKMAN,
SUSAN FOSTER, JUDY WALKER, and
JOHN ROE, individually and in their official
capacities, and OTHER UNIDENTIFIED
DEFENDANTS,

    Defendants.

| | |
|---|---|
| Karen Truszkowski<br>TEMPERANCE LEGAL GROUP, PLLC<br>Attorney for Plaintiff<br>503 Mall Court #131<br>Lansing, MI 48912<br>(844) 534-2560 phone<br>(800)531-6527 fax<br>karen@temperancelegalgroup.com | Elizabeth K. Abdnour<br>ELIZABETH ABDNOUR LAW, PLLC<br>Attorney for Plaintiff<br>1100 W. Saginaw St., Ste. 4A-2<br>Lansing, MI 48915<br>(517) 292-0067 phone<br>elizabeth@abdnour.com |

## COMPLAINT AND JURY DEMAND

    Plaintiff JANE DOE, by and through her attorneys, ELIZABETH ABDNOUR and

KAREN TRUSZKOWSKI, hereby file the following complaint against Defendants as captioned

above.

## INTRODUCTION

1. Plaintiff Jane Doe ("Plaintiff") is a former student of the University of Nebraska-Lincoln

    ("UNL") who attended the school from approximately 2014-2017.

2. While Plaintiff was a student at UNL, she was repeatedly sexually harassed by her

professor, John Roe ("Roe").

3. Title IX of the Education Amendments of 1972 ("Title IX") is a federal law requiring that any educational institutions receiving federal funds must be free of sex discrimination. Title IX is implemented through the Code of Federal Regulations.

4. Pursuant to federal guidance issued by the U.S. Department of Education, all educational institutions that receive federal funding are required to designate a Title IX Coordinator, whose responsibilities include overseeing and coordinating efforts to ensure compliance with Title IX on campus.

5. Nebraska state law is also clear regarding UNL's obligation to maintain a campus free of sex discrimination, both through the Constitution of Nebraska and the Charter establishing the University of Nebraska.

6. UNL's Office of Institutional Equity and Compliance ("IEC"), led by UNL's Title IX Coordinator, is responsible for preventing, responding to, and investigating alleged violations of Title IX on campus.

7. When Plaintiff reported her harassment to IEC, she experienced numerous violations of her rights in the IEC reporting and investigation process.

8. UNL's investigation and response to Plaintiff's complaint of sex discrimination was insufficient and did not comply with basic due process requirements; accepted Title IX response requirements as outlined in guidance from the U.S. Department of Education, Office for Civil Rights; or the Nebraska State Constitution and the University of Nebraska Charter's prohibitions on sex discrimination.

9. UNL's response to Plaintiff constituted sex discrimination in a variety of ways as outlined later in this complaint.

10. UNL repeatedly denied due process to Plaintiff in the investigation process in a variety of ways as outlined later in this complaint.

11. UNL violated Plaintiff's First Amendment right to free speech by repeatedly prohibiting her from discussing the sexual harassment she experienced at the hands of Defendant Roe and the subsequent Title IX complaint resolution process.

12. When Plaintiff rebuffed the unwelcome romantic and sexual advances of Defendant Roe as outlined later in this complaint, he began a vicious retaliation campaign against her which ultimately led her to withdraw from her Ph.D. program at UNL and start all over again at a new institution.

13. When Plaintiff attempted to address these problems and failures through the UNL Title IX investigation and case resolution process, she received threats of retaliation from Defendant Walker.

14. UNL routinely failed to follow its own policies in responding to and investigating claims of sexual misconduct, including sexual assault and other forms of sex discrimination, in a variety of ways as outlined later in this complaint.

15. On October 18, 2016, the UNL Executive Committee met with Defendant Strickman, the recently appointed interim Title IX Coordinator and Director of IEC.  UNL's Faculty Senate Executive Committee raised concerns about due process issues in IEC meetings.

16. The following notes were recorded from that meeting:

> [Professor Richard] Leiter asked what would happen if a person does not agree with the findings of her office. Strickman stated that if it involves a student the case would go to a hearing board which is comprised of trained individuals. If either party disagrees with the findings of the panel the matter goes to the Chancellor who gets an outside mediator involved.[1]

---

[1] UNL Faculty Senate Executive Committee Minutes 3 (Oct. 18, 2016), https://www.unl.edu/facultysenate/exec/16oct18mins.pdf (last visited Feb. 24, 2021).

17. Strickman's statement to the Faculty Senate Executive Committee was false.

18. UNL's failure to appropriately respond and investigate Plaintiff's claims, as well as the sex discrimination and other harms perpetrated by UNL against the Plaintiff, caused severe harms to the Plaintiff, denied her due process, and denied her the ability to participate fully in their education as UNL students.

## JURISDICTION AND VENUE

19. This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, et seq.

20. This is also an action to redress the deprivation of Plaintiff's constitutional rights under the First and Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

21. This is also an action to redress the deprivation of Plaintiff's state constitutional rights under the Constitution of Nebraska, prohibiting discrimination based on sex in public education.[2]

22. This is also an action to redress the deprivation of Plaintiff's rights under the Charter of the University of Nebraska as codified in the Act to Establish the University of Nebraska, Neb. Rev. Stat. §§ 85-101 et seq., which states, "No person shall be deprived of the privileges of this institution because of age, sex, color or nationality."[3]

23. Subject matter jurisdiction is based on 28 U.S.C. § 1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law

---

[2] NEB. CONST. art. I, § 30, https://nebraskalegislature.gov/FloorDocs/Current/PDF/Constitution/constitution.pdf.
[3] NEB. REV. STAT. § 85-116 (1869), https://nebraskalegislature.gov/laws/laws-index/chap85-full.html.

to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights. This Court has subject matter over state law claims pursuant to 28 U.S.C. § 1367.

24. This Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

25. Plaintiff's claims are cognizable under the United States Constitution, 42 U.S.C. §§ 1681 *et seq.*, and under Title IX.

26. The events giving rise to this lawsuit occurred in the city of Lincoln, Nebraska, County of Lancaster, which sits in the federal District of Nebraska.

27. Venue is proper in the United States District Court for the District of Nebraska, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

## APPLICABLE LAW AND POLICY

28. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681(a) *et seq.*, states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

29. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106, 34 C.F.R. Part 100, and 28 C.F.R. § 42.104.

30. Regarding Title IX, 34 C.F.R. § 106.8(b) provides:

> …A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

31. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

32. In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

33. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

> a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

> b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

> Davis, 526 U.S. at 1669-76.

34. In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the United States Supreme Court held that retaliation against a person who complains about sex discrimination is itself a form of discrimination "on the basis of sex" forbidden by Title IX.

35. The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

36. In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the

U.S. Supreme Court held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

37. In *Healy v. James*, 408 U.S. 169 (1972), the U.S. Supreme Court held that the First Amendment applies with the same force at public universities as at other educational institutions.

38. The Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

39. The Nebraska State Constitution protects individuals from discrimination on the basis of sex in public education. Neb. Const. art. I, sec. 30.

40. The Charter of the University of Nebraska states: "No person shall be deprived of the privileges of this institution because of age, sex, color or nationality." Neb. Rev. Stat. § 85-116.

## **PARTIES**

41. Plaintiff Jane Doe ("Plaintiff") is an adult and a former student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska. Plaintiff is now enrolled in a Ph.D. program at another institution.

42. Defendant Board of Regents of the University of Nebraska ("Board of Regents") is the governing body of the University of Nebraska system, which includes UNL, a public, state university located in Lincoln, Nebraska, County of Lancaster, with its principal place of business at 1400 R St., Lincoln, Nebraska, 68588.

43. At all material times, Defendant Tamiko Strickman ("Strickman"), in her official capacity,

was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

44. At all material times prior to an unknown date in 2016, Strickman was an Investigator and Deputy Title IX Coordinator at UNL. Upon information and belief, Strickman resigned from that position for a brief period in 2016. After former IEC Director Susan Foster's departure at some point in 2016, Strickman was rehired and named Interim Director of the Office of Institutional Equity and Compliance for UNL.  In 2016 until around November 2019, Strickman was Associate to the Chancellor, Title IX Coordinator, and Director of the Office of Institutional Equity and Compliance for UNL.  Upon information and belief, Strickman was terminated from her position at UNL in December 2019.

45. At all material times, Defendant Susan Foster ("Foster"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

46. From around February 2015 until an unknown date in 2016, Foster was Associate to the Chancellor, Title IX Coordinator, and Director of the Office of Institutional Equity and Compliance for UNL.

47. At all material times, Defendant Judy Walker ("Walker"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

48. Upon information and belief, at all material times, Walker was the Interim Senior Vice Chancellor of Academic Affairs for UNL.

49. At all material times, Defendant John Roe[4] ("Roe"), in his official capacity, was an agent

---

[4] John Roe is a pseudonym to protect the identity of this party.

8

and/or employee of UNL, acting or failing to act within the scope, course, and authority of his employment and his employer.

50. At all material times, Roe was a professor in UNL's engineering department.

51. Other Unidentified Defendants may be identified in the course of this litigation and Plaintiffs reserve the right to amend this Complaint to add them as defendants as they become known.

## FACTUAL ALLEGATIONS

52. In May 2014, Plaintiff began her academic career with UNL.

53. Plaintiff immigrated to the U.S. with her husband so they could both pursue their respective Ph.Ds.

54. Plaintiff was interested in both the chemical and materials engineering Ph.D. programs at UNL.

55. To help decide which program she should enroll in, Plaintiff met with professors from both departments to request funding through either a Teaching Assistant ("TA") position, where the department would fund her, or a Research Assistant ("RA") position, where the faculty would fund her.

56. In the spring of 2014, Defendant Roe, a professor in the Department of Mechanical and Materials Engineering, offered to be Plaintiff's advisor.

57. Roe told Plaintiff that he would fund her as an RA for the summer of 2014, then fund her as both a TA and RA for the fall of 2014, and then fund her solely as a TA in the spring of 2015.

58. Plaintiff accepted his offer and was admitted to UNL's Mechanical and Materials Engineering ("MME") degree program.

59. Before the start of Plaintiff's program, two other faculty members expressed interest in being her advisor, but Plaintiff had already accepted Roe's offer.

60. Less than seven months into her Ph.D. program, Roe began to sexually harass Plaintiff.

61. On or about December 13, 2014, Roe kissed Plaintiff on the lips while they were in his office.

62. At the time, Roe was about sixty years old, and Plaintiff was twenty-six years old and married.

63. Plaintiff was shocked and disgusted that her advisor would do such a thing but was unable to leave the room because Roe was holding her hands.

64. When Plaintiff asked Roe why he kissed her, Roe started talking to Plaintiff about love.

65. Plaintiff attempted to maintain a professional relationship with Roe for the sake of her degree, but she found it increasingly difficult to dodge his advances.

66. Roe then began a retaliation campaign against Plaintiff that severely adversely affected her academic career.

67. After Roe kissed her in December 2014, Plaintiff tried to obtain research opportunities from other professors so she could limit her interactions with Roe.

68. Only three professors were working in Plaintiff's background area at this time, but she had had a good relationship with many of the engineering professors before Roe kissed her.

69. After December 2014, however, professors that would previously say hello to Plaintiff and make conversation with her suddenly started ignoring her whenever she passed by them in the hallway.

70. This made it difficult for Plaintiff to establish and maintain academic connections outside of Roe and she was forced to keep working for him.

71. Roe also changed Plaintiff's funding to make her more reliant on him.

72. In the fall of 2014, Plaintiff was both a TA for the department and a RA for Roe, so she received half of her funding from Roe directly and the other half from the department.

73. In the spring of 2015, Plaintiff was supposed to be a TA and get all her funding from the department.

74. After Roe kissed Plaintiff in December 2014, he switched her to RA right before the start of spring semester without her knowledge or consent.

75. Plaintiff told Roe that she wanted to be a TA and get her funding from the department, but he denied her request.

76. By making Plaintiff an RA and dependent on him for funding, Roe ensured that Plaintiff would have to keep working for him and tolerate his unwelcome advances.

77. As an international student, Plaintiff could not obtain a loan in order to complete her degree, so she relied on her RA funding to pay her tuition, rent, and other living expenses.

78. Plaintiff wanted to diversify her resume and limit her interactions with Roe, so in spring 2015 she applied for internships for the summer of 2015.

79. When Roe found out that Plaintiff received a summer 2015 internship through the department chair, he was angry at Plaintiff for applying without telling him.

80. Roe told Plaintiff that she had to turn down the position in order to continue working on her paper and research, even though Plaintiff was planning on working on her paper along with her internship.

81. Plaintiff sent an email to the department chair letting him know she was not accepting the position on March 17, 2015.[5]

---

[5] *See* Exhibit 1.

82. This deprived Plaintiff of obtaining practical experience, diversifying her resume, and making professional or academic connections outside of Roe.

83. Roe again prevented Plaintiff from seeking academic experiences outside of his control when he refused to grant her permission to apply for graduate internships for the upcoming academic year.

84. Roe's sexual harassment escalated over the course of Plaintiff's studies.

85. Throughout the summer of 2015, Roe tried to hug Plaintiff, told her he loved her, and kicked her legs between twenty and thirty times.

86. On or around August 17, 2015, Roe told Plaintiff that she "owed him one" because he provided the lab's nitrogen tanks, even though it was his responsibility as her advisor to keep the lab supplies stocked.

87. In later interactions, Roe frequently acknowledged kissing Plaintiff whenever she would try to limit their conversations to her studies.

88. These incidents usually happened in Roe's office outside of the public eye.

89. Even when Plaintiff was not physically near Roe, he would harass her through unsolicited texts and emails.

90. In or around September 2015, Roe texted Plaintiff a kiss face emoji saying it was a kiss for her effort. [6]

91. On or around September 11, 2015, Roe sent Plaintiff a link to a movie where a wife cheats on her husband.[7]

92. Roe described the movie as having a "special warmth" and asked Plaintiff to watch the movie when she "was alone and felt like making a sweet connection."

---

[6] *See* Exhibit 2, p. 1
[7] *Id.*

93. On September 11, 2015, Roe texted Plaintiff that a "kiss also helps the process" while discussing an experiment.[8]

94. In a text dated September 14, 2015, Plaintiff asked Roe if she could apply for an internship since he had been angry with her for applying the prior summer without telling him.

95. Roe accused Plaintiff of "being focused on making money, not research," even though Plaintiff was primarily interested in diversifying her resume.[9]

96. Only allowing Plaintiff to work for Roe made Plaintiff reliant on Roe and unable to escape from his control.

97. On or around September 18, 2015, Roe asked Plaintiff to send him a "selfie" photograph of herself.[10]

98. On or about September 20, 2015, Plaintiff met with Roe in his office in order to address his continuing sexual harassment.

99. Knowing that it would be his word against hers, Plaintiff recorded the conversation.

100. During the conversation, Roe admitted to kissing Plaintiff and sending her an inappropriate movie.

101. Plaintiff expressed her discomfort with the situation and asked Roe to stop harassing her while trying to remain professional and diplomatic for the sake of her academic career.

102. In a text message dated September 25, 2015, Roe told Plaintiff she was "distracted by a bad professor," referencing himself, when she tried to discuss another experiment with him.[11]

---

[8] *Id.* at 2.
[9] *See* Exhibit 3, p. 1.
[10] *Id.* at 2.
[11] *Id.*

103.     On October 2, 2015, Roe texted Plaintiff a kiss face emoji while she was trying to discuss her work with him.[12]

104.     Later that day, Roe began texting Plaintiff telling her he wanted to "fix it" with her husband.[13]

105.     On October 22, 2015, Roe texted Plaintiff that he "had very special feelings" for her, that he felt he "went from a puppy that is all full of happy and good things to a wolf that is all nasty and bad," and told her he knew he "had lost [his place]" which was "a place [he] cherished."[14]

106.     On November 17, 2015, Roe texted Plaintiff a kiss face emoji while she was trying to discuss her work with him.[15]

107.     On December 4, 2015, Roe texted Plaintiff about Edward Munch's Madonna painting, which depicts a nude woman.[16]

108.     Plaintiff was deeply unnerved by Roe's pervasive harassment, but she had to keep working with him in order to complete her Ph.D. program.

109.     The worst of Roe's retaliatory campaign against Plaintiff occurred when he demoted her from first to second author on a paper she wrote to fulfill her Ph.D. requirements.

110.     On January 26, 2016, Roe emailed the original second author of the paper, another UNL faculty member, and two of the paper's collaborators in France.[17]

---

[12] *Id.* at 3.
[13] *Id.*
[14] *Id.* at 4.
[15] *Id.*
[16] *Id*. at 5.
[17] *See* Exhibit 4.

111.     In the email, Roe stated that he originally intended to list Plaintiff as the first author, but "she simply seems not interested in participating" and was not "seriously working" on the project.  Roe further wrote, "It seems unreasonable to put her as the first author if she is not deserving of it."[18]

112.     This email publicly embarrassed Plaintiff in front of several of her colleagues.

113.     Further, Roe's claims that Plaintiff was not interested and was not seriously working on the paper were false, as Plaintiff had put in the majority of the work for the paper leading up to that point and had chosen the journal for publication.

114.     Plaintiff had no idea that Roe was considering demoting her to second author until she received the January 26, 2016 email.

115.     In the many communications Plaintiff and Roe had about the paper, Roe never indicated that he felt Plaintiff was not doing enough work or that he felt the other author deserved to be listed as the first author.

116.     At Roe's insistence, Plaintiff had turned down the internship offer she received for the summer of 2015 in order to spend the summer working on her paper.

117.     One of the requirements for Plaintiff's Ph.D. program was to be listed as first author on a research paper.

118.     By demoting Plaintiff to second author without any notice or adequate reason, Roe placed Plaintiff's ability to complete her degree in jeopardy.

119.     Plaintiff had planned on using this paper to fulfill this requirement and accordingly put a great deal of work into it.

---

[18] *Id.*

120.     Being demoted to second author meant that Plaintiff would have to start from scratch and write a new paper, with no guarantees that Roe would not suddenly decide to demote her on that paper as well.

121.     On May 6, 2016, Roe sent Plaintiff an email telling her that a picture of her was "very appealing and inviting."[19]

122.     Roe's retaliatory campaign against Plaintiff came to a devastating head when he abruptly cut her funding without proper notice.

123.     In May 2016, about two weeks before the start of the summer semester, Roe told Plaintiff that he did not have the funds to support her as an RA for the summer.

124.     On June 20, 2016, Roe emailed Plaintiff informing her that he still did not have funds for her, and that the department was not planning on financially supporting her in the fall as a TA.[20]

125.     This meant that Plaintiff would not have any funding for her program for the foreseeable future.

126.     As a department graduate chair, Roe was aware of the TA funding distribution among current and new graduate students.

127.     Roe failed to reserve a TA position for Plaintiff in March 2016 and hired new students with all of the remaining TA funds.

128.     Roe then waited three months to tell Plaintiff that he could not fund her as an RA and that she would have to seek funding from the department, even though he knew that there was no more funding left.

---

[19] *See* Exhibit 5.
[20] *See* Exhibit 6.

16

129.     Roe also continued to fund the other three male Ph.D. and undergraduate students in his lab after he cut Plaintiff's funding.

130.     This news was both unexpected and devastating for Plaintiff, as she relied on these funds to pay her bills and life expenses.

131.     When Roe told Plaintiff in May 2016 that he could no longer fund her, the application deadline for summer and fall internships had already closed.

132.     Before this conversation, Plaintiff told Roe she wanted to apply for summer internships, but Roe told her she would have to work on her research over the summer, without any mention of the possibility that she would not be funded.

133.     Roe recommended that Plaintiff reach out to the company that he had made her turn down a summer internship with in 2015.[21]

134.     Plaintiff did not have many other professional connections, since Roe had previously prevented her from seeking other job opportunities in order to focus on her research, and she was worried she would not be able to find alternative sources of funding.

135.     Not only was Plaintiff forced to deal with Roe's sexual harassment for a year and a half, but all the hard work she did for him was being called into question because she refused his advances.

136.     Plaintiff would now have to work for her abuser without compensation and, given that Roe harassed her a month prior by calling a picture of her "appealing and inviting," Plaintiff knew that the sexual harassment would continue.

137.     Plaintiff was distracted from her studies, lost weight, and cried constantly from the stress of the situation.

---

[21] *Id.*

138.     Roe's sexual harassment also strained Plaintiff's marriage.

139.     Plaintiff's husband, who was also a student in the engineering Ph.D. program at UNL, avoided interacting with Roe as much as possible, but he could not completely avoid Roe since all the engineering students work in the same building.

140.     Plaintiff did not tell her husband the complete extent of Roe's harassment because she did not want to upset him.

141.     Plaintiff also did not want to jeopardize her husband's studies, since her husband's advisor was a close friend of Roe and she did not want her husband to feel ostracized from the department like she did.

142.     In June 2016, Plaintiff met with a trusted professor and disclosed Roe's sexual harassment.

143.     Plaintiff's husband accompanied her to this meeting, where he learned for the first time about the extent of sexual harassment his wife had faced.

144.     The professor was very upset about what happened to Plaintiff but told her the harassment could not remain confidential.

145.     The professor recommended that Plaintiff report the harassment to UNL's Title IX office.

146.     Up until that point, Plaintiff had no idea that there was an office at UNL specifically dedicated to handling claims of sexual assault and harassment.

147.     Plaintiff had thought that her only option was to call the police, but she did not want to have Roe arrested and further hurt her reputation in the department.

148.     In the two years she had attended UNL, Plaintiff had never heard of the Title IX office or seen it referenced anywhere.

149.    Plaintiff was very happy that there was a place where she could report Roe's harassment and seek justice.

150.    On or about June 21, 2016, Plaintiff met with Susan Foster ("Foster") and Tami Strickman ("Strickman") at UNL's Office of Institutional Equity and Compliance ("IEC"), which handles Title IX claims, about Roe's ongoing sexual harassment and retaliation.

151.    Plaintiff provided ample evidence to IEC of Roe's sexual harassment, retaliation, and the significant amount of work she had done on the paper, including screenshots of text messages, emails, and the voice recording.

152.    In addition to providing Strickman with over 80 emails, Plaintiff also allowed Strickman and University of Nebraska-Lincoln Police Department ("UNLPD") criminal investigator Eric Fischer ("Fischer") to copy all of the documents she had detailing the harassment from her office computer.

153.    At the beginning of the Title IX process, Plaintiff felt that her harassment was finally coming to an end so she could continue her education in peace.

154.    However, Plaintiff soon learned that Strickman and Foster had no intention of addressing the harassment she faced.

155.    Strickman and Foster soon stopped answering Plaintiff's calls and emails.

156.    When Plaintiff went to the IEC office to check on the status of her case, Strickman made Plaintiff feel like she was the harasser rather than the victim.

157.    Strickman would speak to Plaintiff in an angry tone that made Plaintiff feel like she was wasting her time.

158.    During the few instances Strickman and Foster would respond to Plaintiff, they would try to convince her to drop the case.

159.    Strickman and Foster instructed Plaintiff not to tell anyone about her complaint.

160.    Whenever Plaintiff would send Strickman emails asking questions about her case, Strickman would tell her to call her rather than answering her questions over email.[22]

161.    When Plaintiff would then call Strickman, Strickman would try to convince Plaintiff over the phone to drop the case.

162.    Plaintiff spent the entire summer of 2016 waiting for IEC to complete its investigation and seeking alternative sources of funding.

163.    Plaintiff begged department chair Dr. Jeffrey Shield for help, checking in every week to see whether a TA position had opened up.

164.    Strickman and Foster told Plaintiff not to tell Dr. Shield about Roe's sexual harassment because they had already explained the situation to him.

165.    Plaintiff later learned that Strickman and Foster had not explained the situation to Dr. Shield.

166.    Dr. Shield offered Plaintiff a job grading papers for $500.00 per month for two months, which did not even cover her rent, and told her to wait until August 2016 to see if any TA spots opened up.

167.    One professor, Dr. Benjamin Terry, received extra funding and sent out an announcement for a position with his lab on June 30, 2016, which he forwarded directly to Plaintiff.[23]

168.    Plaintiff was qualified for the position and met with Dr. Terry to tell him she was interested in switching into his lab.

---

[22] *See* Exhibits 7 and 8.
[23] *See* Exhibit 9.

169.     Plaintiff did not tell the professor about Roe's sexual harassment or the ongoing Title IX investigation because Strickman specifically told her not to mention it to him.

170.     Roe emailed Plaintiff on July 1, 2016 to interrogate her about her meeting with Dr. Terry and implied that working with Dr. Terry would negatively impact Plaintiff's work with Roe.[24]

171.     Roe and Dr. Terry met later that day about Plaintiff's request to join his lab.

172.     Dr. Terry rejected Plaintiff for the position after talking with Roe.

173.     Given the fact that Plaintiff's visa status was tied to her Ph.D. program, she was scared that she would have to continue working for Roe without compensation and be subjected to further sexual harassment and retaliation.

174.     At the last minute, Plaintiff was able to obtain a funded position a few days before the semester began in August 2016 because a new student dropped out of the program.

175.     Plaintiff was required to change her research area in order to work for another professor.

176.     On August 12, 2016, IEC sent Plaintiff a letter signed by Strickman which made a finding that Roe had violated the University of Nebraska Board of Regents Policy on Sexual Harassment, RP-2.1.8 ("Sexual Harassment Policy").[25]

177.     The letter stated that IEC found that Roe kissed Plaintiff in December 2014, told her on multiple occasions he wanted to kiss her, and that he sent her a link to the movie, which IEC mischaracterized as a "romantic movie," in violation of the Sexual Harassment Policy.[26]

---

[24] *See* Exhibit 10.
[25] *See* Exhibit 11.
[26] *Id.*

178.     IEC wrongly characterized Roe's repeated kicking of Plaintiff as a "playful nudge."[27]

179.     IEC erroneously attributed Roe's demotion of Plaintiff to second author to her "subpar work product."[28]

180.     IEC did not appropriately consider the evidence Plaintiff provided in the course of the investigation.

181.     The letter made no reference to the recording which provided direct evidence of Roe admitting to his harassment of Plaintiff.

182.     The letter wrongly found that there was not enough evidence to find that Roe told her he loved her multiple times.[29]

183.     Based on its findings, IEC determined that UNL should cover the tuition and fees for the remaining six credits Plaintiff needed in order to obtain a master's degree.[30]

184.     Plaintiff already had a master's degree, so this degree had no value to her.

185.     The IEC letter also told Plaintiff that if she disagreed with the finding, she had seven days to request a hearing or administrative resolution from Defendant Walker.[31]

186.     The letter did nothing to rectify both the personal embarrassment Plaintiff experienced as a result of Roe's sexual harassment or the professional harm she endured due to his retaliation.

187.     Contrary to its promise to her in the IEC findings letter, UNL waived Plaintiff's tuition only and not her fees.

---

[27] *Id.* at 2.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*

188.     Upon information and belief, no discipline was imposed upon Roe and his department chair was not notified of the findings against Roe.

189.     Roe was not moved out of the physical proximity of Plaintiff in the engineering building.

190.     On August 19, 2016, Plaintiff contacted IEC to request an administrative resolution regarding her concerns of retaliation by Roe per the requirements of the August 12, 2016 IEC letter.[32]

191.     Plaintiff pointed out that the letter detailing IEC's findings incorrectly listed the start date of the sexual harassment as December 2015 instead of 2014.[33]

192.     Plaintiff also expressed her dissatisfaction with IEC's findings, pointing out how they mischaracterized many of her key allegations and failed to properly consider the ample evidence she provided of Roe's sexual harassment.[34]

193.     After Plaintiff requested an administrative resolution, IEC staff said they would form an "Ad Hoc Committee" to review her concern of retaliation by Roe in changing her authorship rank on the paper she had worked on with him.

194.     This committee was composed entirely of Roe's colleagues from the mechanical engineering department, which was a conflict of interest.

195.     Foster and Strickman told Plaintiff not to tell the Ad Hoc Committee that the reason for the authorship complaint was due to the sexual harassment and retaliation she faced from Roe.

---

[32] *See* Exhibit 12.
[33] *Id.*
[34] *Id.*

196.     On October 3, 2016, the Ad Hoc Committee sent a letter detailing their findings to Defendant Walker.[35]

197.     The committee ranked Plaintiff's contributions to the paper as third, putting her last behind Roe and the new first author.[36]

198.     The committee did not provide any documentation or evidence detailing how they came to their decision, nor did they make any reference to the ample evidence that Plaintiff had given to IEC detailing her contributions to the paper.[37]

199.     Plaintiff was provided with no information or opportunity to review any information Roe may have provided to the Ad Hoc Committee.

200.     Plaintiff received a copy of this letter the next day.

201.     On October 4, 2016, Plaintiff contacted Walker by email and asked for an explanation as to how the Ad Hoc Committee had arrived at its decision and why the committee had not considered all of the evidence she had provided.[38]

202.     On October 7, 2016, Strickman sent Plaintiff a letter referencing the Ad Hoc Committee's findings, stating although IEC had found that Roe sexually harassed Plaintiff, it found that Roe had a legitimate, nondiscriminatory reason to list her as a second author based on the findings of the Ad Hoc Committee.[39]

203.     Strickman's letter stated that IEC found that Roe did not retaliate against Plaintiff.[40]

204.     On October 12, 2016, Plaintiff responded to Strickman's letter and again asked for an explanation as to how the Ad Hoc Committee had arrived at its decision.  Plaintiff also

---

[35] *See* Exhibit 13.
[36] *Id.*
[37] *Id.*
[38] *See* Exhibit 14.
[39] *See* Exhibit 15.
[40] Id.

expressed concern that Roe had falsely claimed that he had collaborated with the new first author and given the new first author credit for Plaintiff's work, and that she had not been given access to any of the evidence provided by Roe to the Ad Hoc Committee.[41]

205.    Strickman did not respond to Plaintiff's email.

206.    On October 25, 2016, Plaintiff sent Walker an email requesting a hearing and a second Ad Hoc Committee review by an objective independent panel, not affiliated with Roe and the UNL mechanical engineering department.[42]

207.    Walker emailed Plaintiff back asking to set up a meeting to discuss next steps.[43]

208.    On November 1, 2016, Plaintiff met with Walker to discuss her requests.

209.    During the meeting, Walker told Plaintiff that if she continued to ask for a second independent committee panel review and exercised her right to a hearing, she would lose UNL's support.

210.    As an international student, this made Plaintiff worry that her student visa status was in jeopardy.

211.    Walker told Plaintiff to make a decision as to whether she wanted to pursue her requests within three days.

212.    On November 4, 2016, Plaintiff emailed Walker and asked for more time to think before making a decision.[44]

---

[41] *See* Exhibit 16.
[42] *See* Exhibit 17.
[43] *Id*.
[44] *See* Exhibit 18.

213.     On November 7, 2016, Walker emailed Plaintiff back, ignored her request for more time to think, and said that since Plaintiff did not get back to her within three days, she was closing the case.[45]

214.     Plaintiff was not granted a second independent Ad Hoc Committee review or a hearing.

215.     From November 2016 until March 2017, Plaintiff continued to be forced to see Roe, even though he was no longer her advisor, because her office was still located within the mechanical engineering department.

216.     Roe would say hello to Plaintiff and stare, smile, and sneer at Plaintiff when he saw her, even though he knew his communications were unwelcome to her and IEC had told Plaintiff that Roe was not supposed to have any contact with her.

217.     It was impossible for Plaintiff to avoid Roe since she had to work in the small engineering building for her labs, and she felt scared and humiliated.

218.     On March 7, 2017, Plaintiff filed another report against Roe with IEC due to his continued harassment of her.[46]

219.     Strickman emailed Plaintiff back the same day to ask if she wanted to go over safety planning with Fischer, which confirmed that Strickman received Plaintiff's email.[47]

220.     Strickman's email copied Fischer, indicating that UNLPD was notified of the ongoing stalking.[48]

221.     Strickman also told Plaintiff that she would talk to Roe.

---

[45] *Id.*
[46] *See* Exhibit 19.
[47] *See* Exhibit 20.
[48] *Id.*

222.     Neither IEC nor UNLPD ever followed up with Plaintiff after she made her complaint and never confirmed that they spoke with Roe.

223.     Upon information and belief, no Title IX or police investigation was initiated based on Plaintiff's March 7, 2017 report of Roe's continued harassment, stalking, and violation of the no-contact directive.

224.     Roe continued to stare at say hello to Plaintiff in the hallway as the school year went on, causing Plaintiff significant fear and anxiety.

225.     At a UNL international-themed New Year party at the end of March 2017, Roe stared at Plaintiff throughout the party.

226.     In the summer of 2017, due to UNL's failure to protect her from Roe's continued harassment and stalking, Plaintiff made the difficult decision to leave UNL.

227.     Plaintiff had been hopeful that UNL would protect her from Roe's harassment and retaliation, but her faith in the school had been completely broken.

228.     Even though Plaintiff knew both she and her husband would have to start their Ph.D. programs all over again, she could no longer stand to be anywhere near Roe or UNL. She had to escape from Roe's ongoing harassment and stalking, from which she knew UNL would not protect her.

229.     Plaintiff started a Ph.D. program at a different institution in fall 2017.

230.     Even after she left UNL, Plaintiff was unable to put the harassment and retaliation from Roe behind her.

231.     On May 31, 2017, Strickman emailed Plaintiff and asked her to sign documents so Roe could apply for a patent with the paper she was demoted from first author on, perpetuating Roe's harassment and retaliation against Plaintiff.[49]

232.     On September 25, 2017, Roe copied Plaintiff on an email to other UNL students.[50]

233.     On September 27, 2017, Plaintiff emailed Strickman to notify her that he had again violated the no-contact directive.[51]

234.     Strickman did not respond.

235.     On September 28, 2017, Plaintiff again emailed Strickman to confirm that Strickman had received the prior day's email.[52]

236.     Again, Strickman did not respond.

237.     Upon information and belief, no Title IX or police investigation was initiated based on Plaintiff's September 27, 2017 report to IEC of Roe's continued harassment, stalking, and violation of the no-contact directive.

238.     On March 14, 2018, Plaintiff emailed Strickman to report that the student who had been promoted to first author on the paper Plaintiff was supposed to be first author on was now making false statements about her.[53]

239.     Even though Plaintiff had already transferred to a new educational institution at this point, the effects of Roe's harassment and retaliation were still affecting her.[54]

240.     Plaintiff shared all the ways she felt that she had been discriminated against by UNL as a result of Roe's harassment and asked for an official apology.[55]

---

[49] *See* Exhibit 21.
[50] *See* Exhibit 22.
[51] *See* Exhibit 23.
[52] *See* Exhibit 24.
[53] *See* Exhibit 25.
[54] *Id.*
[55] *Id.*

241.    Strickman sent Plaintiff a two-sentence email simply stating that the matter had been resolved by IEC.[56]

242.    Upon information and belief, no Title IX or police investigation was initiated based on Plaintiff's March 14, 2018 report to IEC of the student's perpetuation of Roe's harassment and stalking.

243.    These unwanted reminders of her time at UNL made it impossible for her to escape her memories of Roe's harassment and retaliation and move on with her life.

244.    On May 20, 2019, Plaintiff sent a letter to Chancellor Ronnie Green in which she discussed Roe's sexual harassment and UNL's indifference to her plight.[57]

245.    Plaintiff's friend also read this letter aloud at a hearing on UNL's prior mishandling of Title IX complaints.

246.    Plaintiff never received a response to this letter.

247.    As a direct and indirect result of Defendants' actions and inactions, Plaintiff has suffered both financially and emotionally. Plaintiff developed joint pain from the stress of Roe's harassment and IEC's deliberate indifference. In order to alleviate the pain, she had to go to physical therapy and wear knee and wrist pads for over a year. Whenever Plaintiff thinks about her time at UNL, she feels the effects of the stress and joint pain. Plaintiff's mental health was also deeply impacted by her experience at UNL. Plaintiff was constantly in a state of fear and anxiety over Roe's harassment and IEC's failure to support her. She still becomes emotional whenever she thinks about the abuse she endured, which has taken a toll on both her and her husband. Plaintiff wanted to seek counseling while at UNL but could not bring herself to trust any office at UNL or within the small town of Lincoln to

---

[56] *Id.*
[57] *See* Exhibit 26.

help her. Plaintiff also had trouble focusing on her studies while under Roe's control and did not perform as well as she hoped academically. Plaintiff has moved forward with a new Ph.D. program away from Roe and UNL, but still finds herself haunted by her experiences.

### COUNT I
**Violation of Title IX**
**Deliberate Indifference to Sex Discrimination**
**20 U.S.C. §§ 1681, *et seq*.**
**(Defendant Board of Regents)**

248.     Plaintiff incorporates by reference previously pled paragraphs as if fully pled herein.

249.     From December 2014 to September 2017, Plaintiff was subjected to sex-based assault and harassment committed by her male professor.

250.     From December 2014 to September 2017, Defendants engaged in repeated acts of deliberate indifference to Plaintiff's multiple reports of sexual assault, sexual harassment, and retaliation perpetrated by Roe.

251.     Roe continued to engage in sex discrimination against Plaintiff even after IEC had made a finding that he had repeatedly violated the Sexual Harassment Policy in his interactions with Plaintiff.

252.     The sexual assault, ongoing sexual harassment, and retaliation were so severe, pervasive, and objectively offensive that Plaintiff was deprived of educational benefits and programs provided by the University.

253.     Defendants created and subjected Plaintiff to a hostile educational environment in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 (a) ("Title IX"), because:

a.   Plaintiff was a member of a protected class,

    b.  She was subjected to sex discrimination, which included sexual assault, sexual harassment, and retaliation by a male faculty member;

    c.  The discriminatory acts were based on her sex; and

    d.  She was subjected to a hostile educational environment created by the Defendants' lack of effective action to properly prevent, investigate, and address the sex discrimination.

254.    Defendants had actual knowledge of the discriminatory acts, which were created and furthered by Defendants' repeated failure to protect Plaintiff consistent with the University's own policies and state and federal law.

255.    Defendants' repeated failure to promptly and appropriately respond to the sex discrimination Plaintiff experienced resulted in Plaintiff, on the basis of her sex, being excluded from participation in, denied the benefits of, and subjected to discrimination in UNL's education program in violation of Title IX.

256.    Defendants failed to take immediate, effective remedial steps to resolve the complaints of sex discrimination and instead acted with deliberate indifference to Plaintiff's claims.

257.    Defendants' lack of action and failure to appropriately respond to Plaintiff's reports caused Plaintiff to experience further sexual harassment by Roe.

258.    Defendants persisted in their actions and inaction despite the fact that they had actual knowledge of the discrimination to which Plaintiff has been subjected.

259.    Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually assaulted and/or harassed from seeking assistance and protection.

260.     This pattern and practice of behavior constitutes disparate treatment of female students and has a disparate impact on female students.

261.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**COUNT II**
**Violation of Title IX**
**Retaliation by Withholding**
**Protection Otherwise Conferred by Title IX**
**20 U.S.C. §§ 1681, *et seq*.**
**(Defendant Board of Regents)**

262.     Plaintiff incorporates by reference previously pled paragraphs as if fully pled herein.

263.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681 et seq.

264.     Title IX and its interpretive regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

265.     Plaintiff protected herself by reporting the sexual assault and harassment she experienced to IEC.

266.     Plaintiff's actions were protected by the anti-retaliation provisions of Title IX.

267.     Defendants took adverse actions against Plaintiff, including Defendant Walker's threat that the University would stop supporting Plaintiff if she continued to try to remedy

her situation, and Defendant Roe's continued harassment of Plaintiff after he became aware that she had reported him to IEC.

268.    Defendants' adverse actions against Plaintiff were in direct response to and were in retaliation for the exercise of her rights under Title IX.

269.    Defendants' retaliatory adverse actions against Plaintiff violated Title IX and its interpretive regulations.

270.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

### COUNT III
### Violation of Right to Freedom of Speech Under the First Amendment
### 42 U.S.C. § 1983
### (Defendants Strickman, Foster, and Walker)

271.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

272.    Defendants Foster and Strickman repeatedly told Plaintiff not to tell people about the ongoing Title IX investigation and her concerns of sexual harassment, assault, and retaliation by Roe, depriving Plaintiff of her right to freedom of speech under the First Amendment.

273.    Defendant Walker told Plaintiff that the university would no longer support her if she continued speaking out and attempting to enforce her Title IX rights, depriving Plaintiff of her right to freedom of speech under the First Amendment.

274.    The actions and omissions were taken by Defendants Strickman, Foster, and

Walker while acting under color of state of law and had the effect of depriving Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Free Speech Clause of the First Amendment to the United States Constitution.

275.    Defendants Strickman, Foster, and Walker's acts and omissions were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's constitutional rights.

276.    As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiff has suffered, and will suffer, irreparable harm, including the loss of her fundamental constitutional rights, entitling her to declaratory and injunctive relief. Additionally, Plaintiff is entitled to nominal damages and compensatory damages for the loss of her constitutional rights.

<u>**COUNT IV**</u>
**Denial of Due Process**
**42 U.S.C. § 1983, the Fifth Amendment, and the Fourteenth Amendment**
**(All Defendants)**

277.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

278.    Defendants' failure to comply with the administrative requirements of Title IX deprived Plaintiff of her liberty interest in bodily integrity and her property interest in an education, without due process of law, in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution.

279.    Defendants' failures include, but are not limited to:

a.    Failure to identify and to allow Plaintiff review and access all evidence being considered by IEC in a Title IX investigation;

b.    Failure to properly consider and evaluate all information provided by Plaintiff in a

Title IX investigation;

c.  Failure to comply with their own prescribed remedial measures; and

d.  Failure to notify Plaintiff of her rights under UNL policy and state and federal law.

280.  Defendants, in their individual capacities and under color of law, subjected Plaintiff to violations of her liberty interest in bodily integrity and her property interest in her education by failing to appropriately discipline her perpetrator, failing to ensure that the effects of the discrimination against her were remedied, and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

281.  As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**COUNT V**
**Denial of Equal Protection**
**42 U.S.C. § 1983 and the Fourteenth Amendment of the U.S. Constitution**
**(All Defendants)**

282.  Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

283.  Upon information and belief, complaints of sex discrimination, including sexual harassment, sexual assault, and stalking, are treated differently than other types of complaints filed at UNL.

284.  Defendants knew or should have known that female students are more likely to suffer sexual harassment and sexual violence by a significant margin.

35

285.     Defendants' treatment of these complaints disparately impacts female students in violation of Plaintiff's right to equal protection under the law.

286.     Defendants' denial of Plaintiff's constitutional right to equal protection under the law caused Plaintiff to forego educational opportunities, thereby limiting her ability to participate in, and benefit from, the Defendants' educational programs and activities.

287.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**COUNT VI**
**Discrimination on the Basis of Sex**
**Nebraska State Constitution**
**(All Defendants)**

288.     Plaintiff incorporates by reference previously pled paragraphs as if fully pled herein.

289.     The Nebraska State Constitution protects individuals from discrimination on the basis of sex in public education.[58]

290.     The University of Nebraska is a public education institution in the State of Nebraska.

291.     As outlined in this Complaint, Defendants' failure to address, investigate, sanction, and respond to discrimination on the basis of sex violated the Nebraska State Constitution.

292.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental

---

[58] NEB. CONST. art I, § 30 (1875).

constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## <u>COUNT VII</u>
### Discrimination on the Basis of Sex
### Charter of the University of Nebraska and Neb. Rev. Stat. §§ 85-101, *et seq.*
### (Defendant Board of Regents)

293.     Plaintiff incorporates by reference previously pled paragraphs as if fully pled herein.

294.     The Charter of the University of Nebraska (hereinafter "Charter") is a state legislative act to establish the institution of The University of Nebraska, codified in Neb. Rev. Stat. §§ 85-101 et seq.

295.     The Charter reads: "The object of the institution shall be to afford to the inhabitants of this State the means of acquiring thorough knowledge of the branches of literature, science and the arts."[59]

296.     The Charter reads:

> The University of Nebraska shall be composed of a chief governing administrative unit, four universities which shall be the University of Nebraska-Lincoln, the University of Nebraska at Omaha, the University of Nebraska at Kearney, and the University of Nebraska Medical Center, and such other institutions and units as may be designated by the Legislature.[60]

297.     The Charter reads: "The general government of the University shall be vested in a board of eight regents…"[61]

298.     The Charter reads: "The Board of Regents…shall constitute a body corporate, to be known as the Board of Regents of the University of Nebraska, and as such may sue and be

---

[59] NEB. REV. STAT. § 85-102.
[60] NEB. REV. STAT. § 85-103.
[61] NEB. REV. STAT. § 85-104.

sued...".[62]

299. The Charter provides: "All persons residing within the State, or, being non-residents who pay or whose parents or guardians pay not less than thirty dollars annually of School taxes to the State and who shall fill the requirements of the preceding Section, may be admitted to any organized college of the University….[63]

300. The Charter expressly states: "No person shall be deprived of the privileges of this institution because of age, sex, color or nationality."[64]

301. Plaintiff is an intended beneficiary of the Charter and the establishment of the University of Nebraska.

302. Plaintiff was denied her express right to an education at the University of Nebraska based upon her sex.

303. Denial of Plaintiff's right to an education based upon her sex is in direct violation of Section 18 of the Charter as codified in the Nebraska Revised Statutes.

304. Defendant Board of Regents have a duty to Plaintiff and all other intended beneficiaries to uphold the objects and mission of the Charter establishing the University of Nebraska.

305. Defendants have breached their duty as Regents by denying Plaintiff an education based upon her sex.

306. Defendant Board of Regents' breach of their duty to Plaintiff and other intended beneficiaries is a direct and proximate cause of damages to Plaintiff.

---

[62] NEB. REV. STAT. § 85-105.
[63] AN ACT TO ESTABLISH THE UNIVERSITY OF NEBRASKA (1869) § 16. http://unlhistory.unl.edu/legacy/charter/rg01-01-02-charter-unl.html (last visited Feb. 24, 2021).
[64] NEB. REV. STAT. § 85-116.

307.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**COUNT VIII**
**Negligence**
**(All Defendants)**

308.     Plaintiff incorporates by reference previously pled paragraphs as if fully pled herein.

309.     Defendants owed Plaintiff a duty of ordinary care to ensure her safety and freedom from sex-based harassment and abuse while she was a student at UNL and a duty of ordinary care to conduct investigations of her claims in compliance with UNL's own policies and basic industry standards.

310.     Defendants owed Plaintiff a duty of ordinary care to communicate with her during the investigations of her Title IX claims, to ensure the integrity of the investigations, and to engage in appropriate response and action post-investigation, and their failure to do so breached their duty of care to Plaintiff.

311.     Defendants' failure to remedy the effects of John Roe's harassment and prevent its recurrence breached their duty of care to Plaintiff.

312.     Defendants' failure to follow their own policies, federal guidance, and recognized industry standards in reviewing, investigating, and resolving Plaintiff's Title IX complaint breached their duty of care to Plaintiff.

313.     Defendants' failure to supervise their own employees to ensure they were

complying with UNL policy and state and federal law and regulations breached their duty of care to Plaintiff.

314.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT IX
### Negligent Infliction of Emotional Distress
### (All Defendants)

315.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

316.     Roe's sexual harassment of Plaintiff constitutes conduct so reckless as to demonstrate a substantial lack of concern for whether Plaintiff was injured.

317.     The remaining defendants' failure to conduct appropriate investigations, respond appropriately to Plaintiff's report of sexual harassment, remedy the effects of the sexual harassment to Plaintiff, and prevent the recurrence of sexual harassment by Roe constitutes conduct so reckless as to demonstrate a substantial lack of concern for whether Plaintiff was injured.

318.     The events described above would naturally and probably result in emotional distress.

319.     The events described above caused severe emotional distress to Plaintiff.

320.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental

constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

### COUNT X
**Breach of Contract**
**(Defendant Board of Regents)**

321.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

322.     Section 18 of the Charter of the University of Nebraska reads as follows: "No person shall because of age, sex, color or nationality be deprived of the privileges of this institution; provision shall be made for the education of females apart from male students in separate apartments or buildings; provided that persons of different sexes, of the same proficiency in studies may attend the regular college lectures together."[65]

323.     Defendant Board of Regents entered into a binding agreement with Plaintiff, codified in the Charter, to ensure that Plaintiff would not be deprived of the privileges of the institution because of her sex.

324.     As consideration for obtaining an education, and the privileges of attending the institution of the University of Nebraska, Plaintiff paid tuition, fees, and costs, as well as state taxes.

325.     Defendant Board of Regents accepted Plaintiff's consideration.

326.     Defendant Board of Regents breached this contract with Plaintiff by failing to provide Plaintiff with an appropriate education free of discrimination as provided for in the Charter.

---

[65] AN ACT TO ESTABLISH THE UNIVERSITY OF NEBRASKA (1869), § 18. http://unlhistory.unl.edu/legacy/charter/rg01-01-02-charter-unl.html (last visited Feb. 24, 2021).

327.     Defendant Board of Regents' failure to provide Plaintiff with her contractually owed benefit of an appropriate education free of discrimination is a material breach of the contract between Plaintiff and Defendant Board of Regents.

328.     Defendant Board of Regents' failure to cover the promised cost of Plaintiff's $2400.00 in fees for the remaining six credits she needed for her program is a material breach of the contract between Plaintiff and Defendant Board of Regents.

329.     Defendant Board of Regents' material breach resulted in damages to Plaintiff.

330.     As a direct and proximate result of Defendant Board of Regents' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## DAMAGES

331.     Plaintiff incorporates by reference previously pled paragraphs as if fully pled herein.

332.     As a direct and proximate result of the above-described conduct, Plaintiff suffered general, special, incidental, and consequential injury and damages, past, present, and future, in an amount that shall be fully proven at the time of trial. These past, present, and future damages include but are not limited to the following:

a.  Pain, suffering, and emotional distress;

b.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life;

c.  Medical and medical-related expenses;

    d.   Pharmaceutical expenses;

    e.   Loss of education and educational opportunities;

    f.   Additional unnecessary educational expenses;

    g.   Loss of employment and earning capacity;

    h.   Travel and travel-related expenses;

    i.   Prevention from performing daily activities and obtaining the full enjoyment of life;

    j.   Expenses and psychological treatment, therapy, and counseling;

    k.   A loss of society and companionship; and

    l.   All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## <u>RELIEF REQUESTED FOR ALL CAUSES OF ACTION</u>

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

    A.   For past, present, and future non-economic damages in an amount to be determined at trial;

    B.   For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

    C.   For any appropriate statutory damages;

    D.   For costs of this suit;

    E.   For punitive damages, according to proof, as appropriate to the individual cause of action;

    F.   For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G.  For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H.  All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## **JURY DEMAND**

Now comes Plaintiff, by and through her attorneys, Karen Truszkowski and Elizabeth K. Abdnour, and demands a trial by jury.

DATED:      February 28, 2021

Respectfully submitted,

**s/ Karen Truszkowski**
Bar Number: P56929 (MI)
Attorney for Plaintiff
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
Telephone: (844) 534-2560
Fax: (800) 531-6527
Email: karen@temperancelegalgroup.com

**s/ Elizabeth K. Abdnour**
Bar Numbers: 0081795 (OH), P78203 (MI)
Attorney for Plaintiff
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Email: elizabeth@abdnour.com