**IN RE BROILER CHICKEN ANTITRUST LITIGATION**

**This Document Relates To: All Actions**

**Case No. 1:16-cv-08637**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

**June 25, 2020**

Magistrate Judge Jeffrey T. Gilbert

**MEMORANDUM OPINION AND ORDER**

Class Plaintiffs' Motion for Entry of an Order Regarding Remote Depositions of Certain Categories of Witnesses [ECF No. 3610] ("Class Plaintiffs' Motion") is granted in large part for the reasons explained in this Memorandum Opinion and Order.

I.

Class Plaintiffs want to start taking depositions in this case via audiovisual or other remote means pursuant to Federal Rule of Civil Procedure 30(b)(4). They say the Court should allow this to happen to keep this case moving through pretrial discovery, class certification and summary judgment motion practice, and trial in a manner consistent with Federal Rule of Civil Procedure 1 amidst the COVID-19 pandemic now sweeping this country and the world, which can make many in-person depositions impractical at this time. *See* FED. R. CIV. P. 1 ("These rules . . . should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

Direct Action Plaintiffs ("DAPs") seem to agree depositions will need to be taken by remote means in this case though they say it will take time to put into place a protocol for taking those depositions that is acceptable to all parties and the Court. Defendants say now is not the

appropriate time to move forward with remote depositions, but even they appear to grudgingly

Page 2

concede there soon may come a time when remote deposition practice is necessary to move this case forward on a reasonable timetable.[1]

The Court agrees with Class Plaintiffs and DAPs that depositions will need to be taken by remote means if this case is going to move forward as it must, and it disagrees with Defendants that this decision should wait. Some depositions of class representative plaintiffs in this case already have been or are being taken remotely by video albeit by agreement and with some encouragement from the Court. *See* May 19, 2020 Order [ECF No. 3622], at 1; May 18, 2020 Hearing Tr. [ECF No. 3624], at 14-17. Class Plaintiffs say counsel for various parties also have participated remotely by telephone in virtually every deposition taken in this case even before the onset of the pandemic.[2]

The Court also agrees that it needs to enter a protocol for taking remote depositions in a case like this with three putative classes, over 100 opt-out DAPs, more than 20 Defendants, dozens of lawyers, and the United States Department of Justice, as intervenor, watching everything that is going on because of a parallel grand jury investigation, and at least one pending felony indictment. *See United States v. Jason Jeffrey Penn, et al.*, Criminal Action No.: 20-cr-00152-PAB (D.Col. June 2, 2020). Toward that end, Class Plaintiffs have submitted a proposed remote deposition

Page 3

protocol that DAPs and Defendants have commented upon in their respective submissions on Class Plaintiffs' Motion. [ECF Nos. 3610-1, 3628, 3628-1, 3629, 3630].

A.



Defendants object to being required to prepare or present any of their witnesses for either in-person or remote depositions under current circumstances. They raise a host of objections. They say the COVID-19 pandemic makes it unsafe and impractical to travel to or meet with a witness in person, whether to prepare or depose that individual. That is particularly true, they say, of witnesses employed by poultry producers, an industry that has been designated as essential to the national defense and has been hard hit by the COVID-19 pandemic. Defendants also argue this is not the time to be taking Defendants' essential employees away from the critical jobs they are doing to ensure continued operation of companies on the front lines of feeding people who eat meat or chicken. Class Plaintiffs, however, offer repeatedly to accommodate witnesses who say it is impossible for them to sit for a deposition now, and they suggest, correctly, that the Court can resolve any disputes in this regard that the parties cannot resolve themselves. Class Plaintiffs' Motion [ECF No. 3610], at 5; Class Plaintiffs' Reply Brief [ECF No. 3639], at 15.

Defendants also say some of their witnesses have serious health issues that limit their ability to prepare for or give a deposition. But if witnesses have serious health issues, then that would seem to support Class Plaintiffs' desire to memorialize the testimony of those witnesses as soon as possible. Moreover, a video deposition and remote preparation for these witnesses may be much safer and allow for more flexibility than in-person sessions in any event. If necessary, for example, accommodations can be made so that a witness with health issues can testify over more than one session if that is necessary without anyone needing to travel on multiple days.

Page 4

Other witnesses say they have Internet connectivity or capacity issues. Some say they share the Internet in their homes with other family members and that service is spotty when everyone is online. The Court understands these are real issues today. Some of these issues,

though, potentially can be remedied either by the court reporter, the witness, or his (all the Rule 30(b)(1) witnesses appear to be men) current or former employer by upgrading the Internet service, which could provide a benefit that will last well after the deposition is taken. Class Plaintiffs also say a remote deposition protocol in this case should include a provision from another recent case that says no party will be forced to "proceed with a deposition where the deponent cannot hear or understand the other participants or where the participants cannot hear or understand the deponent." Class Plaintiffs' Reply [ECF No. 3639], at 9.

Defendants give no indication that any efforts have been made to investigate if the Internet connectivity or capacity issues some of their witnesses identify can be fixed or mitigated sufficiently to allow these witnesses to be prepared or deposed by remote means. For example, as to the witnesses who say their Internet service is slow when other family members are online at the same time, Defendants do not say whether a witness's family members can refrain from using the Internet when the witness is being prepared or deposed, and whether that would allow the remote deposition to go forward more smoothly. Further, as a last resort, all of these witnesses presumably have telephones, and remote depositions can be taken by telephone as well as by video.

Other defense witnesses are a bit older, live in rural locations, and say they are neither familiar with nor comfortable using the technology required for remote video deposition preparation or testimony. All of these witnesses were high-level executives in large companies. One was president and chief executive officer of a company that bills itself as the sixth largest chicken producer in the world, "serving markets from Arizona to Asia, Tampa to Tokyo." *See*

Page 5

https://mountaire.com/about/ (last visited on June 25, 2020). It is difficult to believe these individuals cannot learn how to use the



technology required for a video deposition or preparation session particularly with the help of sophisticated counsel and a quality court reporting firm. That these witnesses are not presently comfortable or familiar with the technology does not mean they cannot learn the basics that would allow them to be prepared or deposed remotely even if they never become fully comfortable with the technology themselves.

Still other witnesses say they do not have time for a deposition right now either because of the demands of their jobs or, in one instance, the declarant's law practice. Again, the Court notes that Class Plaintiffs have offered to work with Defendants and the witnesses in these instances. Class Plaintiffs' Motion [ECF No. 3610], at 5; Class Plaintiffs' Reply Brief [ECF No. 3639], at 15. Furthermore, it is a rare witness who really wants to make time to be deposed or prepare for a deposition at any time. Yet people make the time, get it over with as soon as possible, and then get on with their lives. In the case of the busy lawyer, the Court only notes that good lawyers, who often also are busy lawyers, always need to juggle clients and cases as part of their law practices, so the Court is confident that this lawyer will be able to satisfy his professional obligations to the Defendant he represents in this case and other clients, including by participating in a deposition in this case if it is necessary for him to do so.

Defendants also point out that many witnesses and their lawyers are working from home during the COVID-19 pandemic and, as a result, "the burden is magnified when witnesses and their lawyers are juggling preparation and caring for children, helping with school, dealing with pets, answering a doorbell, fixing meals, and the like." Defendants' Opposition [ECF No. 3630], at 8. This undoubtedly is true. Even as stay-at-home orders have been relaxed or suspended, many lawyers still are working from home and may have children who currently are not in school during

the summer or who may be attending school only part-time and e-learning from home the other portion of the week when school resumes in the Fall. But, again, accommodation is the answer here rather than a complete cessation of discovery activity until the COVID-19 pandemic abates.

Defendants also argue that preparing or defending a witness for a deposition by remote means will be exceedingly difficult in this case because it will require review of a large number of documents and cover events that took place over many years. Preparing a witness for such a deposition would be difficult and time consuming even in person, but Defendants say it is even more difficult and will take much longer if it needs to be done remotely. Similarly, the prospect of defending a witness in a case like this by remote means presents many challenges given the number of lawyers that have attended the 87 depositions that Class Plaintiffs have taken so far in this case, the likely length of each deposition based on how long other depositions have lasted, the large number of exhibits typically marked in those depositions, and the technological issues that are likely to arise in remote depositions. Defendants' lawyers understandably much prefer to be in the same room with a witness who is being deposed both for the witness's comfort and so that the lawyer can adequately protect the witness by lodging objections or giving instructions not to answer a question when appropriate. Defendants say they will suffer serious prejudice if their lawyers are unable to communicate in person with a witness during deposition preparation and/or to defend a witness in person while he or she is testifying.

Defendants argue strenuously that while courts have allowed depositions to occur remotely on motion, they have not previously *required* a party to prepare a deposition witness by video or other remote means as they say they would be forced to do here if the Court grants Class Plaintiffs' Motion. In the Court's view, this is heavy on semantics. Courts do not speak to how a lawyer must prepare a witness when they allow a witness to be deposed by remote means. They say the



Page 7

deposition can proceed remotely under Rule 30(b)(4) and leave it up to the lawyer and the party or the witness to decide how the witness will be prepared for the deposition. Class Plaintiffs are not asking the Court to require Defendants' lawyers to prepare their witnesses for deposition by video or telephone if they do not want to do so.

The Court, though, understands Defendants are saying that one consequence of the Court granting Class Plaintiffs' Motion may be that they will end up preparing all or some of their witnesses remotely because of safety concerns over lawyers or witnesses traveling or meeting in person, and that will prejudice them. Defendants and their counsel, however, can choose how they want to prepare witnesses for depositions and whether or not they want to be with the witness in person when the witness gives a deposition by remote means. While it may be more difficult for a lawyer to prepare a witness for a deposition without sitting in the same room with her or him, it is not impossible to do so. Similarly, while it may be more difficult to defend a witness who is testifying remotely without being in the same room with the witness, there undoubtedly are ways to reduce the risks and challenges in that situation as well.[3]

The Court's informed guess is that a witness can be well-prepared to give a deposition, even a deposition that may involve a large number of documents and a relevant time period of many years, without being in the same room with her or his counsel. If the witness and counsel have the same universe of documents in front of them, either in hard or electronic copy, those documents are identifiable by a Bates number or other unique identifier, and they utilize a video

Page 8

system that allows them to see each other and even to see a document together on their computer screens at the same time, the preparation session(s) should proceed without too much trouble even if the process takes a bit

longer than in person. The parties in these cases have produced millions of documents electronically, their lawyers likely are accustomed to seeing documents on screens rather than in hard copy, and even in-person depositions occur with electronic documents being shown to witnesses on a screen rather than on paper. *See* Defendants' Opposition [ECF No. 3630], at 12 n.18 and Exhibit 14 [ECF No. 3630-24].

Defendants are correct that remote video technology is not perfect by any means. A host of technological problems can and do arise during a remote video deposition that may interrupt or delay the deposition. There are many opportunities for glitches (*e.g.*, a frozen screen with the dreaded message "your internet connection is unstable") that can frustrate even the most technologically savvy lawyer taking or defending a remote deposition. Defendants point to one deposition taken in this case in which the court reporting firm's electronic platform for displaying exhibits did not always work well and required several breaks in the flow of the deposition to accommodate and fix the issues that arose. Defendants' Opposition [ECF No. 3630], at 12 n. 18. As Defendants acknowledge, this was an *in-person* deposition. Defendants may want the Court to infer that if technological problems can arise during an in-person deposition, the prospect for disruption is even greater in a remote video deposition and the consequences could be much worse. *Id.* The Court, however, takes a different lesson from this deposition vignette. Technological problems can arise during in-person as well as remote depositions, but that is not a reason to prevent remote depositions from occurring. It can be difficult and frustrating in both contexts to accommodate technological problems, but the depositions still proceed.

Page 9

The Court is not blind to nor is it ignoring the very real challenges involved in conducting remote video depositions in a case like this with so many parties and lawyers. But unless the Court is going to stay all depositions that cannot proceed by agreement (whether in-person or



remotely) until there is a cure or a vaccine for COVID-19, or something approaching so-called herd immunity, which it is unwilling to do on a blanket basis, the parties and their counsel are going to have to have to adapt, make some choices, be creative, and compromise in this and every other case in which they are involved during this time without modern precedent.

Finally, in response to Defendants' objections, Class Plaintiffs say Defendants are over-dramatizing the problems they will face in preparing and defending at least the 18 depositions that are the subject of Class Plaintiffs' Motion. For example, Class Plaintiffs point out they are limited to 14 hours of deposition time for Rule 30(b)(6) depositions per Defendant so they have to be judicious with their use of time for the eight Rule 30(b)(6) depositions on their list of 18 depositions. *See* February 28, 2019 Order [ECF No. 1979], at 1. Class Plaintiffs want to cover just three topics in the Rule 30(b)(6) depositions they now want to take dealing with pricing, supply, and production. Plaintiffs' Amended Notice of Rule 30(bo(6) Deposition [ECF No. 3610-5], Topics 18, 21, 22. The Court agrees those are meaty topics (no pun intended), but there still are just three of them, albeit with sub-parts. Class Plaintiffs represent each deposition will take less than a day. Finally, although Class Plaintiffs do not say this, perhaps some of the information Class Plaintiffs now want to obtain with a Rule 30(b)(6) deposition can be provided by one or more Defendants by other means which could serve to reduce witness preparation and deposition time. The Court encourages the parties to engage in this sort of discussion aimed at reducing the number or the length of depositions that need to be taken in this case.

Page 10

B.

Courts are beginning to recognize that a "new normal" has taken hold throughout the country in the wake of the COVID-19 pandemic that may necessitate the taking of remote depositions unless litigation is going to come to an indefinite halt until there is a cure or a vaccine for COVID-19.[4] The more recent court decisions build on pre-pandemic case law that liberally allowed for and encouraged remote depositions as the technology for taking depositions in that way has improved significantly over time.[5]

Page 11

Although there are cases, some of which Defendants cite, in which courts have not permitted depositions to be taken by remote means, many were decided one or almost two decades ago, before video depositions and remote meetings became as commonplace as they are today in the practice of law, and in almost every other aspect of business and social life and interaction, and under different circumstances than now are facing litigants, lawyers, and courts.[6] In the more recent cases cited by Defendants, when courts have denied a party leave to take a remote deposition, it has been based on the particular facts and circumstances present in those cases, some of which are different from this case. *See, e.g.*, *Quarrie v. Wells*, 2020 U.S. Dist. LEXIS 63710, at *2-3 (D. N.M. Apr. 10, 2020) (denying a *pro se* plaintiff's motion for leave to conduct depositions by telephone because of, among other things, the plaintiff's lack of experience in taking depositions and the complex nature of the anticipated testimony); *Egan v. Royal Kona Resort*, 2018 WL 1528779 (D. Hawaii Mar. 28, 2018) (holding that a slip-and-fall plaintiff must travel to Hawaii, where she was injured and filed suit, at the defendant's expense for her deposition rather than be deposed by video at her residence in New Hampshire, when, among other things, the plaintiff previously had agreed to travel to Hawaii for her deposition).[7]

Page 12

Cases in this area are heavily fact dependent. In one recent case, for example, the court accepted a plaintiff's representations that she would experience significant hardship by being required to sit for a remote deposition because she did not have access to the Internet, had scant



knowledge of technology, and lived alone with no one to help her set up the virtual technology that the court reporter would send her. The court ordered the deposition to take place in person within one week. Yet, if that deposition could not be taken in person within a week's time, then the court ordered that it proceed by remote means. *See Thomas v. BJ's Wholesale Club, Inc.*, Superior Court of New Jersey, Law Division, Middlesex County, Docket No. MID-L-5518-19 (June 5, 2020) (holding that "[p]laintiff's deposition must occur virtually via zoom or other teleconference system by that date"). In another recent case, the court required two witnesses to testify remotely by video at trial because the witnesses feared exposure to the virus that causes COVID-19 if they had to testify in person after a lawyer from one of the law firms involved in the trial tested positive for the virus. *See In re RFC and ResCap Liquidating Trust Action*, 2020 WL 1280931, at *3 (D. Minn. Mar. 10, 2020) (finding that "COVID-19's unexpected nature, rapid spread, and potential risk establish good cause for remote [trial] testimony").

Courts have long held that leave to take remote depositions pursuant to Rule 30(b)(4) should be granted liberally. *See*, *e.g.*, *Guillen v. Bank of Am. Corp.*, 2011 WL 3939690, at *1 (N.D. Cal. Aug. 31, 2011) (citing *Brown v. Carr*, 253 F.R.D. 410, 412 (S.D. Tex. 2006)) ("Leave

Page 13

to take depositions by telephone is granted liberally."); *Jahr v. IU Int'l Corp.*, 109 F.R.D. 429, 431 (M.D.N.C. 1986) ("[L]eave to take telephonic depositions should be liberally granted in appropriate cases."); *accord Hoeft v. Richardson*, 2009 WL 3242067, at *3 (W.D. Wis. Oct. 2, 2009) (quoting *Brown*, 253 F.R.D. at 412). All that is required to authorize a remote deposition is a legitimate reason put forward by the party proposing to take a deposition by remote means. *Kaseberg v. Conaco, LLC*, 2016 WL 8729927, at *5 (S.D. Cal. Aug. 19, 2016) (quoting *Jahr*, 109 F.R.D. at 431). A desire to save money taking out of state depositions can suffice to show good cause to take a deposition by remote means.

*Guillen*, 2011 WL 3939690, at *1; *accord Kaseberg*, 2016 WL 8729927, at *6. Once the proponent of taking a deposition by remote means makes a sufficient threshold showing, the burden then shifts to the opposing party to show how it would be prejudiced if the deposition were taken in that way. *Guillen*, 2011 WL 3939690, at *1 (citing *Brown*, 253 F.R.D. at 412; *Cressler v. Neuenschwander*, 170 F.R.D. 20, 21 (D. Kan. 1996)).

Defendants argue that Class Plaintiffs have not established good cause to take each of the 18 depositions they propose to take before they file their class certification motions. Class Plaintiffs, however, say they are seeking to take each of these 18 depositions "not only for class certification but in order to meet the other deadlines necessary to keep this case on track." Class Plaintiffs' Reply [ECF No. 3639], at 14. Moreover, although some courts speak colloquially about whether there is "good cause" to take remote depositions allowed by Rule 30(b)(4), the Rule does not literally require the existence of good cause. Rather, it appears to leave it to the court's broad discretion over discovery to determine whether there is a legitimate reason to take a deposition by telephone or other remote means under all the facts and circumstances of a given case. *See Roberts v. Homelite Div. of Textron, Inc.*, 109 F.R.D. 664, 666 (N.D. Ind. 1983) ("Neither the rule itself nor the notes of the Advisory Committee list the criteria which the trial court should use in

Page 14

exercising its discretion under Rule 30(b)(4) . . . the better reasoned view gives the trial court the same discretion which it enjoys in resolving all other discovery disputes."). The decision whether to allow a remote deposition essentially involves a careful weighing of the reasons put forth by the proponent of the remote deposition and the claims of prejudice and hardship advanced by the party opposing the deposition. *Learning Resources*, 2020 WL 3250723, at *3-4; *Usov v.*



*Lazar,* 2015 WL 5052497, at *2 (S.D. N.Y. Aug. 22, 2015).

Further, one of the primary reasons that Class Plaintiffs say remote depositions are justified in this case—the existence of the global COVID-19 pandemic that renders in-person depositions impractical or unsafe in many instances—transcends the particular circumstances of each of the 18 individual witnesses that Class Plaintiffs wish to depose remotely as of now. So, too, does Class Plaintiffs' argument that their ability to take depositions in this case has been stalled for over a year because the Court granted the United States Department of Justice's application to stay certain discovery while it conducted its grand jury investigation, and depositions should not be delayed further because of the COVID-19 pandemic. *See* [ECF Nos. 2271, 2302, 3153, 3356]. There are other reasons depositions have been delayed in this case besides the stay, as Defendants correctly point out, but there is no denying that the stay had a negative impact on the case moving forward for a period of time through no fault of Class Plaintiffs. The close-approaching date for Class Plaintiffs to file their class certification motions and a looming fact discovery close date early next year are yet additional legitimate reasons for Class Plaintiffs to begin to take remote depositions. A large number of depositions still need to be taken in this case (100 according to Class Plaintiffs and DAPs), and the parties (with the Court's assistance, if necessary) need to get about the business of scheduling and taking those depositions.

Page 15

Accordingly, under the case law and all the circumstances of this case, the Court does not see why Class Plaintiffs must show there is a legitimate reason constituting good cause to take each one of the 18 depositions they want to take as part of their initial burden under Rule 30(b)(4). The thrust of Class Plaintiffs' argument is that these depositions will need to be taken at some point so they should start down that path now. The Court agrees. Further, the Court is not

generally in the business of second-guessing a party's desire to take a deposition it says it needs to take unless the opposing party can show a good reason why that deposition should not be taken. Finally, the Court has limited the total number of depositions Class Plaintiffs can take of each Defendant family in this case so Class Plaintiffs already need to be mindful of who they want to depose and for what reason. *See* August 28, 2018 Order [ECF No. 1155].

C.

Defendants' suggestion that the Court should delay this decision until the Fall is neither practical nor, in the Court's judgment, wise. It is not obvious the situation will be materially different in September when Defendants say the Court and the parties first should begin to consider remote depositions in this case. Defendants understandably cite no authority for their hope that things may be better by September. In fact, one court labeled the "hope the physical distancing and stay-at-home orders required by the current pandemic will be lessened to allow for in-person depositions in the near future" as "pure speculation." *United States ex rel. Chen,* 2020 WL 2631444, at *1.

Recent statements by public health officials about the staying power of COVID-19 also belie Defendants' speculation that things may be so different in the Fall as to render remote depositions in this or any other case unnecessary, or at least less likely. For example, Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, said in an

Page 16

interview with NBC Sports on June 5, 2020, that there was "virtually no chance" that the novel coronavirus, which causes the disease COVID-19, will be eradicated any time soon. https://www.businessinsider.com/fauci-theres-virtually-no-chance-covid-19-will-be-eradicated-2020-5. To the contrary, Dr. Fauci, said he believes a second wave of coronavirus infections is "inevitable" and that "the worst-case scenario . .



. involves a second, larger wave of infections this fall and winter." https://www.businessinsider.com/second-wave-of-coronavirus-infections-may-peak-in-fall-2020-5. In an interview with the *The New York Times*, Dr. Fauci said: "When is it going to end? We're still at the beginning of really understanding." Grady, Denise, "Fauci Warns That the Coronavirus Pandemic Is Far From Over." *The New York Times*, June 10, 2020, Section A, page 7. In addition, COVID-19 cases continue to rise in some states where restrictions have been eased. Calfas, Jennifer, "States See Big Increases in Virus Cases." *The Wall Street Journal*, June 23, 2020, Section A, page 6. ("The nation's death toll surpassed 120,000 as more than 20 states saw the pace of new coronavirus cases rise faster this week than in the week before.").

D.

For all these reasons, the Court agrees with Class Plaintiffs, and with other courts that recently have so held, that there are legitimate reasons for Class Plaintiffs to take at least the 18 depositions they now want to take by remote means because of the COVID-19 pandemic so as to protect the safety and health of witnesses, counsel, court reporters, videographers, and other persons, and to move this case through the pretrial process at an acceptable pace during a time when in-person depositions may present risks to the health and safety of people participating in them. *See Learning Resources*, 2020 WL 3250723, at *3; *Wilkens*, 2020 WL 2496001, at *1; *Grano*, 2020 WL 1975057, at *2; *United States ex rel. Chen*, 2020 WL 2631444, at *1; *Sinceno*, 2020 WL 1302053, at *1; *Joffe*, 17 Civ. 3392 (VEC)(SDA), at *6; *Ogilvie*, 2020 WL 2630732, at *2-3. To

Page 17

be clear, this is not a blanket ruling that the COVID-19 pandemic alone justifies the taking of remote depositions in all cases and under all circumstances. In this case, however, the COVID-19 pandemic, in conjunction with the other circumstances discussed above, are legitimate

reasons for Class Plaintiffs to want to move forward with remote depositions now.

Courts also recognize a basic "underlying principle" that "[t]he right to proceed in court should not be denied except under the most extreme circumstances." *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983) (citing *Klein v. Adams & Peck*, 436 F.2d 337, 339 (2d Cir.1971)). That principle also militates in favor of conducting remote depositions in this case during the COVID-19 pandemic to move the case closer to resolution by dispositive motion, settlement, or trial than would be the case if the litigation treads water until the pandemic abates.[8]

Once Class Plaintiffs meet their burden to show why remote depositions should be allowed in this case, as they have done, then the burden is on Defendants to show why a deposition should not be taken in that way. *Guillen*, 2011 WL 3939690, at *1 (citing *Brown*, 253 F.R.D. at 412; *Cressler*, 170 F.R.D. at 21). *See also Learning Resources*, 2020 WL 3250723, at *3-4; *Usov*, 2015 WL 5052497, at *2. Defendants have not met their burden to show they will suffer undue prejudice if the Court allows Class Plaintiffs to take the 18 remote depositions they now propose to take in this case. The arguments Defendants have put forth are not sufficient to overcome the legitimate reasons that Class Plaintiffs have advanced to depose by remote means the 18 witnesses they have identified pursuant to Rule 30(b)(4), whether as Rule 30(b)(1) or Rule 30(b)(6) depositions. The

Page 18

Court's ruling is based on all the facts and circumstances of this case and on the parties' arguments on Class Plaintiffs' Motion, and it is the result of a balancing of the parties' respective interests detailed above as required by Rule 30(b)(4).

Nothing in the Court's ruling today prevents Defendants from attempting to show there are instances in which there is a legitimate concern



that a particular in-person deposition cannot be taken safely or effectively, or for some other reason, and that the deposition also cannot be taken remotely without undue prejudice to the witness or a Defendant. The Court can address those situations as they arise and in the context of particular facts and circumstances relating to that witness or deposition, most likely in the context of a motion for a protective order under Rule 26(c)(1), if the parties cannot work things out themselves.

Courts sometimes have considered whether remote depositions should be allowed in the context of dueling motions filed pursuant to both Rule 30(b)(4) and Rule 26(c)(1). *See Shibata v. Swingle*, 2018 WL 4522050 (N.D.N.Y. Feb. 26, 2018); *Wilkerson v. Stalder*, 2015 WL 2236417 (M.D. La. May 12, 2015). Although Defendants have not filed a formal Rule 26(c)(1) motion here, many of their arguments are of the type that would be included in such a motion, but they also are arguments that courts can and do consider in ruling on a Rule 30(b)(4) motion given the balancing of interests required to resolve such a motion. In the Court's view, the objections Defendants have made here, though significant and serious, are insufficient, without more, to prevent remote depositions from going forward in this case when there otherwise are legitimate reasons for those depositions to proceed and possible ways to remedy the potential obstacles that at least have been raised to date.

Page 19

II.

Two questions remain: When will Class Plaintiffs begin to take the remote depositions they are allowed to take, and what protocol will govern the taking of remote depositions in this case?

A.

The Court is focused in the first instance on putting Class Plaintiffs in a position to file their motions for class certification as soon as possible.

*See* May 18, 2020 Hearing Tr. [ECF No. 3624], at 42 ("I will tell you that I'm focused right now on class certification because that's the next step in this case, and I would like that process to move forward as quickly as we can...."). Class certification motions now are due on September 3, 2020, consistent with General Order No. 20-2012, as amended, entered in this and all other cases pending in this District which extended all court-set deadlines for a total of 77 days in light of the COVID-19 pandemic. *See In re Coronavirus COVID-19 Public Emergency*, Amended General Order 20-0012 entered on March 17, 2020, Second Amended General Order 20-0012 entered on March 30, 2020, Third Amended General Order 20-0012 entered on April 24, 2020, and Fourth Amended General Order 20-0012 entered on May 26, 2020) ("ILND COVID-19 Orders"). The filing of Class Plaintiffs' motions for class certification triggers a five-month period of briefing, disclosure of experts concerning class certification issues, and the briefing of any related *Daubert* motions. *See* Scheduling Order No. 13 [ECF No. 3420].

Beyond class certification, fact discovery currently is set to close on March 4, 2021. *See* Scheduling Order No. 13 [ECF No. 3420] and the ILND COVID-19 Orders referenced above. It may or may not be possible to meet that date under current circumstances. If depositions beyond the 18 depositions that are the subject of Class Plaintiffs' Motion will be taken by remote means

Page 20

in this case, as Class Plaintiffs apparently intend, it very well may take the parties more time to conduct those depositions and that could require an extension of the fact discovery close date. The parties and the Court recognize the need for the parties to start meeting and conferring about a global schedule and regarding how and when all of those depositions can and will be taken.

It is not clear now, however, when even the 18 depositions Class Plaintiffs say they want to take first will be taken. It also is not clear which of these depositions must be taken before Class



Plaintiffs file their class certification motions and which, if any, do not. The parties have been conferring with Special Master Maura R. Grossman in an effort to expedite and streamline the production of structured data that the Court ordered Defendants to produce before Class Plaintiffs file their motions for class certification. It is unclear whether Class Plaintiffs need any of that structured data for the depositions they seek to take by remote means. Some of the proposed Rule 30(b)(6) topics seem to encompass information that should be contained in the forthcoming productions of structured data; others do not. Defendants seem to assume that the depositions Class Plaintiffs want to take will not occur until the structured data is produced. Defendants' Opposition [ECF No. 3630], at 5. Class Plaintiffs do not really address the issue directly. So, production of this structured data may impact when the depositions will occur.

The parties also are conferring about the proposed topics that Class Plaintiffs say they wish to cover in the eight Rule 30(b)(6) depositions they propose to take remotely. Defendants' Opposition [ECF No. 3630], at 3 n.5. If they cannot reach agreement, then the Court will need to resolve any disputes before those depositions can proceed. The Court also wants to enter a protocol for taking remote depositions that addresses as many potential issues as possible before those depositions begin.

Page 21

The DAPs also note they have not yet reached agreement with Class Plaintiffs about how to allocate time among all Plaintiffs for questioning Defendants' deposition witnesses. Those discussions also have to reach a conclusion, and the Court will need to weigh in on any dispute that the parties cannot resolve themselves.

So, the timing of the depositions Class Plaintiffs want to take, both before and after Class Plaintiffs file their motions for class certification, is something that the Court and the parties still need to address.

B.

The Court and the parties also need to address how remote depositions will proceed. Class Plaintiffs included a proposed protocol for remote depositions with their Motion. DAPs propose modifications to that protocol. Defendants raise issues with the protocols proposed by both groups of Plaintiffs.

The Court agrees that Class Plaintiffs' proposed protocol is a reasonable starting place, but some of DAPs' and Defendants' suggestions have obvious merit. The Court is confident the parties will be able to reach agreement on a remote deposition protocol with or even without the Court's help. In an effort to move the process along, the Court has the following reactions to Defendants' and DAPs' objections and proposed modifications to Class Plaintiffs' deposition protocol.

The Court agrees with Defendants that whether a person is an "essential employee" for reasons that have to do with the a company's role in responding to the COVID-19 pandemic is a factor that should be taken into account when deciding whether that person should sit for an in-person or remote deposition, but it disagrees that there should be a blanket exemption for

Page 22

depositions of all "essential employees" until it knows more about how that term is defined and how it will be applied.

The Court agrees with Defendants that a remote deposition protocol should be consistent, to the extent possible, with the existing deposition protocol in this case [ECF No. 995], and that it does not appear that Class Plaintiffs' proposed four-day notice requirement of telephone attendance at a remote deposition is any more necessary than for an in-person deposition.

The Court agrees with Defendants that a videotape of a deposition that potentially will be



used for trial does not need to show both the witness and his or her lawyer.

The Court agrees with Defendants that if the questioning attorney wants to use electronic exhibits at the depositions, then that attorney should deliver those exhibits in hard copy (or in whatever form the deponent and her or his attorney wants) to the deponent and/or the deponent's attorney before the deposition, and those exhibits should not be opened by the recipient(s) until the deposition starts. The deponent can be asked under oath at the beginning of the deposition whether she or he looked at the exhibits before the deposition began, and the envelope or container in which the exhibits were delivered even can be opened for the first time on screen, if necessary.

The Court agrees with Defendants that Plaintiffs should not be allowed unilaterally to determine the remote video deposition platform. The parties should agree on the remote video deposition platform to be used. If they cannot do so, then the Court will decide.

The Court agrees with Defendants that remote depositions may have to occur over portions of a typical deposition day or over multiple days to accommodate a host of concerns including the fact that witnesses and lawyers may be attending the deposition from home with responsibilities for children or others, and that remote depositions may take longer than in-person depositions for technological and other reasons.

Page 23

The Court does not know if it is possible for a video platform to always show the witness, the witness's attorney, and the questioning attorney on the video screen at all times, as some DAPs suggest, but it agrees that would be preferable.

The Court agrees with some DAPs that the parties and the Court should consider whether to extend the length of time for a remote deposition beyond the time provided by the Federal Rules

and should consider how to take into account time lost for technological glitches, but it is not convinced the suggestion to add an automatic 30 minutes to every remote deposition is the best way to do that.

The Court agrees with some DAPs that there should be no unrecorded or at least unnoted conversations between the witness and his or her attorney during a remote deposition while the witness is on the record, but it is unsure how to phrase or police that rule.

The Court agrees with some DAPs that, to save time, an objection on behalf of one aligned party could be deemed an objection on behalf of all (a convention that also can apply to an in-person deposition) but would like to hear from all parties about that.

The Court also agrees with certain DAPs that there needs to be an allocation of time between Class Plaintiffs and DAPs for questioning of Defendants' witnesses.

III.

A telephonic hearing is set for July 20, 2020, at 10:30 a.m. for the purpose of addressing the matters set forth in Section II of this Memorandum Opinion and Order, and any other issues the parties may wish to raise relating to the taking of remote depositions. By July 15, 2020, the parties shall file an agreed remote deposition protocol and note any remaining disagreements about the terms of such a protocol in that filing. By the same date, Class Plaintiffs also shall submit a timetable for taking the 18 depositions they say they want to take after consultation about that

Page 24

timetable with Defendants and DAPs. Class Plaintiffs should note any disagreements among the parties about their proposed deposition schedule in that submission. If these dates chosen unilaterally by the Court do not work for the parties, liaison counsel should send an email to



the Court's courtroom deputy proposing different dates.

For all these reasons, Class Plaintiffs' Motion for Entry of an Order Regarding Remote Depositions of Certain Categories of Witnesses [ECF No. 3610] is granted in large part.

It is so ordered.

/s/_____
Jeffrey            T.            Gilbert
United States Magistrate Judge

Dated: June 25, 2020

--------

Footnotes:

[1.] If Defendants do not unequivocally commit to the possibility that at least some witnesses will need to be deposed by remote means in this case, then they come pretty close to doing so. *See* Defendants' Opposition [ECF No. 3630], at 14 ("Defendants recognize that this situation is highly fluid and believe the question of remote depositions should be re-examined in September. If, at that time, in-person depositions remain unsafe or inadvisable, the parties and the Court should re-visit the advisability and fairness of remote depositions for certain witnesses. If the needs of the case then require that certain remote depositions take place (notwithstanding Defendants' significant prejudice), the Court should order a protocol providing witness-by-witness accommodations as needed under the circumstances.").

[2.] According to Class Plaintiffs, "For every deposition in this case so far, many attorneys have already attended remotely by telephone, choosing to forgo the benefits of seeing the witness and exhibits as they are stamped, in return for the convenience and time- and cost-savings of not traveling." Class Plaintiffs' Motion [ECF No. 3610], at 4-5.

[3.] For example, to guard against a witness answering a question when the technology

prevents the witness's counsel, who like the witness is participating in the deposition remotely and from a different location, from lodging an objection or instructing the witness not to answer a question, the parties might consider adopting a convention that would allow a witness to answer a question only after the lawyer defending the deposition says the witness can answer. A simple, "you may answer" would suffice. The Court is confident the parties can come up with other conventions that can make the taking and defending of remote depositions more palatable.

[4.] *See, e.g., Learning Resources, Inc. v. Playgo Toys Enterprises Ltd.*, 2020 WL 3250723, at *3 (N.D. Ill. June 16, 2020) (holding "the health concerns created by the COVID-19 pandemic create 'good cause' for the entry of an order requiring that Ms. Latham's deposition take place by remote videoconference"); *Wilkens v. ValueHealth, LLC*, 2020 WL 2496001, at *1 (D. Kan. May 14, 2020) ("Video or teleconference depositions and preparation are the 'new normal' and most likely will be for some time. Litigation cannot come to an indefinite halt."); *Grano v. Sodexo Mgmt., Inc.*, 2020 WL 1975057, at *2 (S.D. Cal. Apr. 24, 2020) (observing "that "[a]ttorneys and litigants all over the country are adapting to a new way of practicing law, including conducting deposition and deposition preparation remotely"); *United States ex rel. Chen v. K.O.O. Construction, Inc.*, 2020 WL 2631444, at *1 (S.D. Cal. May 8, 2020) (holding that it is "pure speculation" that the "physical distancing and stay-at-home orders required by the current pandemic will be lessened to allow for in-person depositions in the near future"); *Sinceno v. Riverside Church in City of New York*, 2020 WL 1302053, at *1 (S.D.N.Y. Mar. 18, 2020) (authorizing remote depositions "[i]n order to protect public health while promoting the 'just, speedy, and inexpensive determination of every action and proceeding'"); *Joffe v. King. & Spalding LLC*, 17 Civ. 3392 (VEC)(SDA), at *6 (S.D.N.Y. June 4, 2020) (ordering parties to proceed with remote deposition over plaintiff's objection because the conditions of in-person depositions create "a bad mix during the pandemic" and a "burden on the witnesses and



their families"); *Ogilvie v. Thrifty Payless Inc.*, 2020 WL 2630732, at \*2-3 (W.D. Wash. May 12, 2020) ("Although the court understands that the parties may have a preference for taking depositions or meetings in person, given the present circumstances, the court urges the parties to consider available alternatives .... This pandemic may well be with us for many months to come. We will all need to adjust to keep litigation moving forward.").

[5.] *See*, *e.g.*, *Rice's Toyota World, Inc. v. Southeast Toyota Distributors, Inc.*, 114 F.R.D. 647 (M.D.N.C. 1987) (refusing to limit video depositions to important witnesses who might be unavailable for trial since plaintiff was not requesting that regular stenographer be dispensed with, thus sharply reducing risks of video deposition); *Riley v. Murdock*, 156 F.R.D. 130 (E.D.N.C. 1994) (allowing videotaped deposition); *Fanelli v. Centenary College*, 211 F.R.D. 268 (D.N.J. 2002) (holding that anxiety over videotaping not good cause sufficient to warrant a protective order); *Kaseberg v. Conaco, LLC*, 2016 WL 8729927, at \*6 (S.D. Cal. Aug. 19, 2016) (requiring a copy of exhibits intended to be used at a remote deposition to be sent to deponent's attorney at least twenty-four hours in advance of the deposition); *Carrico v. Samsung Elecs. Co.*, 2016 WL 1265854, at \*2 (N.D. Cal. Apr. 1, 2016) (approving methods such as exchanging Bates-stamped documents in advance of a remote deposition or using modern videoconference software to share documents and images); *Lopez v. CIT Bank, N.A.*, 2015 WL 10374104, at \*2 (N.D. Cal. Dec. 18, 2015) (disagreeing that reviewing complicated exhibits remotely would be impracticable because exhibits can be shared with modern videoconference software or by distributing Bates-stamped copies); *Lott v. United States*, 2008 WL 2923437, at \*1 (N.D. Cal. July 25, 2008) (finding no prejudice incurred in remote depositions that require reference to critical exhibits such as photographs, diagrams, and drawings because the exhibits may be sent to the deponent in advance of the deposition).

[6.] *See In re Fosamax Prod. Liab. Litig.*, 2009 WL 539858, at \*2 (S.D.N.Y. Mar. 4, 2009) (citing *R.S. ex rel. S. v. Ridgefield Board of Education*, 2008 WL 1989774, at \*2 (D.Conn. May 5, 2008)) (denying request for telephone or video deposition on ground that it could "hamper the Plaintiffs' attorney's ability to fully conduct the deposition"); *Willis v. Mullins*, 2006 WL 894922, at \*3 (E.D. Cal. Apr. 4, 2006) (requiring in-person deposition in light of "unreasonable restraints" of video conferencing, "especially concerning the review and use of documents"); *Silva Run Worldwide, Ltd. v. Gaming Lottery Corp.*, 2003 WL 23009989, at \*2 (S.D.N.Y. Dec. 23, 2003) (rejecting telephonic or video deposition because of importance of testimony and volume of documents).

[7.] In *Quarrie*, the court also denied the plaintiff leave to take a remote deposition on the belief that the officer administering the oath to the witness must be in the same room as the witness, and that was not going to happen in that case due to the COVID-19 risk. 2020 U.S. Dist. LEXIS 63710, at \*2-3. Federal Rule of Civil Procedure 28 does not expressly require the officer who administers the oath to be in the same room as the deponent, and the law is mixed on whether that is necessary. One court recently explained that it is unnecessary for the officer and the witness to be in the same room as technological advances now allow the witness and the officer to see and hear each other. *See SAPS, LLC v. EZCare Clinic, Inc.*, 2020 WL 1923146, at \*1-2 (E.D.La. Apr. 21, 2020). Another recent case clarified that the officer can swear the witness either by telephone or video. *See Sinceno*, 2020 WL 1302053, at \*1 ("For avoidance of doubt, a deposition will be deemed to have been conducted 'before' an officer so long as that officer attends the deposition via the same remote means (*e.g.*, telephone conference call or video conference) used to connect all other remote participants, and so long as all participants (including the officer) can clearly hear and be heard by all other participants.").

[8.] In fact, Class Plaintiffs argue that if they are not allowed to take depositions by remote means,



this case will languish with no real end to the pretrial process in sight. *See* Joint Status Report [ECF No. 3616], at 1 ("Depositions of the Defendants are the key gate-keeping event required for the case to be trial-ready. While certain motions have been briefed and some written discovery has occurred during the COVID-19 pandemic, the continued inability of Plaintiffs to take Defendant depositions will continually delay trial.").

--------



## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

JESSICA STOUT HUDDLESTON,

          Plaintiff,

v.

                                  Case No.  3:19-cv-1545-MCR/MJF

BOWLING GREEN INN
OF PENSACOLA, LLC,

          Defendant.

_____/

### ORDER

This case is before this court on Plaintiff's motion for a protective order and Defendant's motion to compel Plaintiff's deposition. For the reasons set forth below, this court will deny both motions.

**I.     Background**

On May 28, 2019, Plaintiff initiated this action under Title VII of the Civil Rights Act of 1964. She alleges disparate treatment on the basis of her sex. At the time Plaintiff filed her complaint, she alleged that she was a resident of Okaloosa County, Florida. At some point, she moved to the Federal Republic of Germany when her husband's employment resulted in his relocation there. Defendant's principal place of business is Florida.

Defendant seeks to depose Plaintiff in the Northern District of Florida. Plaintiff, who is the mother of an infant child, seeks a protective order that would allow Defendant to depose her telephonically, but would protect her from any requirement to travel to the Northern District of Florida for a deposition. Plaintiff argues that a "deposition by telephone will work no conceivable harm on Defendant's ability to gather all discoverable information and evidence" and Defendant seeks a deposition in the Northern District "purely for the purposes of harassment and to inflict undue burden on Plaintiff." (Doc. 15). She further contends that holding a deposition in Florida will "work a great financial hardship on Plaintiff because of the travel expenses and time away from her infant will be emotionally and financially burdensome. Traveling to Pensacola will be virtually impossible." (*Id.*).

Defendant argues that Plaintiff "failed to show good cause to avoid having her deposition taken in person in the forum she chose for this litigation." (Doc. 17 at 1). Defendant seeks "to depose Plaintiff in person in order to gauge her demeanor and veracity as well as to avoid the difficulty and confusion associated with finding a court reporter in a foreign country and examining Plaintiff on dozens of documents via telephone." (*Id.* at 1).

## II.   Discussion

### A.   Plaintiff's Motion for a Protective Order

The "Federal Rules of Civil Procedure specifically give a party the right to question a witness by oral deposition." *Nat'l Life Ins. Co. v. Hartford Acc. & Indem. Co.*, 615 F.2d 595, 599 (3d Cir. 1980); *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 521 (D.C. Cir. 1975) ("As a general proposition each party to a civil law suit has the right to take depositions of the other party, absent a protective order entered by the trial judge.").   Under Rule 30(a)(1), a "party may, by oral questions, depose any person, including a party, without leave of court . . . ." Fed. R. Civ. P. 30(a)(1).

The Federal Rules of Civil Procedure, however, do not mandate a particular situs for a deposition. *See Salve Regina College v. Russell*, 499 U.S. 225, 236, 111 S. Ct. 1217, 1223 (1991) ("The civil rules do not specify the place for deposing a party . . . ."). This allows for greater flexibility and empowers the parties and their attorneys to arrive at an agreement on the situs. The Local Rules for the Northern District of Florida provide some guidance to parties in that one such Rule requires any party that seeks affirmative relief in this District to submit to a deposition in this District. Local Rule 26.1(B)(1) provides:

> (B) **Place of Depositions.** Unless the Court orders otherwise for cause,
>
> (1) a party who asserts a claim for affirmative relief—other than costs and attorney's fees—can be required to appear once in this District for a deposition . . . .

N.D. Fla. Loc. R. 26.1(b)(1). This Rule obviously admits of exceptions, however, insofar as the Rule is prefaced by the notation that "for cause" this court may order otherwise. *Id.*

Furthermore, Rule 26(c) of the Federal Rules of Civil Procedure provides that a court "for good cause shown . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c). A party seeking a protective order bears the burden of establishing good cause. *See Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001); *Landry v. Air Line Pilots Ass'n Int 7 AFL-CIO*, 901 F.2d 404, 435 (5th Cir. 1990). "For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002). Under the "good cause" standard, the court must balance the competing interests of the parties. *McCarthy v. Barnett Bank of Polk Cty.*, 876 F.2d 89, 91 (11th Cir. 1989); *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985); *see Cazorla v. Koch Foods of Mississippi, L.L.C.*, 838 F.3d 540, 555 (5th Cir. 2016). Trial courts have broad discretion "to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 104 S. Ct. 2199, 2209 (1984).

A district court also enjoys "great discretion in designating the location of taking a deposition." *Thompson v. Sun Oil, Co.*, 523 F.2d 647, 648 (8th Cir. 1975) (per curiam); *see Afram Export Corp.*, 772 F.2d at 1365 (noting a district court's broad discretion to set the location of a deposition); *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1248 (9th Cir. 1981) (holding that a "district judge has discretion to direct the place of a deposition"). In exercising its discretion, a court must consider relevant facts and circumstances. *See DeepGulf, Inc. v. Moszkowsi*, 330 F.R.D. 600, 609-11 (N.D. Fla. 2019) (noting some of the factors a court should consider in exercising its discretion concerning setting the location of a deposition).

This court has considered the competing interests of the parties and the factors discussed by the parties, including the following factors, among others:

***The presumption that a plaintiff should submit to a deposition in the forum district.*** Plaintiff chose to initiate this civil action in the Northern District of Florida. "There is a principle that a plaintiff having selected a particular forum for the adjudication of his case should be prepared to answer a notice of deposition in that locality." *Ellis Air Lines v. Bellanca Aircraft Corp.*, 17 F.R.D. 395, 396 (D. Del. 1955). A plaintiff "should expect to be deposed in the forum where the action is pending." *Culhane v. MSC Cruises (USA), Inc.*, 290 F.R.D. 565, 566 (S.D. Fla. 2013); *Plant v. Merrifield Town Center Ltd. P'ship*, 711 F. Supp. 2d 576, 589 n.9 (E.D. Va. 2010) ("barring exceptional circumstances, plaintiffs must be available for a deposition in

the district in which the action was brought"); *Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 550 (S.D.N.Y. 1989) ("[A] plaintiff must generally submit to deposition in the district where he has commenced litigation."). Indeed, "courts ordinarily presume that a plaintiff may be deposed in the judicial district where the action was brought, inasmuch as the plaintiff, in selecting the forum, has effectively consented to participation in legal proceedings there." *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 471 (E.D. Va. 2010); *Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Prods. Inc.*, 47 F.R.D. 530, 533 (S.D.N.Y. 1969) ("Ordinarily, a defendant is entitled to examine a plaintiff in the forum where plaintiff has chosen to sue.").

"Underlying this rule appears to be the concept that it is the plaintiffs who bring the lawsuit and who exercise the first choice as to the forum. The defendants, on the other hand, are not before the court by choice." *Farquhar v. Shelden*, 116 F.R.D. 70, 72 (E.D. Mich. 1987). "Thus, courts have held that plaintiffs normally cannot complain if they are required to take discovery at great distances" from their location. *Id.*; *see Levick v. Steiner Transocean, Ltd.*, 228 F.R.D. 671, 672 (S.D. Fla. 2005) ("The general rule is that a plaintiff who brings suit in a particular forum may not avoid appearing for examination in that forum."); *Grey v. Cont'l Mktg. Assocs., Inc.*, 315 F. Supp. 826, 832 (N.D. Ga. 1970) (holding that because plaintiffs "selected the forum" they " may therefore be called upon to present themselves at that place for the taking of their depositions").

***The site chosen by the party initiating the deposition.*** Although a party seeking to depose a witness does not possess an absolute right to choose any location for a deposition, "the party taking the deposition usually selects the place where the deposition will be conducted." *Reid v. Temple Univ. Hosp., Inc.*, 329 F.R.D. 531, 532 (E.D. Pa. 2019). Courts have held that, in the first instance, "'the party noticing the deposition usually has the right to choose the location . . . .'" *Buzzeo v. Bd. of Educ., Hempstead*, 178 F.R.D. 390, 392 (E.D.N.Y. 1998) (quoting 7 Moore's Federal Practice—Civil § 30.20); *Turner v. Prudential Ins. Co. of Am.*, 119 F.R.D. 381, 383 (M.D.N.C. 1988) (The party initiating the deposition "may unilaterally choose the place for deposing an opposing party . . . . "). Courts, therefore, give some weight to the location selected by the party conducting the deposition, especially if the location selected also is within the district and division in which the plaintiff initiated the action.

***Alleged financial hardship to Plaintiff.*** Courts also must consider whether conducting a deposition in a particular location will entail a substantial hardship to one of the parties or the deponent. Accordingly, this court considered Plaintiff's claim that a deposition in Florida "will work a great financial hardship on Plaintiff." Indigence, however, normally will not relieve a plaintiff of the duty to submit to a deposition in the forum district. *See Newman v. Metro. Pier & Exposition Auth.*, 962 F.2d 589, 591-92 (7th Cir. 1992) (holding that serious financial hardship was insufficient to overcome the presumption that a plaintiff's deposition may be taken

within the forum district); *Gen. Leasing Co. v. Lawrence Photo-Graphic Supply*, 84 F.R.D. 130, 131 (W.D. Mo. 1979). A plaintiff generally is required to bear any reasonable burden or inconvenience that the civil action presents. *Buzzeo*, 178 F.R.D. at 392. A plaintiff "has not only taken the volitional step of initiating the lawsuit or claim, he or she stands to gain a substantial monetary sum and/or other beneficial relief as a result of suing a defendant." *United States v. Rock Springs Vista Dev.*, 185 F.R.D. 603, 604 (D. Nev. 1999). "A plaintiff, therefore, cannot invoke the mere fact inconvenience or expense as a legitimate reason to refuse to appear and submit himself or herself to questioning by the defendant regarding the basis for the claim." *Id.*

Furthermore, any litigant who seeks a protective order to preclude a deposition in a particular place, must establish *with evidence* an inability to attend a deposition at that place or the probability of suffering a substantial hardship beyond the ordinary inconvenience that any deposition necessarily entails. "Broad allegations of harm unsubstantiated by specific examples or articulated reasoning" are insufficient. *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986); *Joy v. North*, 692 F.2d 880, 894 (2d Cir. 1982) (holding that "a naked conclusory statement" asserting hardship "falls woefully short of the kind of showing" required by the Federal Rules). A mere assertion of indigence will not suffice. *DeepGulf, Inc.*, 330 F.R.D. at 609; *de Dalmady v. Price Waterhouse & Co.*, 62 F.R.D. 157, 159 (D.P.R. 1973)

(noting that when asserting that a deposition in a particular location will result in a financial hardship it "is not sufficient that plaintiff's attorneys make naked assertions with respect to the financial and hardship conditions faced by" plaintiff). Furthermore, in assessing relative hardships, a court must take into consideration any hardship that the non-moving party may suffer if a protective order is granted. *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973).

Plaintiff failed to demonstrate that her financial condition or the fact that she has an infant precludes her from traveling to the Northern District of Florida. She failed to provide any affidavits regarding her financial status, the extent of her household income and expenses, the extent of her financial assets and savings, whether she could obtain a loan to pay for the flight, and other relevant information. When the Federal Rules assign an evidentiary burden to a party, conclusory statements will not suffice to carry that burden. *See United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978) ("The burden is upon the movant to show the necessity of" a protective order, which "contemplates a particular and specific demonstration of fact as distinguished from . . . conclusory statements.").

***Plaintiff's proposed alternative to an "in person" deposition.*** This court also considered the only alternative proposed by Plaintiff: a telephonic deposition. Relatively unimportant witnesses typically can be deposed telephonically or via

videoconference without causing prejudice to either party.[1] But Plaintiff is not a mere witness. She is the party alleging intentional discrimination on the basis of her sex, and her testimony likely will be a key piece of evidence for both parties. If feasible, a defendant generally should be afforded an opportunity to depose such a plaintiff in person. Sometimes exceptional cases arise when that is not possible. But Plaintiff has not set forth sufficient evidence indicating that this is one of those exceptional cases.

Courts have noted that telephonic depositions—although sometimes necessary—are disfavored when the deponent is a party in a case potentially involving issues of the deponent's credibility. *See Kean v. Bd. of Trs. of the Three Rivers Reg'l Library Sys.*, 321 F.R.D. 448, 452-53 (S.D. Ga. 2017). Remote depositions preclude in-person confrontation and the assessment of the deponent's demeanor, affect, non-verbal responses, and facial expressions. *Shockey v. Huhtamaki, Inc.*, 280 F.R.D. 598, 602 (D. Kan. 2012) (noting that telephone deposition "deprives the opposing party of the opportunity to evaluate the deponent's nonverbal responses and demeanor" and "denies the opportunity for face-to-face confrontation of the party being deposed"). These can be highly relevant to judging a witness's credibility. *Black v. Larimer Cty.*, 722 F. App'x 763, 768 (10th Cir. 2018) (noting the importance of conducting a deposition "in person" so that the party could observed the witness's "demeanor for

---

[1] The parties did not propose or discuss a video deposition.  This court, therefore, does not address that possibility.

purposes of judging her credibility"); *Mill-Run Tours, Inc.*, 124 F.R.D. at 549 (noting the importance of observing the demeanor of the deponent to "evaluate his credibility in anticipation of trial").[2]

Telephonic depositions also do not allow the parties to ascertain whether someone is coaching the deponent or providing the deponent with answers to the questions posed. Telephonic depositions also complicate the process of displaying exhibits to a deponent—particularly in complex cases or those involving voluminous documents—and can lead to confusion if the interrogator and deponent fail to remain synchronized in their examination of exhibits. *See United States v. One Gulfstream G-V Jet Aircraft Displaying Tail Number VPCES*, 304 F.R.D. 10, 17 n.4 (D.D.C. 2014) (noting that "telephonic depositions are disfavored because it is impossible to see the witness's demeanor, watch what documents the witness is reviewing, or monitor who else the witness is talking with"); *Schockey*, 280 F.R.D. at 602 ("Telephone depositions may also make it more difficult when the testimony requires the deponent to examine

---

[2] Of course, a party's mere desire to observe a party's demeanor is insufficient to preclude a telephonic deposition, particularly one involving a witness of lesser importance. *See Loughin v. Occidental Chem. Corp.*, 234 F.R.D. 75, 77 (E.D. Pa. 2005) (noting that a "desire to observe the deponent's demeanor during the deposition" in itself does not "does not amount to good cause" for denying a request to conduct a telephonic deposition). "[T]elephonic depositions inherently lack face-to-face questioning, and to deny a request to conduct a telephonic deposition solely because of the opponent's inability to observe the witness would be tantamount to repealing Fed. R. Civ. P. 30(b)(7)." *Cressler v. Neuenschwander*, 170 F.R.D. 20, 22 (D. Kan. 1996).

numerous, lengthy, or complex documents."). "Further, experienced questioners find that witnesses (and particularly adverse or hostile witnesses) will more readily yield admissions to a live questioner." 3 BUSINESS AND COMMERCIAL LITIGATION IN FEDERAL COURTS § 24:13 (4th ed. 2016). Of course, none of these adversities precludes parties from successfully conducting telephonic depositions, but in this case, these complications are one factor this court should consider.

In light of these and the other factors identified by the parties, it is apparent that Plaintiff has failed to carry her burden of demonstrating good cause for a protective order that precludes a deposition in the Northern District of Florida.

### B.    Defendant's Motion to Compel Plaintiff's Deposition in Florida

"A party has a general right to compel any person to appear at a deposition . . . ." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002) (citing Fed. R. Civ. P. 30(a)). More specifically, "each party to a civil law suit has the right to take depositions of the other party, absent a protective order entered by the trial judge." *Colonial Times, Inc.*, 509 F.2d at 521; *see Jules Jordan Video, Inc. v. 144942 Can. Inc.*, 617 F.3d 1146, 1158 (9th Cir. 2010) (observing that "under Rule 30 any person's testimony may be taken by deposition"); *Nat'l Life Ins. Co.*, 615 F.2d at 599 ("The Federal Rules of Civil Procedure specifically give a party the right to question a witness by oral deposition."). The right to take depositions is a "broad"

one because depositions are such an important tool of discovery. *See Credit Lyonnais, S.A. v. SGC Intern., Inc*., 160 F.3d 428, 429 (8th Cir. 1998).

Rule 30(b)(1) states: "A party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and place of the deposition . . . ." Fed. R. Civ. P. 30(b)(1). Thus, to initiate a deposition of an opposing party, the deposing party must first notice the deposition by serving the notice on the opposing party. *See Sali v. Corona Reg'l Med. Ctr*., 884 F.3d 1218, 1222 (9th Cir. 2018) ("The only requirement is that the party be 'served with proper notice' of the deposition beforehand."). "If a person is a party, a simple notice of deposition is sufficient to compel attendance . . . ." *Jules Jordan Video, Inc.*, 617 F.3d at 1158; *Peitzman v. City of Illmo*, 141 F.2d 956, 960 (8th Cir. 1944) ("Service of the notice upon the attorney for defendants was all that was required to make it incumbent upon the parties to appear."); *Collins v. Wayland*, 139 F.2d 677, 678 (9th Cir. 1944) ("The notice for taking appellant's deposition was a proper notice and was properly served. It is immaterial, if true, that no subpoena was served on appellant, for he was a party, and therefore no subpoena was necessary.").

To be efficacious, however, the notice must be "reasonable" and must inform the opposing party of the date, time, and location of the deposition with sufficient time for compliance. *See Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co*., 748 F.3d 160, 173 (4th Cir. 2014) (holding that a deposition notice was unreasonable

when it was provided only five days before the deposition); *Mims v. Cent. Mfrs. Mut. Ins. Co.*, 178 F.2d 56, 59 (5th Cir. 1949) (holding that deposition notices were unreasonable when they called "the taking of depositions of numerous witnesses on the same date, in scattered localities across the continent").

Before a party can move to compel a deposition, it first must show that it served notice of the deposition on the opposing party and that the opposing party failed to attend. *Nuskey v. Lambright*, 251 F.R.D. 3, 12 (D.D.C. 2008) (denying a motion to compel when the witness did not receive written notice stating the time and the place of the deposition). "Absent evidence that the witnesses at issue were given reasonable written notices stating the time and place of their depositions, as required by Rule 30(b)(1), or that they failed to comply with subpoenas compelling their attendance, pursuant to Rule 45, the Court has no authority to compel witnesses, including the parties, to attend any depositions." *Pegoraro v. Marrero*, 281 F.R.D. 122, 128 (S.D.N.Y. 2012); *Siegel v. Truett-McConnell Coll., Inc.*, 13 F. Supp. 2d 1335, 1337 (N.D. Ga. 1994) ("The court has no evidence before it that proper notice was given for any of defendants' witnesses to appear at a deposition. The notice required for depositions is well-defined in the Federal Rules of Civil Procedure, Rule 30(b)(1) and (2). Without proper notice there can be no failure to appear."), *aff'd on other grounds*, 73 F.3d 1108 (11th Cir. 1995).

In its motion to compel, Defendant does not allege that it provided Plaintiff with written notice of the date and location of her deposition, and Plaintiff then failed to attend. Therefore, Defendant's motion to compel Plaintiff's deposition is premature. Because this court has denied Plaintiff's motion for a protective order, counsel for the parties should confer regarding the date, time, and location of Plaintiff's deposition. If the parties cannot reach an agreement, Defendant may notice Plaintiff's deposition at a date and time that provides Plaintiff adequate notification in light of the distance she must travel.  If Plaintiff then fails to attend her deposition on the noticed date, Defendant may move to compel Plaintiff's deposition.

## III.   Conclusion

For the reasons set forth above, Plaintiff's motion for a protective order is denied without prejudice and Defendant's motion to compel is denied without prejudice.

**SO ORDERED** this <u>18th</u> day of December, 2019.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **TERRENCE L. MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:09-cv-00399-LSC-FG3** |
| **vs.** | ) | |
| | ) | **MEMORANDUM AND** |
| **NEBRASKA BEEF, LTD.,** | ) | **ORDER** |
| | ) | |
| **Defendant.** | ) | |

This matter is before the court on plaintiff's Motion for Telephonic Deposition (Doc. 22) and the parties' joint motion to extend the case deadlines (Doc. 28).

The complaint alleges that plaintiff, a non-Hispanic African American male, was employed at the defendant's beef packaging plant in Omaha, Nebraska. His employment was terminated after he complained that Hispanic coworkers harassed him based on his race, color, and sex. Plaintiff seeks relief under 42 U.S.C. § 2000e-5 and 42 U.S.C. § 1981a. The Complaint alleges that plaintiff resided in the State of Texas when he filed this action in Nebraska state court on October 7, 2009.

The parties have been unable to schedule the plaintiff's deposition. In his motion, plaintiff advises that he now lives in the State of Louisiana, is unemployed, is a single parent, and is serving a term of probation that restricts his ability to travel out of the state. He also states that he cannot pay to travel to Nebraska for his deposition, and he cannot pay to have his own attorney travel to Louisiana to attend a deposition. He plans on attending the trial of this matter in Omaha, needs to save money for that trip, and "feel[s] that Nebraska Beef should take [his] deposition by telephone." (Doc. 23, Plaintiff's Affidavit).

Rule 30(b)(4) of the Federal Rules of Civil Procedure provides that "[t]he parties may stipulate–or the court may on motion order–that a deposition be taken by telephone or other remote means." In this case, the defendant does not agree to a telephone deposition.

[T]here is a well-recognized, general rule that a plaintiff is required to make itself available for a deposition in the District in which the suit was commenced, because the plaintiff has chosen the forum voluntarily, and should expect to appear there for any legal proceedings, whereas the defendant, ordinarily, has had no choice in selecting the action's venue.

*Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 588 (D. Minn. 1999). This general rule is subject to exception, "when the plaintiff can make a compelling showing that its application would impose an unduly heavy burden*." Id. See also Gibbs v. National Railroad Passenger Corp.*, 170 F.R.D. 452 (N.D. Ind. 1997).

As the court explained in *United States v. Rock Springs Vista Dev.*, 185 F.R.D. 603, 604 (D. Nev. 1999),

> The issue of taking the deposition of a witness is different from the issue of taking the deposition of a plaintiff.  A witness is not responsible for and has not made the election to be involved in the litigation.  Therefore, there are limits to the imposition that the judicial system should impose on such a person.  The plaintiff, on the other hand, has not only taken the volitional step of initiating the lawsuit or claim, he or she stands to gain a substantial monetary sum and/or other beneficial relief as a result of suing a defendant. A plaintiff, therefore, cannot invoke the mere fact inconvenience or expense as a legitimate reason to refuse to appear and submit himself or herself to questioning by the defendant regarding the basis for the claim.

> \* \* \* \*

> "Telephone depositions are not recommended for obtaining controversial testimony.  You cannot observe the impact of your questions or the witness' nonverbal responses.  Moreover, you will be unable to ascertain if anyone is listening in or 'coaching' the witness."  William W Schwarzer, A. Wallace Tashima, & James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11.443 (1997).

> As a normal rule plaintiff will be required to make himself or herself available for examination in the district in which suit was brought. Since plaintiff has selected the forum, he or she will not be heard to complain about having to appear there for a deposition.  But this is at best a general rule, and is not adhered to if plaintiff can show good cause for not being required to come to the district where the action is pending.

Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE § 2112 (1994).

In this instance, the plaintiff has not shown an extreme hardship that would excuse him from appearing in Nebraska to be deposed.  Plaintiff chose to file this lawsuit in Nebraska.  The defendant should not have to forego the right to take plaintiff's deposition face-to-face simply because plaintiff elected to move from Nebraska (where he was

-2-

employed by the defendant), then to Texas (where he lived when the complaint was filed), and then to Louisiana.

Plaintiff is cautioned that failure to appear for his deposition may result in the imposition of sanctions against him pursuant to Fed. R. Civ. P. 37(b) and (d), including the sanction of dismissal.

**IT IS ORDERED:**

1.   Plaintiff's Motion for Telephonic Deposition (Doc. 22) is denied.  Plaintiff is hereby ordered to make himself available for deposition in Nebraska no later than **October 20, 2010.**

2.   The parties' Stipulated Motion to Extend Discovery and Related Deadlines (Doc. 28) is granted.  An amended progression order will be entered separately extending all existing deadlines by approximately 90 days.

**DATED September 7, 2010.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

**H & T Fair Hills, Ltd., Mark Hein, Debra Hein, Nicholas Hein, Norman Zimmerman,**
**Donna Zimmerman, Steven Wherry, Valerie Wherry, Robert Ruebel, Mary Ruebel and Larry Ruebel,**
**on behalf of themselves and all others similarly situated, Plaintiffs,**
**v.**
**Alliance Pipeline L.P., also known as Alliance USA, Defendant.**

**Civ. No. 19-1095 (JNE/BRT)**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**September 14, 2020**

**ORDER ON DEFENDANT'S MOTION TO COMPEL REMOTE DEPOSITIONS**

Anne T. Regan, Esq., Brian William Nelson, Esq., Gregory S. Otsuka, Esq., Michael R. Cashman, Esq., and Richard M. Hagstrom, Esq., Hellmuth & Johnson; Drew R. Ball, Esq., and Steve McCann, Esq., Ball & McCann, P.C., counsel for Plaintiffs.

Haley L. Waller Pitts, Esq., Nicole M. Moen, Esq., Patrick D. J. Mahlberg, Esq., and Samuel Andre, Esq., Fredrikson & Byron, PA, counsel for Defendant.

This matter came before the Court on Defendant's Motion to Compel Remote Depositions pursuant to Fed. R. Civ. P. 30(b)(4). (Doc. No. 125.) For the reasons set forth below, Defendant's motion is granted in part and denied in part without prejudice.

**DISCUSSION**

Federal Rule of Civil Procedure 30(b)(4) provides that "[t]he parties may stipulate—or the court may on motion order—that a deposition be taken by telephone or other remote means." As recently stated *In re Broiler Chicken Antitrust Litig.*, "[c]ourts

have long held that leave to take remote depositions pursuant to Rule 30(b)(4) should be granted liberally." No. 1:16-CV-08637, 2020 WL 3469166, at *7 (N.D. Ill. June 25, 2020). Rule 30(b)(4) does not explicitly state that there needs to be 'good cause' for the Court to grant a motion. Instead, "[Rule 30(b)(4)] appears to leave it to the court's broad discretion over discovery to determine whether there is *a legitimate reason* to take a deposition by telephone or other remote means under all the facts and circumstances of a given case." *In re Broiler Chicken Antitrust Litig.*, 2020 WL 3469166, at *7 (emphasis added). Courts determine whether to allow a remote deposition with "a careful weighing of the reasons put forth by the proponent of the remote deposition and the claims of prejudice and hardship advanced by the party opposing the deposition." *Id.*

Health concerns created by the COVID-19 pandemic can be a legitimate reason to take a deposition by remote means. *See id.* "[T]he hardship that would be caused to [witness(es) and . . . counsel] by an in-person deposition is obvious." *Grupo Petrotemex, S.A. de C.V. v. Polymetrix AG*, No. 16-CV-2401 (SRN/HB), 2020 WL 4218804, at *2 (D. Minn. July 23, 2020) (quotations omitted). In the deposition setting, counsel taking the deposition are orally asking questions. The witness is testifying orally. Attorneys defending the deposition are orally making objections. "Even with the protection of masks and social distancing, an in-person deposition generally requires the participants to sit in a shared enclosed space for prolonged periods of time." *Id.*

The concerns about the risks of transmission of COVID-19 to participants in an in-person deposition setting are supported by the science. Courts have "cited to an academic article for the uncontroversial proposition that the minimum



distance to prevent transmission of COVID-19 may vary depending on environmental conditions—and that the oft-repeated six-feet rule may not be sufficient in a high-risk environment, such as indoor settings with prolonged exposure." *See, e.g.*, *Joffe v. King & Spalding*, *LLP*, No. 17-CV-3392 (VEC), 2020 WL 3453452, at *7, n.10 (S.D.N.Y. June 24, 2020) (citing Kimberly A. Prather et al., *Reducing transmission of SaARS-Co-V-2*, Science (May 27, 2020) ("Increasing evidence for SARS-CoV-2 suggests the 6ft. CDC recommendation is likely not enough under many indoor conditions where aerosols can remain airborne for hours, accumulate over time, and follow air flows over distances further than 6 ft."), https://science.sciencemag.org/content/early/20 20/06/02/science.abc6197/1).[1] As discussed in *Joffe*, the "CDC guidelines do not suggest that the coronavirus magically decomposes or hits an invisible wall after traveling six feet in the air." *Id.* at *7. Therefore, individuals should still take extreme caution while in indoor spaces and should limit time spent with others.

The health concerns related to in-person depositions discussed in recent cases are bolstered by the facts set forth in the declaration from Defendant's counsel submitted in support of Defendant's motion. Counsel for Defendant include individuals at a higher risk for severe illness from COVID-19 due to existing health issues. (Doc. No. 128, Decl. of Nicole M. Moen in Supp. of Def.'s Mot. ("Moen Decl.") ¶ 13.) In addition, family

Page 4

members of Defendant's counsel are also at a higher risk for severe illness. (*Id.*) Remote depositions are the best safeguard against COVID-19 because even "social distancing does not guarantee a safe deposition environment." *Grupo*, 2020 WL 4218804, at *2 (quoting *Joffe*, 2020 WL 345452, at *7).[2] Remote depositions "entirely 'eliminates' the safety concerns" of transmission between participants. *See Swenson v. Geico Cas. Co.*, No. 2:19-cv-01639-JCM-NJK, 2020 WL 4815035, at *5 (D. Nev. Aug. 19, 2020).

The Court has considered the facts and circumstances of this case, including the number of fact depositions, the December 11, 2020 fact discovery deadline, the nature of the case, and the risk of transmission of the virus in an in-person deposition setting. The Court has also employed the two-prong test discussed in *In Re Broiler Chicken Antitrust Litig.*, to arrive at its conclusion. *See In re Broiler Chicken Antitrust Litig.*, 2020 WL 3469166, at *7. The first prong requires there to be a legitimate reason for remote depositions. In this case, the Court concludes that reducing the risk of transmitting

Page 5

COVID-19 during the pandemic is a legitimate reason for issuing an order to require remote depositions. Video depositions will help prevent the transmission of COVID-19 and ensure the health and safety of the witnesses and participants.

Because the Court finds the first prong satisfied for having all fact depositions in this case done remotely, the burden now shifts to the Plaintiffs, as the parties opposing an order for remote depositions, for consideration of the second prong. Under the second prong, Plaintiffs must show how they would be prejudiced if the depositions were to proceed by remote video conference. *See In re Broiler Chicken Antitrust Litig.*, 2020 WL 3469166, at *7.

The Court first addresses whether Plaintiffs have shown prejudice or hardship relating to any of the deponents already noticed, scheduled, or identified by the parties in their correspondence. With respect to each of these deponents, Plaintiffs have had notice and an ample opportunity to show hardship or prejudice relating to each of these depositions. The pandemic has temporarily redefined how law is practiced. "Attorneys and litigants all over the country are adapting to a new way of practicing law, including conducting depositions and deposition preparation remotely." *Grano v. Sodexo Mgmt.*, No. 18cv1818-GPC(BLM), 2020 WL 1975057, at *3 (S.D. Cal. Apr. 24, 2020). Here, Plaintiffs' counsel



provided no indication in their papers or at the hearing that they were unable to proceed remotely or that any specific witness was unable to participate remotely; instead, counsel for both sides confirmed at the hearing that every deposition thus far has been taken remotely, with each participant, including the lawyers for each side, connecting from a remote location. Therefore, thus far, none of the required

Page 6

participants have been in the same room during the depositions, as of the date of the hearing. According to the Defendant, while these depositions were different from being in-person, they went well. Plaintiffs did not rebut Defendant's assessment. This fact weighs heavily against the Plaintiffs' argument of hardship or prejudice.[3]

The Court recognizes that there may be advantages of in-person depositions under normal circumstances; however, due to the pandemic, "conducting depositions remotely is becoming the new normal." *Rouviere v. DePuy Orthopaedics, Inc.*, No. 1:18-cv-04814(LJL)(SDA), 2020 WL 3967665, at *3 (S.D.N.Y. July 11, 2020). Courts have "overwhelmingly endorsed depositions moving forward by remote means during the pandemic." *Swenson*, 2020 WL 4815035, at *3. Courts recognize that remote depositions promote the safest environment. "[D]epositions by videoconference have emerged as the preferred method of coping with the complications and perils this pandemic has wrought." *Faford v. Grand Trunk W. R.R. CO.*, No. 19-10523, 2020 WL 4890413, at *2 (E.D. Mich. July 28, 2020).

Page 7

Plaintiffs argue that if remote depositions are ordered, counsel will be deprived of the opportunity to question the witness in person. However, the option for remote depositions is provided by Rule 30(b)(4) and is a "'presumptively valid means of discovery' even without the in-person interaction." *Learning Res.,*

*Inc. v. Playgo Toys Enters., Ltd.*, No. 19-CV-00660, 2020 WL 3250723, at *3 (N.D. Ill. June 16, 2020) (quoting *Usov v. Lazar*, No. 13 Civ. 818, 2015 WL 5052497, at *2 (S.D.N.Y. Aug. 25, 2015)). Remote depositions are "by [their] nature . . . not conducted face to face." *Rouviere*, 2020 WL 3967665 at * 4. "If the lack of being physically present with the witness were enough prejudice to defeat the holding of a remote deposition, then Rule 30(b)(4) would be rendered meaningless." *Id.* Rule 30(b)(4) was created for legitimate situations where being in-person is not viable.

Further, since the promulgation of this rule, technology has improved such that counsel can observe witnesses rather closely; the size of the video display can be increased to further help counsel see the testifying witness better. Plaintiffs claim burden and hardship because the depositions may be document intensive. The current technology, however, can be adapted to allow for documents to be displayed along with a view of the witness, and courts have "found that exhibits can be managed in remote depositions by sending Bates-stamped exhibits to deponents prior to the depositions or using modern videoconference technology to share documents and images quickly and conveniently." *Grupo*, 2020 WL 4218804, at *3 (quotations omitted). A "document laden" or "document intensive" deposition is therefore "not an obstacle to a successful remote videoconference deposition." *Rouviere*, 2020 WL

Page 8

396766 at *3. In addition, there are many resources available from vendors and through the legal community to assist counsel in preparing for remote depositions. *Id.* Thus, Plaintiffs have presented no specific concerns for the participants that cannot be overcome, and Plaintiffs have not met their burden under the second prong of the analysis—considering prejudice or hardship to Plaintiffs relating to the deponents already noticed, scheduled, or identified by the parties—to deny Defendant's request for remote depositions.[4] *See In re Broiler Chicken Antitrust Litig.*, 2020 WL 3469166, at *4



("Technological problems can arise during in-person as well as remote depositions, but that is not a reason to prevent remote depositions from occurring.").

Plaintiffs argue that they should have the option to be in the same room with their individually named clients or any willing third-party witness while the deposition is taken. Even in those situations, Plaintiffs have made no showing of prejudice or hardship to counsel that cannot be overcome when participating remotely along with

Page 9

all other participants. While the Court appreciates the role of counsel in defending a witness during a deposition, counsel's role during a deposition is limited. Defense counsel can carefully listen to questions and make appropriate objections, and they can still do this remotely. The parties are encouraged to develop protocols to address any concerns with the process for making objections or instructing a witness not to answer. For example, other courts have addressed the issue of how to allow for a witness to pause before answering questions when being deposed remotely to allow for their attorney to consider whether to lodge any objections. *See In re Broiler Chicken Antitrust Litig.*, 2020 WL 3469166, at *4, n.3.[5] Further, remote deposition protocol can provide for more frequent breaks if needed, and counsel can connect with their clients or witnesses in a private virtual "breakout room" or by a separate remote connection during those breaks.[6] Therefore, the Court concludes that, with respect to the fact

Page 10

depositions identified to date, Plaintiffs have not made a particularized showing of hardship or prejudice, or provided other evidence of a need to proceed with in person depositions that outweigh the health risks created by the ongoing COVID-19 pandemic. *See Valdivia v. Menard Inc.*, No. 19 CV 50336, 2020 WL 4336060, at *2 (N.D. Ill. July 28, 2020) (denying defendant's motion to compel

plaintiff's in-person deposition). Accordingly, with respect to the depositions noticed, scheduled, or identified in correspondence to date, they must be conducted remotely by video conferencing technology and none of the participants may be in the same room (in person with another participant), without further Order from this Court.[2]

The Court now turns to the issue of whether remote depositions should be ordered for all depositions, including depositions of witnesses not yet identified. As discussed above, the Court has found a legitimate reason to conduct all fact depositions through December 11, 2020 in this case remotely. However, the Court cannot rule on the second prong without giving a party or third party the opportunity to show hardship or prejudice with respect to a particular unidentified witness. Accordingly, the Court denies this part of Defendant's motion without prejudice.

The Court, however, will require the parties to immediately meet and confer to attempt to agree on (1) a protocol for taking remote depositions, and (2) a process for

Page 11

any future meet and confer on the hardship or prejudice alleged for a fact deposition that was not identified by the time of the hearing. The Court reiterates that it has already determined that there is a legitimate reason for remote depositions for all fact depositions (identified and not yet identified). Therefore, the first prong of the analysis is met as to all fact depositions. If the parties are unable to resolve any objections relating to a new witness, the opposing party must make a showing of hardship or prejudice to the Court to satisfy the second prong of the analysis.

For the remote deposition protocol, the parties must use the draft protocol in Defendant's Amended Proposed Order as the starting point. The parties must meet and confer no later than **two business days** after the entry of this Order, and they must file their proposed protocol by **September 21, 2020**. If the parties cannot



agree on all provisions, they must present a joint submission, setting forth their respective positions in the body of the protocol document.

## ORDER

Based on the arguments of counsel and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Compel Remote Depositions (Doc. No. 125) is **GRANTED IN PART** and **DENIED IN PART** consistent with the reasoning and rulings above. The motion is granted in part as to any fact deposition identified as of the date of the hearing, and denied in part without prejudice as to any fact deposition not yet identified as of the date of the hearing.

Page 12

Dated: September 14, 2020

s/ Becky R. Thorson
BECKY R. THORSON
United States Magistrate Judge

--------

Footnotes:

[1.] The print version of this article was issued on June 26, 2020. Kimberly A. Prather et al., *Reducing transmission of SaARS-Co-V-2*, 368 Science 1422 (June 26, 2020).

[2.] Both sides assert that Minnesota Executive Orders, guidance from the Minnesota Judicial Branch, and this Court's General Orders govern this Court's decision. Even if they do govern in some respect, this Court does not find that these materials prohibit an in-person deposition altogether if warranted. With that said, there is no question that the District of Minnesota's General Order No. 18, effective through December 31, 2020, strongly encourages the use of video conferences for civil hearings, bench trials, and other proceedings. While the Court is cautiously opening to criminal motion hearings and jury trials, this is because there are no better alternatives. Here, there is a better alternative

permitted by Rule. Federal Rule of Civil Procedure 20(b)(4) provides that the court, on motion, may order remote depositions in civil cases. The Court's General Order No. 18 therefore weighs in favor of Defendant's position.

[3.] In opposing a court order for remote depositions, Plaintiffs argue that remote depositions are most often used for a relatively brief examination that do not involve numerous documents. *See Shockly v. Huhtamaki, Inc.*, 280 F.R.D. 598, 601-02, n.14 (D. Kan. 2012) (citing Manual for Complex Litigation (Fourth) § 11.452 (2004)). But the case Plaintiff relies on cites a manual from 2004, and videoconferencing technology has developed significantly since then. Plaintiffs also rely on *Srebrik v. Dean*, No. 05-cv-0186-WYD-MJW, 2006 WL 2331014, at *1 (D.Colo. June 20, 2006) for the proposition that in-person depositions are the norm. But the remote technology to be deployed in *Srebrik* was a telephone. The new norm today has changed, and remote videoconferencing technology has been specifically tailored to the deposition setting.

[4.] Plaintiffs also take the position that Defendant's health concerns about in-person depositions can be addressed by permitting Defendant's counsel to "remote in" to the in-person deposition. But that is not the inquiry before the Court. The inquiry is whether Plaintiffs have established any prejudice or hardship to Plaintiffs for everyone to appear remotely. Further, the vague hybrid approach offered by Plaintiffs is not justified, especially when considering the record before the Court. As presented, the Court agrees with Defendant's counsel that this hybrid approach would be unfair to Defendant. With that said, with respect to any witnesses who have not yet been identified, if there are special circumstances that require Plaintiffs' counsel to be in person to defend a particular witness, this Order provides an opportunity to meet and confer and present any hardship or prejudice to the Court that might warrant modifications to the deposition setting.

[5.] In *In re Broiler Chicken Antitrust Litig.*, the court described the process as follows:



> [T]o guard against a witness answering a question when the technology prevents the witness's counsel, who like the witness is participating in the deposition remotely and from a different location, from lodging an objection or instructing the witness not to answer the question, the parties might consider adopting a convention that would allow a witness to answer a question only after the lawyer defending the deposition says the witness can answer. A simple, "you may answer" would suffice. The Court is confident the parties can come up with other conventions that can make the taking and defending of remote deposition more palatable.

2020 WL 3469166, at *4, n.3.

[6.] Nothing in this order on remote depositions should be construed to order or set any requirements for how witnesses are to be prepared by counsel or mandate the environment such preparation should be conducted in.

[7.] As mentioned earlier, for witnesses not yet identified, if there are special circumstances that require Plaintiffs' counsel to be in person to defend a particular witness, this Order provides an opportunity to meet and confer and present any hardship or prejudice to the Court that might warrant modifications to the deposition setting.

--------



**Jason List and Alicia List, Plaintiffs,
and
Troy Fiedler and Jodi Fiedler, Intervenor
Plaintiffs,
v.
Robert Carwell, an individual, and
0820527 B C LTD,
a foreign corporation doing business as
Let It Ride Carriers, Defendants.**

**Case No. 18-cv-2253 (DSD/TNL)**

**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

**October 8, 2020**

**ORDER**

Alex Steven Halbach and Michael D. Bornitz,
Cutler Law Firm, LLP, 140 North Phillips Avenue,
Fourth Floor, P.O. Box 1400, Sioux Falls, SD
57101-1400 (for Plaintiffs);

Kathryn Hockin and L. Michael Hall, III, Hall
Law, P.A., 1010 West St. Germain Street, Suite
100, St. Cloud, MN 56301 (for Intervenor
Plaintiffs); and

Brandie L. Morgenroth, Pharaoh Johan Lewis,
and Stanley E. Siegel, Jr., Nilan Johnson Lewis
PA, 250 Marquette Avenue South, Suite 800,
Minneapolis, MN 55401 (for Defendants).

This matter comes before the Court on
several motions: Plaintiffs Jason and Alicia List's
(collectively, "List Plaintiffs") Motion to Compel
Production of Discovery, ECF No. 92; Intervenor
Plaintiffs Troy and Jodi Fiedler's (collectively,
"Fiedler Intervenors")

Page 2

Motion to Compel Discovery, for Leave to
Conduct Defendants' Depositions Remotely, for
an Amendment of the Scheduling Order, & for
Sanctions, ECF No. 108; and Defendants Robert
Carwell ("Carwell") and 0820527 B C LTD ("Let It
Ride") (collectively, "Defendants")'s Motion to

Amend the Scheduling Order, ECF No. 101,
Motion to Compel the List Plaintiffs' Discovery
Responses, ECF No. 132, and Motion to Compel
the Fiedler Intervenors' Discovery Responses,
ECF No. 137.

A remote hearing was held. Michael D.
Bornitz appeared on behalf of the List Plaintiffs;
Kathryn Hockin and L. Michael Hall, III,
appeared on behalf of the Fiedler Intervenors;
and Brandie L. Morgenroth, Pharaoh John Lewis,
and Stanley E. Siegel, Jr., appeared on behalf of
Defendants.

**I. BACKGROUND**

**A. The Accident**

This action arises out of an automobile
accident that occurred in Hennepin County,
Minnesota, in 2015. Order at 2, Dec. 26, 2018,
ECF No. 27 [hereinafter Dec. 26 Order]; *see also*
Intrvnrs.' Compl. ¶¶ 11-18, ECF No. 55. Let It Ride
is a motor carrier located in the Canadian
Province of British Columbia. Dec. 26 Order at 2;
*see also* Intrvnrs. Compl. ¶¶ 3, 6, 10. At the time
of the accident, Let It Ride employed Carwell as a
commercial truck driver. Dec. 26 Order at 2; *see
also* Intrvnrs.' Compl. ¶¶ 3, 13. Carwell also lives
in British Columbia. Pls.' Compl. ¶ 4, ECF No. 1;
Intrvnrs.' Compl.

Page 3

¶ 5; Decl. of Robert Carwell ¶ 2, ECF No. 149.[1]

The accident occurred when the vehicle
Carwell was driving collided with a vehicle driven
by Troy Fiedler. Pls.' Compl. ¶¶ 11-13; Intrvnrs.'
Compl. ¶¶ 15, 17. Both Jason List and Jodi Fiedler
were passengers in the vehicle driven by Troy
Fiedler. Pls.' Compl. ¶ 12; Intrvnrs.' Compl. ¶ 16.

**B. Death of Let It Ride's Owner**

According to Defendants, Let It Ride was
solely owned and operated by Dave Chetcuti.
Decl. of Stanley E. Siegel ¶ 5, ECF No. 105; *see*
Decl. of Rhonda Hiscutt ¶ 6, ECF No. 123;[2] *see*



*also* Second Decl. of Stanley E. Siegel ¶ 3, ECF No. 122.[3] In or around May 2019, Chetcuti was hospitalized in Vancouver, British Columbia, after undergoing a kidney transplant. Second Siegel Decl. ¶ 5; Hiscutt Decl. ¶ 3. Chetcuti was hospitalized until approximately early November. Second Siegel Decl. ¶ 6; *see* Hiscutt Decl. ¶ 3.

On or about November 13, 2019, a Wednesday, Defendants' counsel learned that Chetcuti had been discharged from the hospital and arranged to have a conference call with their client on November 18, the following Monday. Second Seigel Decl. ¶ 6. Chetcuti tragically passed away on November 13 when a tree fell on him at his property. Second Seigel Decl. ¶ 6; Hiscutt Decl. ¶ 4; Ex. 31 to Pls.' Aff. of Counsel, ECF No. 94-31. Based on information in the papers and provided at the hearing, Defendants' counsel

Page 4

learned of Chetcuti's passing sometime between November 13 and 18, but no later than November 18. *See* Second Seigel Decl. ¶ 6. The List Plaintiffs and Fielder Intervenors were informed of Chetcuti's death in early December. Ex. 20 to Pls.' Aff. of Counsel, ECF No. 94-20.

Among other family and friends, Chetcuti is survived by Hiscutt (his partner) and two children. Ex. 31 to Pls.' Aff. of Counsel. In early May 2020, counsel for the Fiedler Intervenors reached out to Chetcuti's daughter and was told that the family's intention was to dissolve Let It Ride, but that the process had not yet begun. Aff. of Kathryn J. Hockin ¶ 2, ECF No. 112. Chetcuti's daughter told counsel that Hiscutt "would be in charge of dealing with . . . Let It Ride." Hockin Aff. ¶ 2. The same day, counsel also reached out to Hiscutt and learned that "she is in possession of the Let It Ride business documents and could easily provide the requested documents." Hockin Aff. ¶ 3.

According to Hiscutt, she was not involved with Let It Ride and the business is in the process of dissolving. Hiscutt Aff. ¶¶ 5, 7. Hiscutt acknowledges that she "ha[s] access to a room full

of boxes and materials which belonged to [Chetcuti], but [she] ha[s] never looked through the boxes nor through any of the documents in any of the boxes in that room." Hiscutt Aff. ¶ 8. Hiscutt is "not familiar with [Chetcuti's] recordkeeping and . . . ha[s] no idea if there are any documents in those boxes relating to the Let It Ride business, or that are responsive to discovery requests from [the List] Plaintiffs or [Fielder] Intervenors." Hiscutt Aff. ¶ 8. The Court understands that Hiscutt has not personally been able to go through these boxes and appreciates that this might well be a "very burdensome and traumatic experience for [her]." Hiscutt Aff. ¶ 10.

Page 5

Fact discovery was scheduled to be completed by June 1, 2020. Fourth Am. Pretrial Sch. Order at 1, ECF No. 86. Between Chetcuti's death in November 2019 and the end of May 2020, the extent to which Defendants pursued documents related to Let It Ride and responding to discovery requests that had been served by the List Plaintiffs and Fielder Intervenors before Chetcuti's death is not entirely clear.[4] Towards the end of January 2020, counsel for the Fielder Intervenors reached out to Defendants' counsel regarding the status of certain discovery requests. Ex. 22 to Pls.' Aff. of Counsel, ECF No. 94-22. Defendants' counsel responded that they "were waiting to hear back on the discovery question as it relates to Let It Ride, and the unfortunate death of its owner/operator." Ex. 22 to Pls.' Aff. of Counsel. Based on information in the papers and provided at the hearing, it appears that Defendants' counsel relied on representations from Let It Ride's insurance adjuster, who had been in contact with Hiscutt, that the company was going to be dissolved and thereby concluded that there was no one able to respond to discovery. *See* Hockin Aff. ¶¶ 4-5. It was not until towards the end of May 2020, after the Fiedler Intervenors' counsel informed Defendants' counsel about the conversation with Hiscutt during a meet-and-confer, that Defendants' counsel reached out to Hiscutt to ascertain what she had in her possession.[5] *See* Hockin. Aff. ¶¶ 4-5.



Based on information provided at the hearing, Defendants' counsel has spoken with Hiscutt a handful of times since the end of May. It is the Court's understanding that

Page 6

Hiscutt has not gone through the documents and was instructed to retain them.

### C. Carwell's Heart Attack

Carwell is over 70 years old, retired, and lives in a remote area of British Columbia. Second Seigel Decl. ¶ 11; Carwell Decl. ¶¶ 2-3. Around the same time Chetcuti passed away, Carwell suffered a heart attack. Carwell Decl. ¶ 5; Seigel Decl. ¶ 4. At the hearing, the Court was informed that the heart attack took place in December 2019. Carwell experienced complications and was subsequently hospitalized until approximately mid-May 2020. Seigel Decl. ¶ 4; Carwell Decl. ¶ 6.

Carwell states that he is "still extremely ill and immunosuppressed," and has been advised by his doctor that he "cannot undergo any strenuous or stressful activities for [his] health until at least the fall of 2020." Carwell Decl. ¶ 7. "Based upon consultation with, and orders from [his] doctor, . . . [Carwell further states that he] will not have the strength, stamina, or mental acuity to prepare for and appear during a deposition under oath in this case, whether in person or by videotape, until the fall of 2020." Carwell Decl. ¶ 7. Other than Carwell's declaration, there is no evidence in the record of any medical restrictions.

### D. COVID-19 Pandemic

The unprecedented COVID-19 has further complicated matters. Beginning on March 13, 2020, and continuing thereafter, the Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota, has issued a series of General Orders in connection with the COVID-19 pandemic, *available at* https://www.mnd.uscourts.gov/coronavirus-covid-19-guidance. These General Orders

Page 7

acknowledge, among other things, that (1) a national emergency was declared by the President of the United States of America in response to COVID-19; (2) a peacetime emergency was declared by the Governor of the State of Minnesota in response to COVID-19; (3) a stay-at-home order was implemented by the Governor of the State of Minnesota in response to COVID-19; and (4) executive orders continued to be issued by the Governor of the State of Minnesota in response to COVID-19 that place restrictions on Minnesota residents.

As particularly relevant in this case, the Centers for Disease Control and Prevention ("CDC") has cautioned that "[t]ravel increases [the] chance of getting and spreading COVID-19," and emphasized that "[s]taying home is the best way to protect yourself and others from COVID-19." *Travel During the COVID-19 Pandemic*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last accessed Oct. 8, 2020). On March 21, 2020, the United States and Canada "temporarily restricted non-essential travel across the US-Canada land borders" and these restrictions remain in effect until October 21, 2020. *Temporary Restriction of Travelers Crossing US-Canada & Mexico Land Borders for Non-Essential Purposes*, U.S. Customs & Border Protection, https://help.cbp.gov/s/article/Article-1596?language=en_US (last accessed Oct. 8, 2020). Further, as of August 6, 2020, the United States Department of State advises that travel to Canada should be "reconsider[ed]" and notes that the CDC "has issued a Level 3 Travel Health Notice for Canada due to COVID-19." *Canada International Travel Information*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-

Page 8



Country-Information-Pages/Canada.html#/ (last accessed Oct. 8, 2020); *see also COVID-19 in Canada*, *Travelers' Health*, Ctrs. for Disease Control & Prevention, https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-canada (last accessed Oct. 8, 2020) ("Warning - Level 3, COVID-19 risk in Canada is high").

## II. ANALYSIS

The instant motions all implicate the Court's broad discretion in handling pretrial procedure and discovery. *See, e.g.*, *Hill v. Sw. Energy Co.*, 858 F.3d 481, 484 (8th Cir. 2017) ("'A district court has very wide discretion in handling pretrial discovery . . . .'") (quoting *United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014)); *Solutran, Inc. v. U.S. Bancorp*, No. 13-cv-2637 (SRN/BRT), 2016 WL 7377099, at *2 (D. Minn. Dec. 20, 2016) ("Further, magistrate judges 'are afforded wide discretion in handling discovery matters and are free to use and control pretrial procedure in furtherance of the orderly administration of justice.'") (internal quotation marks omitted) (quoting *Favors v. Hoover*, No. 13-cv-428 (JRT/LIB), 2013 WL 6511851, at *3 n.3 (D. Minn. Dec. 12, 2013)).

### A. List Plaintiffs' & Fielder Intervenors' Motions to Compel

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "'The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.'" *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment). "[A] court can—and

must—limit proposed discovery that it determines is not proportional to the needs of the case." *Id.*

(quotation omitted). Considerations bearing on proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Vallejo*, 903 F.3d 742-43.

### 1. Carwell's Discovery Responses

The Court begins with the List Plaintiffs' challenges to a number of Carwell's discovery responses.

#### a. Notarized Signature for Interrogatory Answers

Rule 33 requires that "[e]ach interrogatory . . . , to the extent it is not objected to, be answered separately and fully in writing and under oath." Fed. R. Civ. P. 33(b)(3). Carwell's answers to the List Plaintiffs' interrogatories contain a signed "verification" section in which Carwell "declares, under penalty of perjury, that he has read the above and foregoing Interrogatories and know [sic] the content thereof, and that the matters and things set forth therein are true and correct to the best of his knowledge, information and belief." Ex. 7 to Pls.' Aff. of Counsel at 11, ECF No. 94-7; *accord* Ex. 8 to Pls.' Aff. of Counsel at 5, ECF No. 94-8. The List Plaintiffs contend Carwell is required "to provide original *notarized* signatures." Pls.' Mem. in Supp. of Mot. to Compel at 14, ECF No. 93. At the hearing, the parties agreed to stipulate that this "verification" would have the same effect as if it had been executed before a notary. To the extent such stipulation has

not yet been executed, the parties shall execute said stipulation by November 15, 2020.[6]



**b. Agreements to Supplement: Criminal History**, **Cell Phone Records**, **Medical Records**, **and Interrogatory 7**

The List Plaintiffs move to compel Carwell to respond or supplement his responses to discovery requests concerning his criminal history (Interrogatory 3),[7] cell phone records (Request For Production 15),[8] and medical records (Request for Production 26). Defendants have agreed to address these responses. At the hearing, the parties informed the Court that they were in the process of obtaining the relevant information and authorizations. To the extent such authorizations have not been

Page 11

completed already, Carwell shall complete them by November 1, 2020. Consistent with the spirit of this agreement, Carwell shall fully cooperate with any reasonable request for further information in connection with these authorizations so that the documents sought by the authorizations can be obtained.

The List Plaintiffs have also moved to compel Carwell to supplement his response to Interrogatory 7, requesting that he "identify any third party . . . alleged [to have] caused or contributed to the cause of the collision and state the facts upon which . . . this contention" is based. Pls.' Mem. in Supp. of Mot. to Compel at 26. Carwell has also agreed to supplement this response. To the extent he has not already done so, Carwell shall supplement his response to Interrogatory 7 by November 15, 2020.

**c. Insurance-Related Discovery**

The next group of requests concern statements Carwell made regarding the accident (Request for Production 21); correspondence Carwell had with any person other than counsel regarding the accident (Request for Production 23); Defendants' claims file (Request for Production 25); and the insurance policy. Collectively, these requests are largely designed to get at information Carwell may have shared with Defendants' insurance company, Insurance Corporation of British Columbia ("ICBC"). Defendants respond that all information regarding the ICBC insurance policy has been produced and Carwell does not have any statements or correspondence to produce. Defendants additionally respond that Carwell does not have the claims file, which belongs to ICBC. At bottom, this dispute is really over information the List Plaintiffs contend should be obtainable from ICBC.

Page 12

Back in 2016, approximately six months after the accident, the List Plaintiffs sent a letter to ICBC, requesting preservation of various things in connection with the accident. *See generally* Ex. 9 to Pls.' Aff. of Counsel, ECF No. 94-9. The List Plaintiffs argue that "ICBC is in the business of insurance, and that includes claims investigations," and "ICBC, like all insurers, routinely obtains statements from their insureds in the regular course of business." Pls.' Mem. in Supp. of Mot. to Compel at 18. The List Plaintiffs further argue that "Carwell should be able to get some of the requested documentation from [ICBC]." Pls.' Mem. in Supp. of Mot. to Compel at 22. According to the List Plaintiffs, they "should be allowed to determine what . . . Carwell and Let It Ride reported to ICBC regarding the cause of the collision and what happened at the scene." Pls.' Mem. in Supp. of Mot. to Compel at 23.

A party cannot be compelled to produce what it does not have. *See, e.g., Edeh v. Equifax Info. Servs., LLC*, 291 F.R.D. 330, 337 (D. Minn. 2013) ("Here, Equifax maintains that it does not have the documents requested in Requests for Production Nos. 3 and 4. If Equifax does not have the documents in its possession, custody, or control, it cannot be compelled to produce them."); *see also Bombardier Recreational Prods., Inc., v. Arctic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 WL 5685463, at *7 (D. Minn. Sept. 24, 2014) ("The Court must accept, at face value, a party's representation that it has fully produced all materials that are discoverable.") (quotation omitted); *Farmers Ins. Exch. v. West,*





No. 11-cv-2297 (PAM/JJK), 2012 WL 12894845, at *5 (D. Minn. Sept. 21, 2012) ("Of course, the Court cannot order any party to produce something in discovery that does not, in fact, exist."). Carwell does not have information responsive to the List

Page 13

Plaintiffs' requests, so there is nothing to compel from him. Nor is ICBC a party to this case. Whatever ICBC-claims-related discovery the List Plaintiffs may have hoped to get indirectly from Defendants should have been sought directly from ICBC by subpoena or other similar process—something the List Plaintiffs had ample opportunity to do during discovery.[9]

Therefore, with respect to these requests, the Court will grant the List Plaintiffs' motion only to the extent that Carwell formally supplement his response to Request for Production 21 by November 15, 2020, if he has not done so already. *See* Second Seigel Decl. ¶ 7 (Defendants confirmed on telephone call that "Carwell did not have any correspondence or recorded or written statements in his possession to produce"). The List Plaintiffs' motion is otherwise denied as to these requests.

### d. Counting of Interrogatories

Initially, Carwell objected to the number of interrogatories served by the List Plaintiffs, asserting they exceeded the number of interrogatories permitted by the pretrial scheduling order. Ex. 3 to Pls.' Aff. of Counsel at 2, 4-5, ECF No. 94-3; *see, e.g.*, Fourth Am. Pretrial Sch. Order at 1 ("No more than 30 Interrogatories, counted in accordance with Fed. R. Civ. P. 33(a), shall be served by any party."). Nevertheless, Carwell subsequently responded to all of the interrogatories served by the List Plaintiffs. When asked by the Court at the hearing if this issue was moot, the List Plaintiffs expressed

Page 14

concern over potential future discovery should the Court extend the time for fact discovery in this matter.

The issue of whether Carwell should be compelled to respond to certain interrogatories served by the List Plaintiffs in this matter is presently moot; he has already done so. Therefore, this portion of the List Plaintiffs' motion is denied as moot.

As set forth in greater detail below, *see infra* Section II.C, the Court is not inclined to allow additional written discovery beyond that which was served on or before May 1, 2020. The Fourth Amended Pretrial Scheduling Order provides that "[f]act discovery shall be *commenced in a time to be completed* on or before *June 1, 2020*." Fourth Am. Pretrial Sch. Ord. at 1. The List Plaintiffs have had well over a year to conduct discovery. While the Court's ruling should not be interpreted to prohibit or preclude reasonable requests for clarification of a response ordered herein, whether any such follow-up request exceeds the bounds of clarification will be a context-specific inquiry that is simply premature at this time. The Court strongly encourages the parties to focus their efforts on the substantive issues at hand.

### 2. Carwell's Deposition

The List Plaintiffs and Fielder Intervenors have both moved to compel Carwell's deposition to occur remotely.

Defendants maintain they have agreed to conduct Carwell's deposition remotely. *See, e.g.*, Defs.' Opp'n to Pls.' Mot. to Compel at 8 ("Plaintiffs failed to disclose Defendant Carwell's voluntary agreement to . . . participate in a remote deposition during the meet and confer discussions before this Motion was filed."), ECF No. 121; Defs.'

Page 15

Opp'n to Intrvnrs.' Mot. to Compel at 9 ("During the parties['] meet[-]and[-]confer call on May 21, 2020, Defendants' counsel agreed to allow the



deposition of Defendant Carwell to move forward remotely."), ECF No. 125. Defendants have, however, conditioned their agreement: "Carwell could be deposed, once his health allowed, by the parties remotely if his counsel was physically present." Second Seigel Decl. ¶ 7; *see, e.g.*, Second Seigel Decl. ¶ 10 ("Defendants' counsel agreed to allow the deposition of Defendant Carwell to go forward remotely if Defendants' counsel was able to be present with Defendant Carwell to defend the deposition."); Defs.' Opp'n to Pls.' Mot. to Compel at 8 (stating Defendants already agreed to "[a]llow for Defendant Carwell's deposition to be taken remotely if his defense counsel could be present with him at the time of the deposition."); *see also* Defs.' Opp'n to Intrvnrs.' Mot. to Compel at 9 ("Defendants' counsel requested, however, that because Defendant Carwell is in Canada and unfamiliar with the legal process in the United States, that counsel be present with him for his deposition."). Defendants argue that conducting Carwell's deposition remotely "would still require someone to be present in his home to equip him with and train him on a computer and deposition software." Defs.' Opp'n to Intrvnrs' Mot. to Compel at 2; *see also* Seigel Decl. ¶ 10. Defendants also assert that "Carwell's doctor has advised against the strenuous activity associated with deposition preparation as well as having anyone present in . . . Carwell's home." Defs.' Opp'n to Intrvnrs' Mot. to Compel at 3. According to Defendants, Carwell will "not be able to attend a deposition until the fall of 2020." Seigel Decl. ¶ 10.

Rule 30(b)(4) of the Federal Rules of Civil Procedure provides that the Court may

Page 16

order "a deposition to be taken by telephone or remote means." *See, e.g.*, *Learning Res., Inc. v. Playgo Toys Enters. Ltd.*, No. 19-cv-00660, ___ F.R.D. ___, 2020 WL 3250723, at *1 (N.D. Ill. June 16, 2020) (discretion to order deposition be taken by remote means under Rule 30(b)(4)); *accord Sonrai Sys., LLC v. Romano*, No. 16 CV 3371, 2020 WL 3960441, at *1 (N.D. Ill. July 13, 2020). This Rule, like all of the other Rules, must

be "construed, administered, and employed . . . to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1; *see Swenson v. GEICO Cas. Co.*, No. 2:19-cv-01639-JCM-NJK, ___ F.R.D. ___, 2020 WL 4815035, at *3 (D. Nev. Aug. 19, 2020) ("As with the Federal Rules of Civil Procedure more generally, courts are mindful to construe Rule 30(b)(4) in a manner that secures the just, speedy, and inexpensive determination of the case.").

"Generally, leave to take depositions by remote means should be granted liberally." *Swenson*, 2020 WL 4815035, at *2; *see also In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637, 2020 WL 3469166, at *7 (N.D. Ill. June 25, 2020) [hereinafter *In re Broiler Chicken*] ("Courts have long held that leave to take remote depositions pursuant to Rule 30(b)(4) should be granted liberally.") (citing cases).

> Analyzing whether to permit remote depositions generally consists of two steps. First, the proponent must advance a legitimate reason for seeking a remote deposition. Second, if that foundational showing is made, then the burden shifts to the opposing party to make a particularized showing that conducting the deposition by remote means would be prejudicial.

*Swenson*, 2020 WL 4815035, at *2 (quotation and citation omitted); *accord In re Broiler Chicken*, 2020 WL 3469166, at *7. This requires careful consideration of the facts and

Page 17

circumstances, including the hardships asserted. *See, e.g.*, *Learning Res., Inc.*, 2020 WL 3250723, at *1 ("[T]his Court must balance claims of prejudice and those of hardship and conduct a careful weighing of the relevant facts.") (quotation omitted); *accord Rouviere v. DePuy Orthopaedics, Inc.*, No. 1:18-cv-04814 (LJL) (SDA), 2020 WL 3967665, at *2 (S.D. N.Y. July



11, 2020); *see also In re Broiler Chicken*, 2020 WL 3469166, at *7.

"COVID-19 'is a potentially fatal illness with the ability to spread through asymptomatic or pre-symptomatic carriers, with no approved cure, treatment, or vaccine.'" *Grupo Petrotemex, S.A. de C.V. v. Polymetrix AG*, No. 16-cv-2401 (SRN/HB), 2020 WL 4218804, at *2 (D. Minn. July 23, 2020) [hereinafter *Grupo*] (quoting *Rouviere*, 2020 WL 3967665, at *3) (internal quotation omitted). "[T]he [CDC] ha[s] noted that the best way to prevent illness is to minimize person-to-person contact," *Learning Res., Inc.*, 2020 WL 3250723, at *2 (quotation omitted); *see How to Protect Yourself, Coronavirus Disease 2019 (COVID-19)*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed Oct. 8, 2020). As this and other federal courts have recognized, "the President of the United States has declared a national emergency due to the spread of the COVID-19 virus." *Learning Res., Inc.*, 2020 WL 3250723, at *2 (quotation omitted); *see generally* Gen. Order Nos. 18, 19. General Order No. 18 "continues to strongly encourage the use of videoconferencing for civil hearings, bench trials, and other proceedings."[19] Gen. Order No. 18 at 3.

Page 18

Carwell is at increased risk for severe illness from COVID-19 based on his age and his underlying medical conditions. *See, e.g.*, *Older Adults, Coronavirus Disease 2019 (COVID-19)*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed Oct. 8, 2020); *People with Certain Medical Conditions, Coronavirus Disease 2019 (COVID-19)*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-

ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed Oct. 8, 2020) (individuals with heart conditions and those in an immunocompromised state at increased risk for severe illness); *see also How to Protect Yourself*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html ("Older adults and people who have certain underlying conditions like heart or lung disease or diabetes are at an increased risk of severe illness from COVID-19 illness."). Further, as noted above, various restrictions are in place for travel between the United States and Canada. Indeed, regardless of the current level of outbreak in either location, the very nature of long-distance travel is a contact-intensive activity: "[T]ravelers must find transportation to and from airports[;] interact with security personnel, airline personnel, and other travelers[;] sit in relatively close proximity to other travelers on airplanes[;] and stay in hotels." *Grupo*, 2020 WL 4218804, at *2.

"Due to the COVID-19 pandemic, conducting depositions remotely has become the 'new normal.'" *Id.* at *2 (citing *In re Broiler Chicken*, 2020 WL 3469166, at *5).

Page 19

"Courts are beginning to recognize that a 'new normal' has taken hold throughout the country in the wake of the COVID-19 pandemic that may necessitate the taking of remote depositions unless litigation is going to come to an indefinite halt until there is a cure or a vaccine for COVID-19." *In re Broiler Chicken*, 2020 WL 3469166, at *5 (footnote citing cases omitted); *see also Swenson*, 2020 WL 4815035, at *3 ("[C]ourts within the Ninth Circuit routinely highlight remote depositions as an effective and appropriate means to keep cases moving forward notwithstanding pandemic-related restrictions.") (citing cases).

The indefinite delay Defendants seek so that counsel may travel to Canada to conduct deposition activities with Carwell is entirely unworkable. "[O]ne court labeled the 'hope that



physical distancing and stay-at-home orders required by the current pandemic will be lessened to allow for in-person depositions in the near future' as 'pure speculation.'" *In re Broiler Chicken*, 2020 WL 3469166, at *8 (quoting *United States ex rel. Chen v. K.O.O. Constr., Inc.*, 445 F. Supp. 3d 1055, 1056 (S.D. Cal. 2020)). Defendants have cited no authority that their ability to travel to Canada may be better anytime soon, and this Court is likewise "unable to predict the creation and distribution of an effective vaccine or the ebbs and flows of the spread of the virus." *Swenson*, 2020 WL 4815035, at *6. "Unfortunately, it could well be that pandemic-related restrictions exist for many months to come . . . ." *Id.*; *see Rouviere*, 2020 WL 3967665, at *4 ("There is no basis to believe that the conditions that require a remote deposition to be taken will not continue for the foreseeable future, and the Court declines to indefinitely delay the completion of discovery in this case."); *Chen*, 445 F. Supp. 3d at 1056 ("It is not feasible

Page 20

for the Court to extend deposition deadlines until a time when they can be safely conducted in person because no one knows when that will occur and there are alternatives."). Proceeding with Carwell's remote deposition now "move[s] th[is] case closer to resolution by dispositive motion, settlement, or trial than would be the case if the litigation treads water until the pandemic abates." *In re Broiler Chicken*, 2020 WL 3469166, at *9 (footnote omitted).

The Court appreciates Carwell's legitimate concerns for his own health as he recovers from his heart attack and the complications he experienced. At the same time, while the Court has no reason to doubt the representations of Carwell and Defendants' counsel, there is no medical evidence in the record supporting the degree of restriction Carwell is purportedly under. In any event, it has now been approximately ten months since Carwell's heart attack and five months since he was released from the hospital. Defendants have represented that Carwell would be in a position to be deposed in "the fall."

Carwell Decl. ¶ 7; Defs.' Opp'n to Intrvnrs.' Mot. to Compel at 2.

The Court is also mindful of Defendants' logistical concerns based on Carwell's location and the fact that he does not possess certain technical equipment that might otherwise more easily facilitate the taking of his deposition remotely. Courts have rejected these and similar types of challenges as reasons not to conduct depositions remotely. *See*, *e.g.*, *Swenson*, 2020 WL 4815035, at *4-5; *In re Broiler Chicken*, 2020 WL 3469166, at *2-5; *Grano v. Sodexo Mgmt., Inc.*, 335 F.R.D. 411, 415 & n.4 (S.D. Cal. 2020). What may come across as harsh is nevertheless true: "Attorneys and litigants all over the country are adapting to a new way of practicing law, including conducting

Page 21

depositions and deposition preparation remotely." *Grano*, 335 F.R.D. at 415; *accord Chen*, 445 F. Supp. 3d at 1057. "There are numerous resources and training opportunities available throughout the legal community to assist [the parties'] counsel in the operation and utilization of the new technology." *Grano*, 335 F.R.D. at 415; *see also*, *e.g.*, *Swenson*, 2020 WL 4815035, at *5 ("In short, ample resources exist for counsel to prepare themselves to proceed by video to facilitate the smooth operation of a remote deposition."); *Grupo*, 2020 WL 4218804, at *3 ("In addition, there are many resources available from vendors and throughout the legal community to assist counsel in preparing for remote depositions.").

Nor is there evidence in the record to suggest that Carwell "cannot learn how to use the technology required for a video deposition or preparation session" with the help of counsel and other resources. *In re Broiler Chicken*, 2020 WL 3469166, at *3. That Carwell, or counsel for that matter, may "not presently [be] comfortable or familiar with the technology does not mean they cannot learn the basics that would allow them to be prepared or deposed remotely even if they



never become fully comfortable with the technology themselves." *Id.*

The Court will grant the List Plaintiffs and Fielder Intervenors' request to take Carwell's deposition remotely.[11] No sooner than December 1 but no later than December 15, 2020, Carwell shall sit for a deposition by video conference. This timeframe balances

Page 22

a number of competing concerns. First, it is consistent with Carwell's medical restrictions. Second, it provides time for Carwell to supplement his discovery responses to the extent he has not done so already. Third, it gives Defendants' counsel reasonable time to prepare Carwell. Lastly, it advances this litigation forward in the face of the pandemic's uncertain duration. *See*, *e.g.*, *Grupo*, 2020 WL 4218804, at *3 ("On balance, the Court finds that the potential risk of danger and hardship to witnesses, counsel, court reporters and videographers will be considerable lessened through remote video depositions, and outweighs the potential prejudice to Plaintiffs."); *In re Broiler Chicken*, 2020 WL 3469166, at *8 ("In this case, however, the COVID-19 pandemic, in conjunction with the other circumstances discussed above, are legitimate reasons for the Class Plaintiffs to want to move forward with remote depositions now.").

The Court is confident that the parties can work together to come up with procedures, protocols, conventions, and the like "that can make the taking and defending of remote depositions more palatable." *In re Broiler Chicken*, 2020 WL 3469166, at *4 n.3. Counsel for the Fielder Intervenors "have conducted numerous depositions via remote technology, and have prepared their own clients for depositions via remote technology." Intrvnrs.' Mem. in Supp. of Mot. to Compel at 17, ECF No. 111. Their experience may yield suggestions on how this process might be more easily facilitated. The Court also encourages the parties to look at the rather extensive protocol outlined in *In re Broiler*

*Chicken* for ideas. 2020 WL 3469166, at *4 n.3, 11-12.

### 3. Let It Ride's Discovery Responses

Let It Ride has not responded to discovery served by either the List Plaintiffs or

Page 23

the Fielder Intervenors. *See*, *e.g.*, Pls.' Mem. in Supp. of Mot. to Compel at 4, 10; Intrvnrs.' Mem. in Supp. of Mot. to Compel at 3, 8. With respect to the List Plaintiffs, at issue are those interrogatories and requests for production of documents the List Plaintiffs served on Let It Ride in May 2019.[12] *See* Pls.' Mem. in Supp. of Mot. to Compel at 14. With respect to the Fielder Intervenors, at issue are the requests for production of documents the Fielder Intervenors served in November 2019 and ten[13] interrogatories also served in November 2019. *See* Intrvnrs.' Mem. in Supp. of Mot. to Compel at 4-7, 10-14. Defendants' position is that there is no one to respond to discovery because "Let It Ride is in the process of dissolving, and its owner, operator, and sole employee, . . . was killed last fall." Defs.' Resp. to Pls.' Mot. to Compel at 12, ECF No. 121; *accord id.* at 13-14; *see also* Defs.' Resp. to Intrvnrs.' Mot. to Compel at 1, 7-9.

Defendants have provided no authority to support the position that Let It Ride does not have an obligation to respond to discovery simply because it may no longer be actively conducting business or is contemplating dissolution. Let It Ride is a party to this action; it has answered and contests liability. *See Burris v. Versa Prods.*, *Inc.*, No. 07-cv-3938 (JRT/JJK), 2013 WL 608742, at *6 (D. Minn. Feb. 19, 2013). While Hiscutt may have communicated her intent to dissolve Let It Ride to its insurer and possibly

Page 24

Defendants' counsel as well, the law of British Columbia[14] provides that "a legal proceeding commenced by or *against the company before its dissolution may be continued as if the company*



*had not been dissolved*." Business Corporations Act, S.B.C. 2002, c. 57, s. 346(1)(a) (emphasis added); *see, e.g., Ziemer v. Wheeler*, 2014 BCSC 2049, para. 201 (Can. B.C. S.C.) ("Section 346(1)(a) provides that if proceedings are brought against the company, then they continue as if the company had not been dissolved.").

At the hearing, Defendants did not dispute this continued legal existence even if Let It Ride should dissolve. "If a dissolved [British Columbian company] may still be a party in a civil lawsuit, . . . then it has a duty under the Federal Rules of Civil Procedure to respond to discovery that is properly served on it." *Burris*, 2013 WL 608742, at *6. As a party to this litigation, Let It Ride must respond to discovery. *Id.* "What [Let It Ride] cannot do, free of consequences, is tell [the List Plaintiffs and Fielder Intervenors] that they are just out of luck." *Id.* at *7.

The Court recognizes that a series of unfortunate circumstances have culminated in an unclear chain of succession for Let It Ride, but it is not this Court's responsibility to resolve the "who" or the "how" for Let It Ride. There are individuals to whom Defendants' counsel may turn for information. ICBC, Let It Ride's insurance company, has been on notice of the accident since at least March 2016, when the List Plaintiffs sent a preservation letter to the company. ICBC continues to communicate with Defendants'

Page 25

counsel and may be the most incentivized through its own potential exposure. *See* Ex. 9 to Pls.' Aff, of Counsel. Carwell and other former employees may have information responsive to the List Plaintiffs and Fielder Intervenors' discovery requests. *See Burris*, 2013 WL 608742, at *6.

In addition, the several boxes of documents in Canada with Hiscutt may very well be responsive to and assist in answering the discovery propounded. Under Rule 34, a responding party must produce those documents in its "possession, custody, or control." Fed. R.

Civ. P. 34(a)(1). This concept of "possession, custody, or control" is not confined to physical possession, but also looks to "whether the party has a legal right to the documents or practical ability to obtain the information." *Triple Five of Minn., Inc. v. Simon*, 212 F.R.D 523, 527 (D. Minn. 2002) (citing *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 636 (D. Minn. 2000)). There is no real dispute that Let It Ride has the ability to obtain these documents from Hiscutt, who has physical possession of them. While Hiscutt has expressed varying degrees of willingness to go through the documents herself given the understandable emotional strain of such a task, it cannot be said that documents are not within Let It Ride's possession, custody, or control.

Absent the current public health situation, Defendants' counsel intended to travel to Canada to examine the documents. The COVID-19 pandemic has, however, severely curtailed the availability of this option and the timeframe in which this option might once again become reasonably available is entirely speculative. Similarly, the Court does not doubt or discount the significant personal burden to Hiscutt of having to go through these documents herself in the wake of Chetcuti's tragic and unexpected passing.

Page 26

There is, however, another solution that well accounts for and balances the principles of Rules 1 and 26. Under Rule 1, the Federal Rules of Civil Procedure are to be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Rule 26 mandates proportionality in discovery. *See* Fed. R. Civ. P. 26(b)(1). As stated above, considerations bearing on proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its



likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Vallejo*, 903 F.3d 742-43.

At the hearing, counsel for the Fielder Intervenors offered to pay for these documents to be shipped from Canada to Defendants' counsel. Counsel for the List Plaintiffs also offered to assist in the cost of shipping the documents. Given the current state of Let It Ride and the unique circumstances of this case, reviewing those documents is likely one of the few remaining ways to obtain information relevant to the issues at stake in this litigation. The Fielder Intervenors and List Plaintiffs have agreed to shoulder the expense of having the documents shipped to Defendants. Having the documents shipped to Defendants' counsel greatly lessens the personal burden to Hiscutt. Moreover, as a practical matter, whether the documents bear on this litigation and their significance, if any, will very likely be more readily apparent to Defendants' counsel than Hiscutt, thereby increasing the efficiency of going through the documents. Lastly, shipping the documents to Defendants' counsel now—rather than awaiting an

Page 27

undetermined period of time for the pandemic to subside—fosters a timelier resolution of this action.

Finally, Let It Ride's wholesale failure to respond to discovery is not attributable to an arguably excusable few days' delay or inadvertent calendaring error. The List Plaintiffs and Fielder Intervenors regularly followed up with defense counsel regarding the status of Let It Ride's discovery responses. *See*, *e.g.*, Pls.' Mem. in Supp. of Mot. to Compel at 5-10 (since at least July 3, 2019); Intrvnrs.' Mem. in Supp. of Mot. to Compel at 3 (since at least January 13, 2020). Nor was it, at bottom, a reasonable response in the wake of an unexpected series of events or the product of an unprecedented pandemic. While their efforts and abilities may have been hindered in part as of mid-March, this does not account for Defendants having largely sat on their hands in

the months following Chetcuti's death, assuming Let It Ride would just fade away.

The time for these discovery responses is long overdue. Let It Ride's inaction has rendered any objections it might have had to these discovery requests untimely. *See* Fed. R. Civ. P. 33(b)(2), (4) (answers to interrogatories and any objections due within 30 days; untimely objections waived); Fed. R. Civ. P. 34(b)(2)(A)-(C) (responses to requests for production and any objections due within 30 days); *Cargill, Inc. v. Ron Burge Trucking, Inc.*, 284 F.R.D. 421, 424 (D. Minn. 2012) ("Although Rule 34 does not contain an automatic waiver provision for untimely objections as does Rule 33(b)(4), courts have reasoned that Rule 33(b)(4) type waiver should be implied into all rules involving the use of the various discovery mechanisms.") (quotation omitted). "For the waiver provision in Rule 33, and, by implication, Rule 34, to mean anything, a party cannot unilaterally

Page 28

determine that it is entitled to a stay of discovery and maintain its objections to discovery requests that it never responded to." *Cargill*, 284 F.R.D. at 427.

Therefore, with respect to the outstanding discovery responses, the Court will grant the List Plaintiffs and Fielder Intervenors' motions to compel as follows: By November 15, 2020, the parties shall arrange to have the boxes of documents with Hiscutt shipped from Canada to Defendants' counsel.[15] By January 15, 2021, Defendants shall respond, without objection, to (a) the List Plaintiffs' Interrogatories and Requests for Production of Documents to Defendant 0820527 B C LTD d/b/a Let It Ride Carriers (First Set), dated May 8, 2019; (b) the Fielder Intervenors' Request for Production of Documents to Defendant 0820527 B C LTD d/b/a Let It Ride Carriers, dated November 5, 2019; and (c) Interrogatories 1, 20, 27, 28, 31, 35, 37, 39, 41, and 47 of the Fielder Intervenors' Interrogatories to Defendant Let It Ride Carriers, dated November 5, 2019. Defendants shall arrange and



pay for the boxes of documents to be shipped back to Hiscutt no later than 60 days after the termination of this action, including any appeals.

The List Plaintiffs and Fielder Intervenors' motions to compel are otherwise denied with respect to the outstanding discovery responses.

Should Let It Ride

persist[] in its position that it will not provide substantive answers to interrogatories or document requests, . . . consequences may include preventing [it] from contesting issues addressed in the discovery or defending itself using documents or other pieces of information that have not been produced. *See* Fed. R. Civ. P. 37(d)(1)(A)(ii) (providing for

Page 29

sanctions for failure to answer interrogatories or requests for inspection); Fed. R. Civ. P. 37(d)(3) (providing that the Court may impose sanctions under Rule 37(b)(2)(A)(i)-(vi)). It may also be subject to other more dispositive sanctions, including the entry of judgment against it. Fed. R. Civ. P. 37(b)(2)(A)(v)-(vi).

*Burris*, 2013 WL 608742, at *7.

### 4. Let It Ride's 30(b)(6) Deposition

The List Plaintiffs also seek to compel Let It Ride to sit for a 30(b)(6) deposition.[16] Again, Defendants respond that there is no one left to designate. Defendants' position is plainly without legal support.

"The testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponents." *United States v. Taylor*, 166 F.R.D. 356, 361

(M.D. N.C. 1996); *accord Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 538 (D. Nev. 2008). When a party notices the deposition of a corporation like Let It Ride, the corporation "*must* then designate one or more officers, directors, or managing agents, or designate *other persons who consent to testify on its behalf*." Fed. R. Civ. P. 30(b)(6) (emphasis added). "The persons designated must testify about information known or reasonably available to the organization." *Id.*

"A Rule 30(b)(6) designee is not required to have personal knowledge on the designated subject matter." *Great Am. Ins. Co.*, 251 F.R.D. at 538. "If the persons designated by the corporation do not possess personal knowledge of the matters set out in

Page 30

the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation." *Taylor*, 166 F.R.D. at 361. "Thus, the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved." *Id.*; *accord Great Am. Ins. Co.*, 251 F.R.D. at 539; *see also*, *e.g.*, *Klein v. Affiliated Grp., Inc.*, No. 18-cv-949 (DWF/ECW), 2019 WL 246768, at *9 (D. Minn. Jan. 17, 2019). As "[t]his obligation requires the designee to testify about information known or reasonably available to the organization[, it] . . . can include information held by third-party sources if that information is reasonably available to the organization." *Klein*, 2019 WL 246768, at *9 (quotation omitted).

Significantly and regrettably in this case, "a corporation has a life beyond that of mortals." *Taylor*, 166 F.R.D. at 361. A corporation "can [also] discharge its 'memory,' i.e., employees, and they can voluntarily separate themselves from the corporation." *Id.* "Consequently, it is not uncommon to have a situation . . . where a corporation indicates that it no longer employs individuals who have memory of a distant event



or that such individuals are deceased." *Id.* "These problems *do not* relieve a corporation from preparing its Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Id.* (emphasis added); *accord Great Am. Ins. Co.*, 251 F.R.D. at 539 ("The fact that an organization no longer has a person with knowledge on the designated topics does not relieve the organization of the duty to prepare a Rule 30(b)(6) designee.").

> By requiring the responding party to produce a witness who is

Page 31

> capable of testifying as to matters known or reasonably available to the organization, [Rule 30(b)(6)] makes plain its preference that a party not subvert the beneficial purposes of the Rule by simply incanting that no witness is available who personally has direct knowledge concerning all of the areas of inquiry.

*Prokosch*, 193 F.R.D. at 638 (quotation omitted). When "no current employee has sufficient knowledge to provide the requested information, *the party is obligated to prepare one or more witnesses* so that they may give complete, knowledgeable and binding answers on behalf of the corporation." *CMI Roadbuilding, Inc., v. Ia. Parts, Inc.*, 322 F.R.D. 350, 360-61 (N.D. Ia. 2017) (quotation omitted) (emphasis added); *see also, e.g.*, *Kanaji v. Philadelphia Child Guidance Ctr. of Children's Hosp.*, No. CIV. A. 00-937, 2001 WL 708898, at *2 (E.D. Pa. June 20, 2001); *Prokosch*, 193 F.R.D. at 638-39; *Taylor*, 166 F.R.D. at 361-62.

Recognizing the circumstances of this case are likely a bit more uncommon than other situations in which corporate memory concerning the events at issue has been discharged, the Court inquired of the parties at the hearing whether they could direct the Court to legal authority

regarding the taking of a 30(b)(6) deposition of a corporation whose sole owner/operator/existing employee was no longer available. Unfortunately, they were not able to do so. The Court has found the following caselaw instructive in reaching the conclusion that "[a] corporation that is in existence but no longer actively doing business can be compelled to produce a witness for a Rule 30(b)(6) deposition." *W.R. Grace & Co. v. N & M, Inc.*, No. 1:06mc602WJG, 2006 WL 3694595, at *2 (S. D. Miss. Dec. 13, 2006) (citing *Kanaji*, 2001 WL 708898, at *2-3).

Page 32

In *W.R. Grace & Co.*, the defendant corporation was "a defunct business" with "no employees, officers, assets, or business records." *Id.* at *1. All of its documents had been delivered to counsel. *Id.* The defendant corporation argued "that because [it] is defunct there is no one it can designate to appear as a corporate representative for a deposition." *Id.* The defendant corporation also argued that one of its former owners, "the individual with the most knowledge," had already been deposed. *Id.* The plaintiff's motion to compel was granted and the defendant corporation ordered to produce a representative for the 30(b)(6) deposition. *Id.* at *2.

In another case, counsel for the defendant corporation had been unable to communicate with the corporation's president, learned that the president's home was vacant, and became aware that the corporation may no longer be conducting business. *McGrath v. Chesapeake Bay Diving, Inc.*, Civil Action No. 06-11413-CJB-SS, 2009 WL 1076735, at *1 (E.D. La. Apr. 20, 2009). The defendant corporation sought "a continuance of the corporate deposition to identify and educate a willing person to serve as [the] corporate representative." *Id.* at *3. "The parties agree[d] that [the defendant corporation wa]s unable to designate an officer, director, or managing agent." *Id.* The *McGrath* court granted the request for a continuance and, responding to an objection that defense counsel be the one to make the designation, noted that no authority had been cited "for the proposition that where a



corporation is defunct and without an officer, director, or managing agent to testify, counsel employed by its insurer to defend the corporation's interests cannot designate a person who consents to offer testimony which shall be binding on the corporation." *Id.*

Page 33

Perhaps the more common scenario are cases in which a corporation argues a legal unavailability of sorts based on the invocation of those with knowledge of their right against self-incrimination under the Fifth Amendment. *See, e.g.*, *Martinez v. Majestic Farms, Inc.*, No. 05-60833-CIV, 2008 WL 239164, at *2-3 (S.D. Fla. Jan. 28, 2008) (discussing *City of Chicago v. Wolf*, No. 91 C 8161, 1993 WL 177020 (N.D. Ill. May 21, 1993)); *see also In re: New England Compounding Pharm., Inc. Prods. Liab. Litig.*, MDL No. 13-2419-RWZ, 2015 WL 13715289, at *9 (D. Mass. July 31, 2015) [hereinafter *In re New England Compounding*]; *Convertino v. United States Dep't of Justice*, No. 07-13842, 2013 WL 153311, at *5 (E.D. Mich. Jan. 15, 2013); *cf. Sec. & Exch. Comm'n v. Leach*, 156 F. Supp. 2d 491, 495-98 (E.D. Penn. 2001) (answering a complaint). In such situations, courts have directed the corporation to "retain a person not previously associated with the corporation" and prepare that person so that he or she can answer questions absent very exceptional circumstances. *Martinez*, 2008 WL 239164, at *3; *compare Convertino*, 2013 WL 153311, at *5; *Martinez*, 2008 WL 239164, at *3, *with In re New England Compounding*, 2015 WL 13715289, at *9-10.

All of this is to say that it is well within this Court's discretion to direct Let It Ride to designate, prepare, and produce a Rule 30(b)(6) representative. *See also Lake City Assocs., LLC v. Windsor Arms, LLC*, No. 3:13-cv-782-J-39JBT, 2014 WL 12609863, at *2 (M.D. Fla. June 19, 2014) (ordering defendant entities to designate another corporate representative when designated representative was recovering from surgery as Rule 30(b)(6) "does not contemplate an indefinite delay in depos[ing] a corporate representative because of the physical incapacity of one person"). Such preparation may

Page 34

indeed "be an onerous task." *Great Am. Ins. Co.*, 251 F.R.D. at 540; *accord Prokosch*, 193 F.R.D. at 639. Nevertheless, "[t]he view that the duty to educate a person with no prior knowledge is prejudicial to a corporation has not prevailed, and it appears now to be recognized that the Rule 30(b)(6) deponent must be woodshedded with information that was never known to the witness prior to deposition preparation." *Brunet v. Quizno's Franchise Co. LLC*, No. 07-cv-01717-PAB-KMT, 2008 WL 5378140, at *2 (D. Colo. Dec. 23, 2008) (quotation omitted). "Although adequately preparing a Rule 30(b)(6) deposition can be burdensome, 'this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business.'" *Great Am. Ins. Co.*, 251 F.R.D. at 540 (quoting *Taylor*, 166 F.R.D. at 362).

Therefore, the List Plaintiffs' motion to compel the 30(b)(6) motion of Let It Ride is granted, and Let It Ride shall prepare and produce a Rule 30(b)(6) representative to sit for its deposition. In light of the well-documented concerns regarding COVID-19 and the Court's prior ruling with respect to Let It Ride's discovery responses, such deposition shall occur remotely by February 15, 2021. Let It Ride should bear in mind that "[a] court may levy appropriate sanctions for a corporation's inadequate designation in response to a Rule 30(b)(6) notice." *CMI Roadbuilding, Inc.*, 322 F.R.D. at 361 (quotation omitted); *see* Fed. R. Civ. P. 30(d)(2), 37(d)(1)(A)(i); *see, e.g.*, *Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 345 (8th Cir. 2009).

### B. Defendants' Motions to Compel

Defendants have also moved to compel the List Plaintiffs and Fiedler Intervenors

Page 35



to supplement certain prior discovery responses. Under the existing pretrial scheduling order, the deadline to file non-dispositive motions related to discovery was June 1, 2020. Fourth Am. Pretrial Sch. Order at 3. The pretrial scheduling order further states that "[t]his schedule may be modified only upon a formal motion and a showing of good cause." Fourth Am. Pretrial Sch. Order at 1. Defendants' motions to compel were filed on June 17, 2020, two weeks after the June 1 deadline.

"District courts have broad discretion in establishing and enforcing deadlines and in maintaining compliance with discovery and pretrial orders." *In re Baycol Prods. Litig*., 596 F.3d 884, 888 (8th Cir. 2010) (citing *Marmo v. Tyson Fresh Meats, Inc*., 457 F.3d 748, 758-59 (8th Cir. 2006)). Rule 16 provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *see, e.g*., *Marmo*, 457 F.3d at 759. "[T]he 'good-cause standard is not optional.'" *Petrone v. Werner Enters., Inc*., 940 F.3d 425, 434 (8th Cir. 2019) (quoting *Sherman v. Winco Fireworks, Inc*., 532 F.3d 709, 716 (8th Cir. 2008)). "Rule 16(b) assures that a magistrate judge's scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded without peril." *Klein*, 2019 WL 246768, at *4 (quotation omitted).

"The primary measure of good cause is the movant's diligence in attempting to meet the scheduling order's requirements." *Harris v. FedEx Nat'l LTL, Inc*., 760 F.3d 780, 786 (8th Cir. 2014) (quotation omitted); *accord Sherman*, 532 F.3d at 716. "The 'good cause' standard is an exacting one, for it demands a demonstration that the existing schedule "cannot reasonably be met despite the diligence of the party seeking the extension." *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn*., 187 F.R.D.

Page 36

578, 581-82 (D. Minn. 1999) (quotation omitted); *see, e.g*., *Klein*, 2019 WL 246768, at *4; *Khoday v. Symantec Corp*., No. 11-cv-180 (JRT/TNL),

2013 WL 12141434, at *2 (D. Minn. May 15, 2013).

Defendants do not adequately address the pretrial scheduling order's June 1 deadline. Perhaps Defendants assumed that their motion to amend the scheduling order, addressed in the next section, would excuse the untimely filing of these motions to compel. But, Defendants have not made that argument. Moreover, nothing in Defendants' three motions—the two motions to compel and the motion to amend the scheduling order—explains why Defendants were able to meet the June 1 deadline with respect to their motion to amend the scheduling order but not the two motions to compel.

Collectively, the discovery at issue in these two motions to compel was served by Defendants no later than September 5, 2019, and, in the case of the List Plaintiffs, almost two months before that. Again collectively, Defendants received responses to their discovery requests no later than mid-November. Yet, the record before the Court shows that Defendants elected not to follow up on any purported deficiencies until mid-April 2020 when approximately one month of fact discovery remained. Defendants' five-month delay in raising their dissatisfaction with the List Plaintiffs and Fielder Intervenors' discovery responses can hardly be said to show that these issues were diligently pursued. *See, e.g*., *Stai v. Deshane*, No. 14-cv-4152 (RHK/LIB), 2016 WL 11031224, at *4-5 (D. Minn. Jan. 22, 2016); *Bredemus v. Int'l Paper Co*., 252 F.R.D. 529, 534 (D. Minn. 2008); *see also* Fed. R. Civ. P. 26(b)(2)(C)(ii).

The Court recognizes that a series of unfortunate events have impacted this

Page 37

litigation. As discussed above, however, it appears from the information before the Court that Defendants' approach following Chetcuti's passing has been more passive than diligent in the legal sense, and little was done to determine the status of Let It Ride after his death. This stagnation is all the more troubling considering



evidence before the Court early on in this litigation suggesting that Let It Ride was attempting to evade service. *See* ECF No. 27 at 3, 5, 9. In any event, Defendants were well aware of these events in March 2020, when the parties stipulated to the June 1 deadline. *See generally* ECF No. 84.

The Court also recognizes that the unprecedented COVID-19 pandemic and its social-distancing measures have brought new challenges to people's daily lives and the practice of law. Although the recent pandemic may be unparalleled, it does not account for Defendants' failure to engage fully in the discovery process in the months prior. And, again, Defendants have not specifically articulated why they could not have brought their motions to compel by the June 1 deadline.

In sum, Defendants have not been diligent in attempting to meet the deadlines in the Fourth Amended Pretrial Scheduling Order. Defendants have not shown good cause to excuse the untimely filing of their motions to compel, and therefore the motions are denied. *See Petrone*, 940 F.3d at 434-36 (error to permit modification of deadline in scheduling order where good cause had not been shown).

## C. Amendment of the Pretrial Scheduling Order

While Defendants and the Fielder Intervenors have each formally moved to amend Fourth Amended Pretrial Scheduling Order, the parties all agree that some adjustments to

Page 38

the schedule need to be made. *See*, *e.g.*, Defs.' Mem. in Supp. of Mot. to Am. at 1-2, ECF No. 102; Intrvnrs.' Mem. in Supp. of Mot. to Compel at 18-19; Pls.' Mem. in Opp'n to Mot. to Am. at 2, ECF No. 118; *see also* Intrvnrs.' Mem. in Opp'n to Mot. to Am. at 1, ECF No. 129. The parties do not agree, however, on the length of the extension necessary.

As stated above, whether to the modify the deadlines set forth in a pretrial scheduling order requires the Court to consider a party's diligence (or lack thereof) in attempting to meet those deadlines. *See*, *e.g.*, *Harris*, 760 F.3d at 786; *Sherman*, 532 F.3d at 716. Local Rule 16.3 assists the Court's consideration of diligence by requiring the party seeking to modify the discovery deadlines in a pretrial schedule order to: "(1) describe what discovery remains to be completed; (2) describe the discovery that has been completed; (3) explain why not all discovery has been completed; and (4) state how long it will take to complete discovery." D. Minn. LR 16.3(c).

Defendants seek a five-month extension of fact discovery "to allow the parties to finish engaging in written discovery and take depositions of the parties in this case," Defs.' Mem. in Supp. of Mot. to Am. at 1, citing the major medical events experienced by Carwell and Chetcuti, Chetcuti's tragic passing, and COVID-19. Defendants reiterate that, after Chetcuti's death, "it has been impossible to conduct discovery on behalf of Let It Ride, or locate a 30(b)(6) representative for a deposition." Defs.' Mem. in Supp. of Mot. to Am. at 6.

The List Plaintiffs and Fielder Intervenors seek a two-month extension of fact discovery to "conduct the necessary depositions and provide the requested written

Page 39

discovery." Intrvnrs.' Mem. in Opp'n to Mot. to Am. at 1; *see* Pls.' Mem. in Opp'n to Mot. to Am. at 2 ("This limited extension would allow the Defendants to produce long overdue discovery and schedule the remote depositions of . . . [Carwell and Let It Ride]."); *see also* Intrvnrs.' Mem. in Supp. of Mot. to Compel at 19.

The Court finds good cause for some modification of the existing pretrial schedule to allow the discovery ordered herein and party depositions to take place, but the record does not support a blanket, unqualified extension of fact discovery. The parties have had more than one



year to conduct discovery in this case. It is not particularly clear what additional written discovery Defendants seek from the List Plaintiffs and Fielder Intervenors and why it was not pursued sooner. Nor is the Court persuaded by Defendants' contention that "it has been impossible for the parties to conduct discovery on [Let It Ride]." Defs.' Mem. in Supp. of Mot. to Am. at 2.

As for the List Plaintiffs and Fielder Intervenors, the Court has ordered Carwell and Let It Ride to address discovery requests served prior to May 1, i.e., discovery that had been commenced in a time to be completed by the June 1 deadline. Beyond responses to this written discovery and party depositions, the List Plaintiffs and Fielder Intervenors have not identified what, if any, additional written discovery they seek from Defendants. While the Court's ruling should not be interpreted to prohibit or preclude reasonable requests for clarification of a response ordered herein, whether any such follow-up request exceeds the bounds of clarification will be a context-specific inquiry.

Taking into account the time (a) allotted for Carwell's supplementation; (b) needed to ship the boxes of documents from Canada, review them, and respond to

Page 40

discovery served on Let It Ride; and (c) required to schedule and orchestrate the remote depositions of Carwell and Let It Ride as well as complete any remaining party depositions, the Court will grant an extension of the fact discovery until February 15, 2021, to complete this pending discovery according to the timeline set forth herein. The Court will then adjust other deadlines, including but not limited to expert discovery, dispositive motions, and the trial-ready date to account for the extension of fact discovery. The Court will also reset the settlement conference. A Fifth Amended Pretrial Scheduling Order shall issue shortly.

In closing, the Court does not make these modifications lightly. This case was filed in 2018. It took nearly six months to effect service on Let It Ride, including a motion for alternative service, where evidence before the Court suggested Let It Ride was attempting to evade service in this matter. *See* ECF No. 27 at 3, 5, 9. The completion of fact discovery has been complicated by unforeseeable major medical events, a death, and a global pandemic altering the ways people interact with one another and affecting international travel. The parties must use their best efforts to persevere and press on through these challenges. The parties are cautioned that the Court will not look favorably on any future extension requests.

### D. Fees & Costs

Lastly, each party has requested their attorney fees and costs associated with briefing and responding to the motions to compel. Rule 37 provides for expenses in connection with a motion to compel under certain circumstances. *See generally* Fed. R. Civ. P. 37(a)(5). The List Plaintiffs and Fielder Intervenors' motions were granted in part

Page 41

and denied in part. *See* Fed. R. Civ. P. 37(a)(5)(C) (permitting expenses when a motion is granted in part and denied in part.). Defendants' motions were both denied. *See* Fed. R. Civ. P. 37(a)(5)(B) (requiring expenses when a motion is denied unless "the motion was substantially justified or other circumstances make an award of expenses unjust"). It is this Court's view that any award of attorney fees and costs would have little if any positive effect, and would serve only to embolden further the recipient party, entrench the parties in their respective positions, and increase the costs of this litigation, making an award of fees unjust under the circumstances. Accordingly, each party shall bear its own costs and attorney fees.

### III. ORDER



Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The List Plaintiffs' Motion to Compel Production of Discovery, ECF No. 92, is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

2. The Fiedler Intervenors' Motion to Compel Discovery, for Leave to Conduct Defendants' Depositions Remotely, for an Amendment of the Scheduling Order, & for Sanctions, ECF No. 108, is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

3. Defendants' Motion to Amend the Scheduling Order, ECF No. 101, is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

4. Defendants' Motion to Compel the List Plaintiffs' Discovery Responses, ECF No. 132, is **DENIED.**

5. Defendants' Motion to Compel the Fiedler Intervenors' Discovery Responses, ECF No. 137, is **DENIED.**

Page 42

6. To the extent the parties have not yet executed the stipulation regarding the effect of Carwell's verification, such stipulation shall be executed by **November 15**, **2020.**

7. To the extent the authorizations for Carwell's criminal history, cell phone records, and medical records have not yet been completed, Carwell shall complete them by **November 1**, **2020.** Consistent with the spirit of the parties' agreement, Carwell shall fully cooperate with any reasonable request for further information in connection with these authorizations so that the documents sought by the authorizations can be obtained.

8. To the extent he has not already done so, Carwell shall supplement his response to Interrogatory 7 by **November 15**, **2020.**

9. To the extent Carwell has not supplemented his response to Request for Production 21, he shall do so by **November 15**, **2020.**

10. Carwell shall sit for a deposition by video conference **no sooner than December 1 but no later than December 15, 2020.**

11. **By November 15**, **2020**, the parties shall arrange to have the boxes of documents with Hiscutt shipped from Canada to Defendants' counsel.

12. **By January 15, 2021**, Defendants shall respond, without objection, to (a) the List Plaintiffs' Interrogatories and Requests for Production of Documents to Defendant 0820527 B C LTD d/b/a Let It Ride Carriers (First Set), dated May 8, 2019; (b) the Fiedler Intervenors' Request for Production of Documents to Defendant 0820527 B C LTD d/b/a Let It Ride Carriers, dated November 5, 2019; and (c) Interrogatories 1, 20, 27, 28, 31, 35, 37, 39, 41, and 47 of the Fiedler Intervenors' Interrogatories to Defendant Let It Ride Carriers, dated November 5, 2019.



13. Let It Ride shall prepare and produce a Rule 30(b)(6) representative to sit for a deposition by video conference, such deposition to occur by **February 15, 2021.**

14. A Fifth Amended Pretrial Scheduling Order shall issue.

15. Each party shall be responsible for its own costs and attorney fees.

16. All prior consistent orders remain in full force and effect.

Page 43

17. Failure to comply with any provision of this Order or any other prior consistent Order shall subject the non-complying party, non-complying counsel and/or the party such counsel represents to any and all appropriate remedies, sanctions and the like, including without limitation: assessment of costs, fines and attorneys' fees and disbursements; waiver of rights to object; exclusion or limitation of witnesses, testimony, exhibits and other evidence; striking of pleadings; complete or partial dismissal with prejudice; entry of whole or partial default judgment; and/or any other relief that this Court may from time to time deem appropriate.

Dated: October 8, 2020

s/        Tony    N.        Leung
Tony            N.            Leung
United   States   Magistrate   Judge
District of Minnesota

--------

Footnotes:

[1.] The Carwell declaration was first filed on June 8, 2020, along with Defendants' opposition to the List Plaintiffs' and Fielder Intervenors' motions to compel. ECF Nos. 124, 128. It was not signed or dated. Two days before the hearing, the Carwell declaration was "refiled." ECF Nos. 149, 150. This time, the Carwell declaration was signed and dated June 12, 2020. ECF Nos. 149, 150.

[2.] The same declaration was also filed at ECF No. 127.

[3.] The same declaration was also filed at ECF No. 126.

[4.] The List Plaintiffs served their first set of discovery requests on Let It Ride in May 2019. *See generally* Ex. 1 to Pls.' Aff. of Counsel, ECF No. 94-1.

[5.] This is despite stating to counsel for the List Plaintiffs at the beginning of April that Defendants' counsel would "attempt to make a few final contacts to get you a response . . . [to the issue of the outstanding discovery served on Let It Ride] by mid-April." Ex. 28 at 2 to Pls.' Aff. of Counsel, ECF No. 94-28.

[6.] To the extent this issue might arise in the future with respect to other discovery responses in this case, the parties are reminded of 28 U.S.C. § 1746, which governs unsworn declarations under penalty of perjury and provides as follows:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established,

or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(1) If executed without [sic] the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).
(Signature)."

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
(Signature)."

[7.] Any concern by the List Plaintiffs regarding the notarization of Carwell's response is addressed by the agreed-upon stipulation. *See supra* Section II.A.1.a.

[8.] The List Plaintiffs contend that they "are also entitled to know who . . . Carwell called following the collision." Pls.' Mem. in Supp. of Mot. to Compel at 18. To the extent the List Plaintiffs seek to compel further information regarding the identity of the persons Carwell called in connection with Request for Production 15, rather than just the production of the cell phone records, their motion is denied. Request for Production 15 merely asks for Carwell's cell phone records. Ex. 3 to Pls.' Aff. of Counsel at 8 ("Produce your wireless telephone records for March 6, 2015 to September 6, 2015."), ECF No. 94-3.

[9.] As stated above, the List Plaintiffs maintain that "Carwell should be able to get some of the requested documentation from [ICBC]." Pls.'

Mem. in Supp. of Mot. to Compel at 22. Other than this conclusory assertion, the List Plaintiffs have not articulated how these documents should be deemed within Carwell's possession, custody, or control. *See* Fed. R. Civ. P. 34(a)(1). The List Plaintiffs are represented by counsel and the Court will not make arguments for them.

[10.] Even criminal proceedings that were once handled in person are now being conducted remotely with the defendant's consent. *See generally* Gen. Order Nos. 18, 19.

[11.] "The Court's holding in this case is not tantamount to a finding that concerns raised regarding COVID-19 will *always* suffice to support the entry of an order requiring a remote videoconference deposition." *Learning Res., Inc.*, 2020 WL 3250723, at *3 n.2; *see also In re Broiler Chicken*, 2020 WL 3469166, at *8 ("To be clear, this is not a blanket ruling that the COVID-19 pandemic alone justifies the taking of remote depositions in all cases and under all circumstances.").

[12.] To the extent the List Plaintiffs seek an order compelling the production of "future discovery requests," Pls.' Mem. in Supp. of Mot. to Compel at 14, any such requests are not before the Court. The Court will not grant the List Plaintiffs a blank check as to any and all future discovery.

[13.] While additional interrogatories were served, the Fielder Intervenors confirmed at the hearing that they are seeking to compel just the following ten interrogatories: 1, 20, 27, 28, 31, 35, 37, 39, 41, and 47. *See* Intrvnrs.' Mem. in Supp. of Mot. to Compel at 10-14.

[14.] "Rule 17(b) defines when a party has the capacity to sue or be sued in federal court." *Lundquist v. Univ. of S.D. Sanford Sch. of Med.*, 705 F.3d 378, 379 (8th Cir. 2013); *see generally* Fed. R. Civ. P. 17(b). For corporations like Let It Ride, Rule 17(b)(2) states that the capacity to sue or be sued is determined "by the law under which [the corporation] was organized."

[15.] While awaiting the arrival of these documents, Defendants would do well to explore



additional avenues of information so as to be in a position to complete Let It Ride's responses within the timeframe set forth herein.

16. Although the Fielder Intervenors have not expressly moved to compel a 30(b)(6) deposition of Let It Ride, they have moved to extend the deadline for fact discovery to take Defendants' depositions. *See*, *e.g*., Intrvnrs.' Mem. in Supp. of Mot. to Compel at 19 (noting Defendants "have been unable to answer written discovery, or produce . . . Carwell or a 30(b)(6) deponent for Let It Ride within the current discovery deadline and requesting an extension of time "to allow factual discovery to be completed from Defendants").

--------




**Grupo Petrotemex, S.A. DE C.V., and DAK Americas, LLC, Plaintiffs,
v.
Polymetrix AG, Defendant.**

**Case No. 16-cv-2401 (SRN/HB)**

**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

**April 26, 2020**

**MEMORANDUM OPINION AND ORDER**

Eric W. Schweibenz, John F. Presper, J. Derek Mason, and Robert C. Mattson, Oblon, McClelland, Maier & Neustadt, LLP, 1940 Duke Street, Alexandria, VA 22314, and Barbara J. D'Aquila, Margaret Rudolph, and Laura J. Borst, Norton Rose Fulbright US LLP, 60 South Sixth Street, Suite 3100, Minneapolis, MN 55402 for Plaintiffs.

Todd A. Noah, Stephen H. Youtsey, and Igor Shoiket, Dergosits & Noah LLP, One Embarcadero Center, Suite 350, San Francisco, CA 94111, and Bernard E. Nodzon, Jr., Theodore M. Budd, and Timothy M. Sullivan, Faegre Drinker Biddle & Reath LLP, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402 for Defendant.

SUSAN RICHARD NELSON, United States District Judge

**I. INTRODUCTION**

Before the Court are Plaintiffs Grupo Petrotemex, S.A. de C.V. and DAK Americas LLC's (collectively, "Plaintiffs") Objections ("Pls.' Obj.") [Doc. No. 572] to Magistrate Judge Bowbeer's March 13, 2020 Order on Plaintiffs' Motion to Compel ("March 13, 2020 Order") [Doc. No. 569]. Defendant Polymetrix AG ("Polymetrix") urges the Court to overrule Plaintiffs' Objections and adopt the Order in full. (*See* Def.'s Resp. to Obj. [Doc. No. 573].)

Based on a review of the record, and for the reasons set forth below, the Court overrules Plaintiffs' Objections and affirms the March 13, 2020 Order.

**II. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Factual Background**

The facts pertinent to this matter have been accurately detailed in the March 13 Order, and will not be repeated in full here. (Order at 1-5.) Stated briefly, Plaintiffs brought this patent infringement action against Polymetrix in July of 2016. (*Id.* at 1.) The instant dispute concerns certain communications that occurred when Polymetrix's parent corporation, Bühler Holding, AG ("Bühler"), was negotiating the sale of a majority stake in Polymetrix to a third-party buyer, Beijing Sanlian Hope Shin-Gosen Technical Service Co ("Sanlian"). These negotiations began after the start of this patent infringement action. (*Id.* at 2.)

On March 22, 2018, Bühler completed its sale to Sanlian of 80% of its shares of Polymetrix. (*Id.*) (citing Müller Suppl. Decl. ¶ 7).) The record reflects that Polymetrix was not directly involved in the negotiations between Bühler and Sanlian. (*Id.*) Yet as described below, Polymetrix and Bühler conferred on the handling of the pending patent action, including whether Bühler would retain liability for the litigation after the sale. (*Id.*)

Indeed, during these acquisition negotiations, Polymetrix's counsel, Mark Wilming, provided Polymetrix and Bühler an email dated July 5, 2017, (the "July 5, 2017 Email"), which included, among other things, an assessment of the risks associated with the present patent litigation. (*Id.* at 3.) In preparing this email, Mr. Wilming asked Polymetrix's lead trial counsel in this action, Todd Noah, to draft an assessment of the litigation. (*Id.*) Based on his assessment, Mr. Wilming incorporated a "summary statement" from Mr. Noah into the



July 5, 2017 Email. (*Id*.) Mr. Wilming then sent the July 5, 2017 Email to both Polymetrix and Bühler. Because Bühler owned 100% of Polymetrix at the time, Polymetrix claims that Mr. Wilming was authorized to share this email under the protections of the common interest doctrine. (*Id*. at 3 (citing Müller Suppl. Decl. ¶ 3).)

What transpired next, however, sparks this dispute. During negotiations, Sanlian also inquired about the pending patent litigation. (*Id*. at 2.) In response, a Bühler employee, Frank Zimmerman, shared the July 5, 2017 Email with Sanlian, who then publicly revealed certain information from this email. (*Id*. at 2-4.) In its public filings with the Shenzhen Stock Exchange, Sanlian referenced Plaintiffs' pending lawsuit against Polymetrix, and three documents contained the following statement:

> In the opinions of [Mr.] Noah and [Mr.] Wilming, it is less likely that Polymetrix infringed any of the three patents and it is very unlikely that Polymetrix infringed any two of the three patents.

(*Id*. at 4.) Polymetrix does not dispute this disclosure is based on the "summary statement" Mr. Wilming included (from Mr. Noah) in the July 5, 2017 Email.

But the record demonstrates that Polymetrix never consented or authorized Bühler to share the July 5, 2017 Email, or the underlying content, to Sanlian at any time during the negotiations. (*Id*. at 3 (citing Müller Suppl. Decl. ¶ 4); Wilming Decl. ¶ 4.) And although Bühler's in-house counsel authorized Mr. Zimmerman to share the July 5, 2017 Email with Sanlian, the company claims it never authorized Sanlian to disclose the contents publicly. (*Id*. at 4-5.) Both Polymetrix and Bühler appear to have learned about this public disclosure when Plaintiffs in the pending litigation brought this issue to Mr. Noah's attention in

Page 4

December of 2018, eight months after Sanlian had acquired a majority interest in Polymetrix. (*Id*. at 4.) At the time, Polymetrix also learned that the July 5, 2017 Email was shared with Sanlian by Bühler without its consent. (*Id*. at 4.)

## B. Plaintiffs' Motion to Compel

On December 12, 2019, Plaintiffs moved to compel the opinion of counsel provided by Todd Noah to Polymetrix, ("Mot. to Compel" [Doc. No. 485]), arguing that Polymetrix waived attorney-client privilege to "all documents and communications related to the subject matter" of the July 5, 2017 Email. (Pls.' Suppl. Mem. Mot. to Compel ("Pls.' Mem") [Doc. No. 551] at 4.) Accordingly, Plaintiffs also seek "all communications and documents" related to Mr. Noah's opinion.

Polymetrix opposed Plaintiffs' motion on the grounds that, while the disclosure of the "summary statement" in Sanlian's stock exchange filings amounts to a "waiver" of the privilege for the particular statement revealed, the waiver does not extend beyond that statement. Polymetrix contends that it never waived privilege for any of the confidential communications at issue, including communications related to the content of the July 5, 2017 Email. (Def.'s Suppl. Opp'n. Mot. to Compel ("Def.'s Opp'n") [Doc. No. 540] at 4.)

In denying Plaintiffs' motion, Magistrate Judge Bowbeer concluded that Polymetrix never waived attorney-client privilege for Mr. Noah's communication. Specifically, Judge Bowbeer determined that Polymetrix did not waive privilege when Mr. Wilming sent the July 5, 2017 Email to Bühler because both companies shared a common legal interest. (Order at 6.) Thus, under the common interest doctrine, Polymetrix's disclosure of the July 5, 2017 Email did not constitute a waiver beyond what was revealed in Sanlian's filings with the

Page 5



Shenzhen Stock Exchange. (*Id.* at 6-7.) Judge Bowbeer further found that the transfer of the July 5, 2017 Email to Sanlian did not waive the privilege because the transfer was unauthorized by Polymetrix. Since Polymetrix never gave permission to its parent company to share the document, "Bühler could not waive the attorney-client privilege on Polymetrix's behalf." (*Id.* at 8.)

Finally, Judge Bowbeer concluded that Polymetrix never "impliedly waived" the privilege by taking no action after it learned of (1) the disclosure of the July 5, 2017 Email to Sanlian; and (2) the public disclosure of the "summary statement" in Sanlian's stock exchange filings. (*Id.* at 9.) By the time Polymetrix discovered both disclosures, Judge Bowbeer found there was "no reason" for it to "claw back" the email from Sanlian. (*Id.* at 9.) Sanlian had become a significant majority owner of Polymetrix. (*Id.* at 10.) Likewise, once the "summary statement" was public, Judge Bowbeer found "there was nothing Polymetrix could have done to undo" this disclosure "once it became aware of it." (*Id.* at 10.)

In their Objections, Plaintiffs argue that the magistrate judge's ruling is "clearly erroneous and contrary to law" for three main reasons. First, Plaintiffs contend that the ruling "erroneous[ly] distinguishes" two relevant holdings because there is no dispute that a "waiver" occurred as to the "summary statement" in Sanlian's stock exchange filings. (Pls.' Obj. at 3-5) (citing *Electro Scientific Indus., Inc. v. Gen. Scanning, Inc.*, 175 F.R.D. 539, 541-44 (N.D. Cal. 1997); *U.S. v. Jacobs*, 117 F.3d 82, 89-91 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. U.S.*, 134 S. Ct. 2384, 2388 n.2 (2014)). According to Plaintiffs, the law mandates that the privilege here is "automatically waived on the entire underlying opinion . . . *irrespective of context.*" (*Id.* at 4) (emphasis in original). Second,

Page 6

Plaintiffs assert that the ruling fails to address the scope of the "subject matter waiver" here altogether, (*id.* at 5-8, 12-14). Third, Plaintiffs argue that the magistrate judge erred in ruling

that Polymetrix need not have remedied the unauthorized disclosure of the July 5, 2017 Email when it was discovered, (*id.* at 8-11).

## III. DISCUSSION

The Court's review of decisions of a magistrate judge on nondispositive matters is limited to determining whether the order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); Local Rule 72.2(a)(3). Such an order is "clearly erroneous" when, after a thorough review of the record, the "court is left with the definite and firm conviction that a mistake has been committed." *Knutson v. Blue Cross & Blue Shield of Minn.*, 254 F.R.D. 553, 556 (D. Minn. 2008) (quoting *Thorne v. Wyeth*, No. 06-cv-3123 (PAM/JJG), 2007 WL 1455989, at * 1 (D. Minn. May 15, 2007)). The order is "contrary to law" when it "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Id.* (quoting *Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*, 592 F. Supp. 2d 1087, 1093 (N.D. Iowa 2008)). The standard of review of "an appeal of a magistrate judge's order on a nondispositive issue is extremely deferential." *Reko v. Creative Promotions, Inc.*, 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999).

Here, Plaintiffs do not dispute that the "common interest" doctrine applies to Polymetrix's disclosure of the July 5, 2017 Email to Bühler and hence that no waiver is effected by this particular communication. Neither do Plaintiffs claim that Polymetrix provided its consent to share the July 5, 2017 Email with Sanlian.

Rather, Plaintiffs object to the Order's waiver analysis because of the alleged effect of

Page 7

the "waiver" of the "summary statement" in Sanlian's stock exchange filings. (Pls.' Obj. at 3-5.) Citing two decisions, Plaintiffs claim, incorrectly, that the uncontested "waiver" of the "summary statement" in Sanlian's stock exchange filings "mandate[s]" the automatic disclosure of the



"entire underlying opinion." (*Id.* at 4-5) (arguing that the relevant law requires that "once a waiver has occurred as to a summary statement, the waiver automatically extends to the underlying opinion upon which that summary statement was based."). Plaintiffs assert that Judge Bowbeer misapplied the law to the facts here.

The Court disagrees. Plaintiffs' reliance on the rulings in *Electro Scientific* and *Jacobs* is misplaced. Contrary to their assertions, neither rulings "automatically" extend a waiver to the underlying opinion once a portion of the communication was disclosed. In *Electro Scientific*, for instance, the court found that the privilege holder, GSI, "intentionally disclosed" an "important part" of a privileged communication in a News Release to customers. 175 F.R.D 539, 541-544 (noting this fact was "critical" to the court's waiver analysis). Accordingly, the court determined GSI could not "reasonably believe that it would be able to preserve the confidentiality of the *other* parts of that communication." *Id.* at 543 (emphasis added). Likewise, in *Jacobs*, the privilege holder disclosed a portion of a privileged communication while marketing a program to customers. 117 F.3d 82, 89-91. In mandating the disclosure of the underlying confidential material, the *Jacobs* court determined the privilege holder appeared to convey inaccurately his attorney's advice to third parties, (*id.* at 90), which only served to further his own financial interests.

Unlike the situations in *Electro Scientific* and *Jacobs*, here, the privilege holder (Polymetrix) never "intentionally disclosed" *any* part of a privileged communication to

Page 8

Sanlian. As such, the Court need not determine whether Polymetrix "reasonably believed the *other* parts" of the communication would be confidential. *Electro Scientific*, 175 F.R.D. at 543 (emphasis added). And, as for the public release of such information, both privilege holders in *Electro Scientific* and *Jacobs* appear to have voluntarily shared a portion of confidential information to advance their own commercial interests. Polymetrix, in contrast, did not stand to gain financially from the public release of the "summary statement," which also factors against "mandating" the disclosure of the underlying opinion. *See* Order at 8 (noting that "all of the information before the Court indicates the decision to disclose the opinion to Sanlian was made *by Bühler*, *for Bühler's benefit* in its negotiations with Sanlian—negotiations in which Polymetrix played no part—and that Polymetrix did not even know about the disclosure, let alone consent to it.") (emphasis in original).

The Court therefore agrees with Judge Bowbeer's waiver analysis. Despite the public release of the "summary statement" in Sanlian's stock exchange filings, the Court finds that this release did not effect a waiver of attorney-client privilege. Polymetrix never consented to share the July 5, 2017 Email with Sanlian, much less authorize the public release of this information. Absent such consent, Judge Bowbeer correctly concluded that Polymetrix never waived "the attorney-client privilege as to that email, its contents, or the communications and opinions of counsel" on which the email was based. (Order at 8.)

Plaintiffs next contend that the Order failed to consider the scope of the unauthorized "waiver" of the "summary statement" in Sanlian's stock exchange filings. (*See* Pls.' Obj. at 5-8, 12-14.) Without a waiver effected by the privilege holder here, the Court need not determine how broad such a waiver might be, which Plaintiffs concede is a matter of

Page 9

discretion for the Court. *See*, *e.g.*, *Electro Scientific*, 175 F.R.D. at 543. The Court therefore agrees with Judge Bowbeer's analysis that the Court "need not consider what additional information should, in fairness, be revealed." (Order at 10-11.) Unless Polymetrix itself proposes or attempts to "use the [underlying] opinion in this litigation or in some other public, non-privileged forum," the unauthorized "waiver"



here only extends to the statement actually revealed in Sanlian's public stock exchange filings. (*Id*. at 11.)

Finally, Plaintiffs contend that Polymetrix waived the privilege here by its inaction after discovering the unauthorized disclosure of its confidential information. The Court is unpersuaded by this argument. As Magistrate Bowbeer correctly determined, Plaintiffs cite no authority that supports finding an implied waiver here. Indeed, in the cases upon which Plaintiffs rely, the privilege holder was aware of a voluntary or inadvertent disclosure, but still did not act to prevent it or "claw back" the documents. (Pls.' Obj. at 10.) None of the cited cases require Polymetrix to "claw back" the July 5, 2017 Email from Sanlian nearly eighteen months after this issue was brought, for the first time, to Polymetrix's attention. As Judge Bowbeer correctly found, "there was nothing Polymetrix could have done to undo it." (Order at 9-10.) In sum, the Court finds no error in Judge Bowbeer's conclusion that Polymetrix's alleged inaction never amounted to an "implied waiver."

The Court thus assigns no error to Judge Bowbeer's findings and her application of the relevant law to the facts.

Page 10

## IV. ORDER

Based on the submission and the entire file and proceedings herein, **IT IS HEREBY ORDERED THAT**:

> 1. Plaintiffs' Objections [Doc. No. 572] to the Order on Plaintiffs' Motion to Compel [Doc. No. 569] are **OVERRULED**;

> 2. Magistrate Judge Bowbeer's Order of March 13, 2020 [Doc. No. 569] is **AFFIRMED**.

Dated: April 26, 2020

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge

