IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE,<br><br>       Plaintiff,<br><br>   vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY<br>OF NEBRASKA; and individuals TAMIKO<br>STRICKMAN and JOHN ROE, individually<br>and in their official capacities; and OTHER<br>UNIDENTIFIED DEFENDANTS;<br><br>       Defendants. | **CASE NO. 4:21-CV-3049** |

---

## REPLY BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

Submitted by:

Susan K. Sapp, #19121
Lily Amare, #25735
CLINE WILLIAMS WRIGHT JOHNSON
    & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

January 2, 2024

**TABLE OF CONTENTS**

I.  INTRODUCTION...................................................................................................3

II.  DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EVIDENCE AND ADDITIONAL STATEMENT OF FACTS ......................................................................... 7

  A.  PLAINTIFF'S DECLARATION [FILING NO. 90-3] IS A SHAM DECLARATION THAT SHOULD BE STRICKEN AND DISREGARDED. ................................................................ 7

  B.  IMMATERIAL AND IRRELEVANT ALLEGATIONS CANNOT BE USED TO DEFEAT SUMMARY JUDGMENT. ................................................................................................ 8

III.  DEFENDANTS' REBUTTAL TO PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS................................................. 9

  A.  PLAINTIFF FAILED TO INCLUDE PINPOINT REFERENCE TO EVIDENCE IN VIOLATION OF NECIVR 56.1(B)(1), AND THEREFORE, DEFENDANTS' STATEMENT OF UNDISPUTED FACTS SHOULD BE DEEMED ADMITTED IN THEIR ENTIRETY. ............................... 10

  B.  ALL OF PLAINTIFF'S PURPORTED DISPUTES DIRECTLY CONTRADICT PLAINTIFF'S PRIOR, UNDER OATH, DEPOSITION TESTIMONY................................................ 12

IV.  ARGUMENT.................................................................................................... 17

  A.  THERE IS NO RECOVERABLE DAMAGE IN THIS CASE.......................................... 17

    1.  *Cummings* bars recovery of emotional distress. .............................. 17

    2.  There are no medical expenses for physical injuries caused by post-February 2017 conduct and there are no medical records or experts identified that show that Plaintiff suffered from physical injury caused by post-February 2017 conduct........................................... 22

    3.  There are no compensatory damages resulting from non-emotional distress harm and stemming from Post- February 2017 Conduct.... 25

  B.  PLAINTIFF FAILED TO PRODUCE EVIDENCE TO PRECLUDE SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S CLAIM OF TITLE IX VIOLATION. .................................... 26

    1.  Plaintiff failed to establish that she was subjected to unwelcome harassment and that Defendant had notice of such harassment..... 26

    2.  BRUN's responses to March 2017 and September 2017 concerns were not clearly unreasonable in light of the known circumstances. ....... 29

    3.  Plaintiff failed to prove the additional element of causal nexus........ 30

V.  CONCLUSION.................................................................................................. 31

The Board of Regents of the University of Nebraska ("BRUN" or "Board of Regents") and Tami Strickman ("Strickman"), collectively referred to as "Defendants," respectfully submit this Reply Brief in support of their Motion for Summary Judgment ("Motion").

## I.   <u>INTRODUCTION</u>

Plaintiff's opposition to Defendants' Motion for Summary Judgment is premised on a distorted narrative that directly contradicts Plaintiff's testimony at her deposition.  In relevant part, Plaintiff:



```
    Of lawful age, being first duly
    cautioned and solemnly sworn as
    hereinafter certified, was examined
          and testified as follows:

    (Witness's response to oath - "Yes.")
```



```
 1        Q.  You started the process to switch from the
 2   Ph.D. program to a master's program at UNL in June of
 3   2016; correct?
 4        A.  June 2016.  It was in the -- in that time
 5   domain.
 6        Q.  I am sorry.  What?
 7        A.  It was around that time domain.
 8        Q.  There's a June 26th, 2016, e-mail,
 9   Exhibit 42, written to Mr. Negahban indicating:  I
10   have gone to the graduate studies in order to be
11   known as a master's student and graduate in
12   December 2016.
13        Do you recall sending him that e-mail?
14        A.  Yes.
```

```
18        Q.  Why did you decide to switch from the Ph.D.
19   program to the master's program in the summer of
20   2016?
21        A.  Because I experienced harassment for a long
22   time, and I experienced the retaliation of rejecting
23   the harasser's request.  And I was -- my funding
24   source, as a retaliation, was also cut off.
25             So all of this, and also Title IX office was
```

```
1   not looking that wants to help to solve my concerns.
2   So then I thought that I need to leave.
3        Q.  So those were all of the things that
4   factored into your decision in the summer of 2016 to
5   switch to the master's program; correct?
6        A.  Yes.
7        Q.  In fact, you applied to Georgia Tech
8   November 19th, 2016; correct?
9        A.  I remember I applied to Georgia Tech in fall
10   2016.
11        Q.  And why did you apply to Georgia Tech's
12   Ph.D. program in the fall of 2016?
13        A.  I wanted to go to continue my Ph.D. because
14   I was passionate to continue my study.  And I applied
15   to Georgia Tech because it's really high ranked.  Now
16   it's number five in the United States.  It's a very
17   high-ranked university.  And I knew my background,
18   and I knew that I would do well at Georgia Tech.
19        Q.  So your understanding when you applied in
20   the fall of 2016 is that Georgia Tech's Ph.D. program
21   was higher ranked than UNL's?
22        A.  Yes.
```

[Supplemental Declaration of Lily Amare ("Supp. Dec. of Amare"), ¶ 4, Ex. W, Dep. of Plaintiff at 5:1-6 & 34:1 – 36:22.] Moreover, with respect to her husband, Plaintiff testified:

4

> Q.   And he was attending the University of Nebraska; correct?
> A.   **Yes.**
> Q.   And he was getting an MS in computer science; correct?
> A.   **Two MS's.  One computer science, one electrical.**
> Q.   Did he ever start a Ph.D. program?
> A.   **Yes, he start.**
> Q.   And then he switched to a master's program?
> A.   **Yes.**

> Q.   And he switched to the master's degree program in 2016; correct?
> A.   **Yes.**
> Q.   And he graduated with his master's from UNL; correct?
> A.   **Yes.**

[Filing No. 85-12, Plaintiff Dep. at 154:10 -155:19.] All the evidence before this Court—other than the unsubstantiated allegations contained in Plaintiff's sham declaration—shows Plaintiff made the decision to switch to the Master of Science program in 2016, pre-February of 2017. Accordingly, Plaintiff cannot show she suffered any recoverable damages stemming from any conduct of the Defendants that occurred post-February of 2017.

It is also insufficient and unpersuasive for Plaintiff to try to attempt to discredit BRUN's position that it fulfilled its obligations under Title IX by clinging to her own unsubstantiated, conclusory allegations. Instead, she must proffer evidence, not just bare assertions, to support her contention that material issues are in dispute. She has failed to do so. Most importantly, Plaintiff has not proffered any evidence that she was subjected to additional discrimination or harassment after February 2017. Nor has she presented any evidence that the Defendants did not respond to her concerns of March 2017 and September 2017, *and* that such failure caused her to be vulnerable to additional

harassment. There is no legitimate dispute that Defendants responded to her concerns immediately and effectively.

In addition, Plaintiff's utter failure to address several key issues dooms her claims against Strickman and John Roe. Specifically, ***first***, as it relates to the constitutional violation claims against Strickman, Plaintiff expressly stated "based on a thorough review of Defendants' arguments and cited law, Plaintiff makes no arguments regarding whether Defendant Strickman violated her constitutional rights." [Filing No. 88 at p. 26.] This is an admission that Strickman is entitled to judgment in her favor.

***Second***, Plaintiff failed to address Defendants' argument that Plaintiff does not have standing to assert a third party's right or interest (her husband's interest). Therefore, Defendants respectfully ask this Court to grant judgment in Defendants' favor with respect to all claims asserted for alleged expenses incurred by Plaintiff's husband.

***Third,*** Plaintiff failed to address the service issue with respect to the claims asserted against John Roe. Specifically, in their opening Brief, Defendants brought to the Court's attention that Plaintiff failed to serve John Roe within 90 days of filing the Complaint, as required by FED. R. CIV. P. 4(m) and that she failed to file "proof of service," as required by FED. R. CIV. P. 4(l)(1). Plaintiff did not even address her failures, let alone show good cause for such failures. Defendants respectfully ask this Court to dismiss the claims against John Roe.

In sum, based on the reasons set forth in the opening Brief and herein, Defendants are entitled to judgment in their favor and entry of final judgment.

## II.   DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EVIDENCE AND ADDITIONAL STATEMENT OF FACTS

### A.   PLAINTIFF'S DECLARATION [FILING NO. 90-3] IS A SHAM DECLARATION THAT SHOULD BE STRICKEN AND DISREGARDED.

"It is well-settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir. 2021) (citing *Button v. Dakota, Minn. & E. R.R. Corp.,* 963 F.3d 824, 830 (8th Cir. 2020)). "An affidavit is a sham affidavit and should be disregarded 'if it contradicts prior testimony or is a 'sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before.'" *Id.*

The Eighth Circuit has addressed "the troublesome issue of whether summary judgment may be granted when one of the parties after giving a deposition later files an affidavit with directly contrary statements." *City of St. Joseph, Mo. v. Sw. Bell Tel.,* 439 F.3d 468, 475 (8th Cir. 2006) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363 (8th Cir. 1983)). The Eighth Circuit explains:

> The very purpose of summary judgment under Rule 56 is to prevent 'the assertion of unfounded claims or the interposition of specious denials or sham defenses ....' 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2712 (1983). If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*City of St. Joseph,* 439 F.3d at 475–76 (quoting *Camfield*). Accordingly, a party cannot create a "sham" issue of fact in an effort to defeat summary judgement by filing an affidavit directly contradicting prior deposition testimony.

Paragraphs 12–14, 16, 19, 23-27 of Plaintiff's Declaration [Filing No. 90-3] should be disregarded because they are "sham" attestations; a last-minute attempt, without any explanation, to contradict Plaintiff's prior deposition testimony in order to survive summary judgment.

As provided above, at her deposition, Plaintiff testified that she and her husband switched from a Ph.D. program to a Master of Science program in 2016. Now, Plaintiff contradicts that testimony by attesting that she did not "switch" to a Master of Science program and that she instead "added" a Master of Science program. Such story is an improbable concoction given Plaintiff's own prior under-oath testimony, and the multitude of evidence Defendants presented to this Court, as thoroughly discussed in section IV.A.3 *infra*. Given there is no explanation for this confabulation, this Court should disregard all contradictory statements contained in the Plaintiff's declaration.

### B.   IMMATERIAL AND IRRELEVANT ALLEGATIONS CANNOT BE USED TO DEFEAT SUMMARY JUDGMENT.

FED. R. EVID. 401 states evidence is relevant if it has the tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

In addition, "a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson*, 477 U.S. at 248). See NECivR 56.1(a)(2) ("A fact is 'material' if pertinent to the outcome of the issues identified in the summary judgment motion").

As discussed in Defendants' Response to Plaintiff's Statement of Additional Facts, Plaintiff's Statement of Facts contained in Filing No. 89, ¶ 4, 5, 9, 21, 22 and 23 are irrelevant and immaterial facts. Simply stated, they do not affect the outcome of the issues identified in Defendants' summary judgment motion.

### III.   DEFENDANTS' REBUTTAL TO PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

To survive summary judgment, Plaintiff must offer more than "[m]ere allegations, unsupported by specific facts or evidence beyond [his] own conclusions." *Mann v. Yarnell, 497 F.3d 822, 827 (8th Cir. 2007)* (internal quotations omitted). Plaintiff utterly fails to do so. Even viewing the facts in the light most favorable to Plaintiff, the Court is not obligated to "accept unreasonable inferences or sheer speculation as fact." *Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004)*. The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on which the finder of fact could conceivably find for the nonmovant. *Turner v. XTO Energy, Inc., 989 F.3d 625, 627 (8th Cir. 2021)* (quoting *Anderson, 477 U.S. at 247*).

As stated above, "a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011)* (citing *Anderson, 477 U.S. at 248*). *See* NECivR 56.1(a)(2) ("A fact is 'material' if pertinent to the outcome of the issues identified in the summary judgment motion."). Defendants need not negate the Plaintiff's (nonmoving party's) claims by producing evidence of "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)*. Rather, "the burden on the moving party may be discharged by . . . pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to Defendants' Statement of Undisputed Facts, Plaintiff admits a significant portion of Defendants' Statement of Undisputed Material Facts. To be precise, Plaintiff admits 39 of 64 Defendants' Statement of Facts. [See Filing No. 89, ¶¶ 1, 6, 10, 11, 13, 15- 25, 27 – 30, 32, 33, 34, 37, 38, 42-47, 49-52, 54, 55, 57, and 59.]

9

Plaintiff admitted in part and disputed in part 12 of 64 of the Defendants' Statement of Facts. [Filing No. 89, ¶¶ 4, 7, 8, 9, 12, 36, 39, 40, 41, 53, 56, 58.] Furthermore, Plaintiff attempts to create a dispute regarding the remaining 13 Statement of Facts. This attempt is not genuine, as it is based on unsubstantiated statements and conclusions, and statements that directly contradict Plaintiff's own, under oath, testimony.

**A.    PLAINTIFF FAILED TO INCLUDE PINPOINT REFERENCE TO EVIDENCE IN VIOLATION OF NECIVR 56.1(B)(1), AND THEREFORE, DEFENDANTS' STATEMENT OF UNDISPUTED FACTS SHOULD BE DEEMED ADMITTED IN THEIR ENTIRETY.**

NECIVR 56.1(b)(1) provides that the party opposing a motion for summary judgment "must include a separate statement of concise responses to the moving party's statement of material facts" and such statement "***must include*** pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies." (emphasis added).

Plaintiff's Response to Defendants' Statement of Facts plainly violates NECIVR 56.1(b)(1) as she failed to include pinpoint reference to evidence. Specifically, Plaintiff disputed Paragraphs 2, 3, 4, 5, 7, 26, 35, 48, 56, 58, and 60 – 64 but ***utterly failed to cite any evidence*** in support of her dispute or the statements included therein as the reason for her dispute.

The Eighth Circuit Court addressed this same issue in *Tramp v. Associated Underwriters, Inc.,* 768 F.3d 793, 798–800 (8th Cir. 2014). In *Tramp*, the plaintiff appealed to the Eighth Circuit arguing, among other things, that the district court erred in failing to consider her submitted facts, which she labelled as "additional material facts" in her brief opposing summary judgment. 768 F.3d at 798. The Eighth Circuit Court held the district court committed no abuse of discretion, and reasoned:

> Nebraska's rule concerning summary judgment procedure places clear requirements on the moving and opposing parties.
>
> . . .

The rules then state that, as the opposing party, Tramp must: include in [her] brief a concise response to the moving party's statement of material facts. Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which [Tramp] relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed. *Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.*

Neb. Civ. P. 56.1(b)(1). Tramp's inclusion of "additional material facts" in her opposing brief did not comply with these requirements. Although numbered and referenced with pinpoint references, nowhere in Tramp's fact section does she dispute any undisputed fact advanced by Associated Underwriters. Accordingly, the district court properly considered the movant's material facts admitted.

. . .

Per the local rules, the additional facts, when possible, should have referenced the exact paragraph of the "undisputed facts" at issue so as to avoid the very problem we now face—that is, discerning which of Tramp's additional facts are truly additional and which respond to facts advanced by Associated Underwriters, thus placing them in dispute.

*Tramp*, 768 F.3d at 798–800. *See also Riggle v. Saver*, No. 8:15-CV-411, 2016 WL 7168030, at *3 and n.1 (D. Neb. Dec. 8, 2016) (striking plaintiff's objection to defendant's motion for summary judgment and deeming defendant's statement of undisputed material facts admitted, where plaintiff failed to controvert the statement of material facts in accordance with NECivR 56.1); and *Reasonover v. St. Louis Cnty., Mo.,* 447 F.3d 569, 579 (8th Cir. 2006) (holding district courts have discretion to enforce local rules and we do not fault the district court for doing so in this case).

Accordingly, Defendants respectfully ask this Court to deem Paragraphs 2, 3, 4, 5, 7, 26, 35, 48, 56, 58, and 60 – 64 of Defendants' Statement of Undisputed Material Facts admitted.

**B.**   **ALL OF PLAINTIFF'S PURPORTED DISPUTES DIRECTLY CONTRADICT PLAINTIFF'S PRIOR, UNDER OATH, DEPOSITION TESTIMONY.**

1.   **Paragraphs 2, 3, 4, 5, 7, 8, 9: Plaintiff's education at the University of Nebraska.**

In responses to Paragraphs 2, 3, 4, 5, 7, 8, and 9, Plaintiff admits the substance of what is contained therein, except she attempts to state that she and her husband did not decide to switch from Ph.D. program to a Master of Science program in 2016.

As discussed above, under oath, Plaintiff admitted that both her and her husband "switched" from the Ph.D. program to the master's program in 2016. [Ex. W, Dep. of Plaintiff at 34:1 – 36:22 and 154:4 – 155:11.]

In fact, the very facts she admits further confirm her original testimony that she switched to a Master of Science program. Specifically, Plaintiff admits that, in June and early July of 2016, she submitted the Graduate Student Application to gain admission to the Master of Science in Mechanical Engineering and Applied Mechanics program, with specialization in Materials Engineering, effective the summer semester/term of 2016, which such application was approved. Plaintiff also admits that, on August 18, 2016, she submitted a revised Memorandum of Courses for admission to candidacy for the Master of Science degree, wherein it lists the courses she must take to graduate with a Master of Science. [Filing No. 85-2, Memorandum of Courses.] In fact, between fall 2016 through summer 2017, Plaintiff took the very courses listed in the Memorandum of Courses and graduated with her Masters.  [Filing No. 85-3, Transcript.]

In addition, Plaintiff admitted that, on November 19, 2016, she applied for Graduate Admission at Georgia Institute of Technology ("Georgia Tech") with a degree objective of Ph.D. to begin in Fall 2017 semester because Georgia Tech is "really high ranked," and she "knew [her] background," and "knew [she] would do well at Georgia Tech." [Ex. W, Dep. of Plaintiff at 35:7-22.] In fact, in her application, Plaintiff specified that she was pursuing a masters degree at the University of Nebraska, with expected

graduation in May of 2017:

| ACADEMIC HISTORY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| College Code | Name of Institution | City | Attend From | Attend To | Degree | Degree Date | Major | GPA |
| Z97856 | Amirkabir Univ of Technology | Tehran | 09-2006 | 09-2010 | BS | 09-2010 | Polymer Engineering | 16 |
| Z97856 | Amirkabir Univ of Technology | Tehran | 09-2010 | 09-2012 | MS | 09-2012 | Polymer Engineering | 17.5 |
| 006877 | Univ Nebraska Lincoln* | Lincoln | 05-2014 | 05-2017 | MS | 05-2017 | Materials Engineering | 3.73 |

[Filing No. 85-13.]

**2.      Paragraph 12: John Roe's Removal as Plaintiff's Advisor.**

In response to Paragraph 12, Plaintiff, in direct contradiction to her under oath testimony, states "to the best of Plaintiff's recollection, Roe remained her advisor until July of 2017 [essentially, until she graduated]."

Under oath, Plaintiff admitted John Roe was removed as her advisor:

> Q.  Did your advisor get changed, ma'am?
>
> A.  Yes.
>
> Q.  And who did it get changed to?
>
> A.  I changed to Dr. Turner's group.

> Q.  And if we could look at Exhibit 68, that's July 8th, 2016, where you are thanking Tami Strickman for her efforts --
>
> A.  Uh-huh.
>
> Q.  -- on changing your advisor; correct?
>
> A.  Yes.  Because she told me that she's working on that.  Then I replied I am thanking you are working on that.

[Ex. W, Dep. of Plaintiff at 91:15-16, 94:22 – 95:8.]

13

**3.     Paragraphs 26 and 35: Zero Tolerance Retaliation Policy and Plaintiff's meeting with Strickman and Officer Eric Fischer on July 26, 2016.**

Plaintiff states she disputes Paragraphs 26 and 35 but fails to state any reason for her dispute. These Paragraphs should be deemed admitted.

**4.     Paragraphs 36, 39, 40, 41: Strickman's investigation, finding and recommendation.**

Plaintiff admits the substance of the statements contained in Paragraphs 36, 39, 40, and 41 but deflects by providing irrelevant narrative, with no evidence whatsoever to support such contentions, to facts that are clearly not in dispute. As such, these paragraphs should be deemed admitted.

**5.     Paragraph 48: Contact Officer Fischer on March 7, 2017.**

Plaintiff's dispute of ¶ 48 is not genuine and is unsupported by the very email exchange to which Plaintiff is referring.  Same day as Plaintiff's email, on March 7, 2017, Strickman replied to Plaintiff's email and asked: "Would you like to go over additional safety planning with investigator Fischer," to which Plaintiff responded she did. Strickman then communicated via email with Officer Fischer and asked, "Did you get her response?", to which he responded, he did not. Strickman then advised Officer Fischer that Plaintiff wanted to coordinate a safety plan with him. Officer Fischer then communicated with the Plaintiff asking her for a time to meet and discuss. [Filing No. 1-20; Filing No. 85-7, Email exchange between Plaintiff, Strickman, and Officer Fischer; Dec. of Strickman, ¶ 32.]

**6.     Paragraphs 53 and 58: report of further interaction between Plaintiff and John Roe after March of 2017.**

In response to Paragraph 53, Plaintiff admits that she did not report any additional interaction between herself and John Roe for the remainder of Plaintiff's time as a student at the University of Nebraska. Plaintiff adds she "did not report any further harassment as she realized that any further reporting would be futile." And, in response to paragraph 58, Plaintiff adds that he may not have "verbally talked to Plaintiff," but he made other

"unwelcome communications to Plaintiff as reported in March 2017." Yet again, this contradicts Plaintiff's under oath testimony. At her deposition, Plaintiff admitted:

> Q. So from July of 2016 to the present he has never texted or called or e-mailed you other than you were cc'd in on the group e-mail that initiated with Zane Gernhart; correct?
>
> A. I don't recall of any, yeah.
>
> Q. And other than saying hello or perhaps smiling around March of 2017, he has never said another word to you; correct?

> A. Yes. I think so.
>
> Q. And you have not seen him at all since you left the University of Nebraska-Lincoln; correct?
>
> A. Correct.

[Ex. W, Dep. of Plaintiff at 142:14 – 143:4.] Nor has Plaintiff communicated any other acts of John Roe that could be deemed "unwelcome communication." Accordingly, there was no "further harassment" to report after March of 2017.

**7.      Paragraph 56: Email response from John Roe in September of 2018.**

Plaintiff admits the substance of the statement contained in Paragraph 56 but deflects by providing irrelevant narrative, with no evidence whatsoever to support such contentions, to facts that are clearly not in dispute. As such, this paragraph should be deemed admitted.

**8.      Paragraphs 60 – 64: No report of sexual harassment, misconduct, stalking after February 2017.**

Plaintiff skirts around the statements provided in Paragraphs 60 to 64. Paragraphs 60, 61, and 62 stated that Plaintiff did not "state" John Roe was sexually harassing,

15

stalking, or engaging in sexual misconduct towards her after February of 2017, meaning she did not use those words to describe any incident after February of 2017.

In fact, during her safety planning with Officer Fischer on March 10, 2017, Plaintiff told him that "she has not received any threats, emails, calls, or messages from [John Roe]. . . ," and that "she felt comfortable still doing her work and going to class." [Filing No. 92-7, UNLPD Reports and Safety Plan, at pp. 7-8; Ex. W. Dep. of Plaintiff at 124:5 – 126:21.] At that time, there were no threats or threatening behavior reported. At her deposition, Plaintiff testified she had no reason to doubt the accuracy of what Officer Fischer wrote in the UNLPD Reports and Safety Plan about what she reported to him on March 10, 2017.

Furthermore, Plaintiff's commentary in response to Paragraph 64 fails to address the substance of the statement in Paragraph 64 and is immaterial and irrelevant. With that said, although it is undisputed that there was no additional written report created and placed in Plaintiff's student record or investigation record, Strickman did maintain the email communication related to Plaintiff's March of 2017 concern and the documents generated during the investigation of such concern. Specifically, Strickman testified:

> Q. Would it be important information to have an – an – in a complainant's file that they had made these allegations in case it happened again in the future so that you would have a record of the allegations?
>
> A. Well, all of this information would be in the e-mail, in elect - - - kept in an electronic database.
>
> . . .
>
> Q. What would happen if – say an investigator has a file. There are certain things that they don't document in that – in that case file, and then it happens again, and there's no record of it, of the initial report?
>
> A. – in this case, though, there was a record of it through my email and the correspondence and the follow-up.
>
> Q. Who would have had access to these emails? If  a subsequent investigator or coordinator picks up that file, would they have access to those emails?
>
> A. Yes. And Jody would transfer my e-mails.
>
> Q. So were the emails considered part of the file?

A. Yes. All of . . .

Q. The record?

A. All of the email correspondence is.

[Ex. Y, Dep. of Strickman at 128:6 – 129:21.]

## IV.   ARGUMENT

### A.   THERE IS NO RECOVERABLE DAMAGE IN THIS CASE.

#### 1.   *Cummings* bars recovery of emotional distress.

Plaintiff erroneously argues that because the Eighth Circuit has not addressed the question of whether *Cummings* applies to Title IX that this Court should decline to do so in this case. This reasoning fails to understand that, although *Cummings* dealt with the Rehabilitation Act and the ACA, the reasoning underlying the holding mandates the same conclusion in a Title IX case.

This Court has addressed a similar argument in *Abdulsalam v. Bd. of Regents of Univ. of Nebraska*, No. 4:22-CV-3004, 2023 WL 4266378, at *5 (D. Neb. June 29, 2023). In that case, this Court held, even though *Cummings* did not involve a Title IX claim, there is "no reason why its logic would not apply to Title IX claims." *Id.* The Court reasoned as follows:

> *See City of Pawtucket,* 2022 WL 4551953, at *3 ("It is no large leap to conclude that the Supreme Court's reasoning in *Cummings* applies to Title IX cases"). Just like the Rehabilitation Act and the Affordable Care Act, "Congress enacted Title IX pursuant to its authority under the Spending Clause[.]" *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 540 (7th Cir. 2022). *Cummings* was predicated on the fact that the Rehabilitation Act and Affordable Care Act are "Spending Clause statutes[.]" *See Cummings*, 142 S. Ct. at 1570. "Thus *Cummings* applies with full force here." *Party,* 2022 WL 17459745, at *4 . . ..

*Id.* at *5.

Indeed, the Supreme Court of the United States has held that Title IX is spending clause legislation and "much in the nature of a contract." "Congress enacted Title IX in 1972 with two principal objectives in mind: [T]o avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection

against those practices." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, (1998) (citations and quotation marks omitted). Title IX operates in the manner of "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Id.*

Therefore, as Spending Clause legislation, a private right of action for damages under Title IX is permitted only under certain limited circumstances. *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992). This is because "legislation enacted pursuant to the spending power is much in the nature of a contract, and the legitimacy of Congress' exercise of its power to condition funding on state compliance with congressional conditions rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 655 (1999).

This fundamental principle is what warrants the application of the holding in *Cummings* to a Title IX case.  In fact, as thoroughly explained in the opening Brief, the Supreme Court in *Cummings* expressly stated that the Rehabilitation Act, ACA, Title IX, and Title VI were adopted pursuant to the Spending Clause, and that the types of damages recoverable are limited to those available for contract claims. *Cummings*, 142 S. Ct. at 1570. Specifically, the Supreme Court explained:

> Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent: in return for federal funds, the recipients agree to comply with federally imposed conditions. For that reason, the legitimacy of Congress' power to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on whether the recipient voluntarily and knowingly accepts the terms of that contract.

*Id.* at 1570 (citations and quotation mark omitted and cleaned up). And, the Court—after recognizing that it has not been able to define the full scope of relief under the Spending Clause statutes as these statutes did not even provide private remedies in the first place— stated: "In order to decide whether emotional distress damages are available under the

Spending Clause statutes we consider here, we therefore ask a simple question: Would a prospective funding recipient, at the time it engaged in the process of deciding whether to accept federal dollars, have been aware that it would face such liability? If yes, then emotional distress damages are available; if no, they are not." *Id.* at 1570-71 (citation and quotation marks omitted and cleaned up). The Supreme Court held emotional distress damages are not available under the Spending Clause statutes. *Id.*

Accordingly, the only sound conclusion that is consistent with the decision of the highest court of the United States and this Court's prior holding is: emotional distress damages are unavailable in a private suit to enforce Title IX.

Furthermore, Plaintiff relies on *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, No. 3:20-CV-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023) and argues *Cummings* does not bar the type of medical expenses she alleges in this case. Plaintiff's presentation of the holding in *Pennington* is distorted. [Filing No. 88 at p. 24.]

In *Pennington*, the plaintiffs alleged in the Complaint that, "[a]s a direct and proximate result of the Defendant's discrimination, [they] suffered mental, emotional, and psychological injuries which may be permanent. It has also caused pain, suffering, and has caused [them and their parents] to incur medical expenses." The defendants filed a motion to dismiss arguing Plaintiff is only seeking emotional damages as relief, which are no longer recoverable under the Rehabilitation Act and the ADA pursuant to the decision in Cummings. *Id.* at *3.

The plaintiffs argued they were not seeking emotional damages but, "rather seeking compensatory damages for severe mental, emotional, psychological injuries and pain, suffering, and medical expenses." *Id.* at *2 (internal quotation marks omitted). Plaintiffs argued the damages they sought were different than what *Cummings* dealt with because the plaintiffs were diagnosed with PTSD, 'which can cause physical symptoms' and is 'also

19

associated with long-term physical health conditions like diabetes and heart disease,' and they incurred medical costs to treat their condition." *Id.* at *4.

The *Pennington* court found plaintiff's argument unconvincing, and held the plaintiff is simply attempting "to rebrand their request for damages for 'mental, emotional, psychological injuries' and 'pain and suffering' as something other emotional damages." *Id.* The court explained:

> Whether it is labeled like Plaintiffs in the instant case or labeled as "humiliation, frustration, and emotional distress," like in *Cummings*, its all the same concept. The labels are all variations of the same principal that the defendant's actions caused the plaintiff a "highly unpleasant mental reaction"—*i.e.*, emotional distress. *Emotional Distress*, BLACK'S LAW DICTIONARY (11th ed. 2019). *See also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. j ("Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea."). Additionally, Plaintiffs did not provide citations to any legal authority to support their suggestion that damages for severe emotional responses and diagnosable psychiatric conditions, as opposed to simple "humiliation" or "frustration," are recoverable. . . ., and the Court has no reason to believe that is true when the Supreme Court in *Cummings* did not distinguish between degrees of emotional distress.

*Id.* Based on this analysis, the court held "plaintiffs' request for 'compensatory damages' for 'mental, emotional, and psychological injuries' and 'pain [and] suffering' is nothing more than a request for emotional damages, which is no longer permitted. Consequently, this damages request is stricken." *Id.* at *4.

In *Pennington*, the court also addressed whether a request for medical expenses attributed to treatment of physical injury sustained in the course of bullying was recoverable. Particularly, the plaintiff alleged he was stabbed in the arm with a pencil by another student and had to have it surgically removed and that he was hospitalized due to suicidal ideations. *Id.* at *3. The court held that this is the type of "compensatory damages for economic losses, which *Cummings* did not preclude." *Id.* at *3 - *4.

Similarly, *Doe next friend of Doe v. City of Pawtucket*, 633 F. Supp. 3d 583, 590 (D.R.I. 2022) is distinguishable. In *City of Pawtucket*, the court held damages stemming

from medical examination and treatment for physical harm that the minor plaintiff sustained during her sexual assault is recoverable damages resulting from non-emotional distress harm and is not precluded by *Cummings*.

In this case, there was no physical altercation between the Plaintiff and John Roe. In fact, she does not even allege any physical contact between Plaintiff and John Roe post-February of 2017. Instead, in the Amended Complaint, Plaintiff alleges she "developed joint pain from **the stress of Roe's harassment** and IEC's deliberate indifference. In order to alleviate the pain, she had to go to physical therapy and wear knee and wrist pads for over a year. **Whenever Plaintiff thinks about her time at UNL**, she feels the effects of the stress and joint pain." [Filing No. 13, ¶ 88.] In fact, Plaintiff described it as follows "physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life. . . ." [Filing No. 13, ¶ 130.b. (emphasis added)]. *See. e.g. Doe v. Fairfax Cnty. Sch. Bd.*, No. 118CV00614MSNIDD, 2023 WL 424265, at *5–6 (E.D. Va. Jan. 25, 2023) (holding "while Plaintiff asserts that she produced invoices relating to expenses for counseling and medical treatment for stomach-related issues," "the Court finds these damages 'resemble varying forms or descriptions of emotional distress' and are therefore unavailable under *Cummings, and holding "finding that* the medical expenses Plaintiff seeks to recover are proxies for impermissible emotional distress damages, the Court will preclude Plaintiff from presenting such evidence at trial.").

Plaintiff's claim of alleged physical harm squarely fits what the court in *Pennington* described as a rebranded request for damages for mental, emotional, psychological injuries and pain and suffering as something other than emotional damages and was like the denied request for medical expenses in *Fairfax Cnty. Sch. Bd.* Accordingly, because such a request for expenses is not allowed under *Cummings*, it must be barred.

**2.    There are no medical expenses for physical injuries caused by post-February 2017 conduct and there are no medical records or experts identified that show that Plaintiff suffered from physical injury caused by post-February 2017 conduct.**

Furthermore, Plaintiff's request for medical expenses must still be dismissed because there is no record of medical expenses incurred after February 2017.  FED. R. CIV. P. 26(a)(1)(iii) requires a party to provide "a computation of each category of damages claimed by the disclosing party. . ." and to "make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Plaintiff's initial disclosures provided that Plaintiff suffered "an unknown physiotherapy costs," estimated at $1,000 and that the "UNL Health Center records should document [such] cost." [Filing No. 85-15.]

Defendants requested information from Plaintiff about alleged physical injuries and requested documents that support computation of damages. In response to Defendants' Interrogatories, Plaintiff's response showed that there are no medical providers who have provided any statement, as expert or otherwise, regarding any causal connection between alleged medical condition and the alleged incidents in this case:

> **INTERROGATORY NO. 6:** Identify each physician or other medical care provider who has made any oral or written statements regarding whether or not there is a causal connection between the incidents at issue in this case and any of the Plaintiff's claimed injuries, impairments, illnesses, symptoms and/or pain and suffering. With respect to each person identified, please describe the specific statements regarding causation, including whether such statements were made orally or in writing.
>
> **ANSWER:**
>
> 1.    From 2004–October 2013 I was not living in the U.S. and did not have any physical or mental issues.
>
> 2.    From October 2013–May 2014, I was in the U.S. as an F2 Visa holder, and I did not visit any doctors as far as I remember.
>
> 3.    From May 2014–December 2014 (the first time I was harassed by MN), I was an F1 visa holder. I may have visited some doctors at UNL health center for basic visits like eyes or a cold.

[Supp. Dec. of Amare, ¶ 7, Ex. Z, Plaintiff's Answers to Interrogatories.] In response to Defendants' request for documents regarding her computation of damages, Plaintiff stated:

> **REQUEST NO. 9:**   All documents upon which you base any computation of your damages in this action (including materials bearing on the nature and extent of injuries suffered).
>
> **RESPONSE:**   My medical records are available from the UNL Health Center.

[Supp. Dec. of Amare, ¶ 8, Ex. AA, Plaintiff's Responses to Request for Production of Documents.]

In October 2022, Defendants issued a subpoena upon the University of Nebraska-Lincoln Health Center ("Health Center") requesting "the complete medical records" for the Plaintiff. [Supp. Dec. of Amare, ¶ 9.] The records received from the Health Center revealed that Plaintiff's last visit to the Health Center was on March 3, 2016, approximately one year before February 28, 2017. [Supp. Dec. of Amare, ¶ 9.] Accordingly, the claimed damage of $1,000 in medical expenses related to any visit to the Health Center is not recoverable as it was incurred pre-February of 2017 and, obviously, has zero connection to post-February 2017 conduct.

**Second**, the Plaintiff has not produced any medical record that shows any physical injury caused by post-February 2017 conduct, or identified a medical expert to attest that any physical injury is related to or caused by post-February 2017 conduct.

In the Amended Complaint, Plaintiff alleges she "developed joint pain from the stress of Roe's harassment and IEC's deliberate indifference. In order to alleviate the pain, she had to go to physical therapy and wear knee and wrist pads for over a year. Whenever Plaintiff thinks about her time at UNL, she feels the effects of the stress and joint pain." [Filing No. 13, ¶ 88.] Plaintiff described this alleged phenomenon as "physical

23

manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life. . . ." [Filing No. 13, ¶ 130.b.]

"Ordinarily, in medical cases, product defect and medical causation must be established by expert testimony." *Nuzum v. Chlorella*, No. 8:05CV335, 2006 WL 3825111, at *3 (D. Neb. Dec. 27, 2006) (quoting *Uribe v. Sofamor, S.N.C.*, 1999 WL 1129703 at *7 (D.Neb. Aug. 16, 1999), appeal dismissed (8th Cir. Sept. 27, 2001)). "A lack of expert testimony on the question of causation results in an insufficiency of proof where the issue involves technical, scientific or medical matters which are beyond the common knowledge or experience of jurors." *Id.  See e.g., Nuzum,* 2006 WL 3825111, at *3 (quoting *Mendoza v. Omaha Meat Processors,* 408 N.W.2d 280, 289 (Neb.1987)) ("Unless the character of an injury is objective, that is, an injury's nature and effect are plainly apparent, an injury is a subjective condition, requiring an opinion by an expert to establish the causal relationship between an incident and the injury as well as any claimed disability consequent to such injury."); and *Narmo v. IBP, Inc.,* No. 8:00 CV 527, 2005 WL 675806, at *2 (D. Neb. Jan. 28, 2005) (quoting *Eiting v. Godding*, 191 Neb. 88, 89, 214 N.W.2d 241, 243 (1974) ("Where the claimed injuries are of such a character as to require skilled and professional persons to determine the cause and extent thereof, the question is one of science. Such a question must necessarily be determined from the testimony of skilled professional persons and cannot be determined from the testimony of unskilled witnesses having no scientific knowledge of such injuries. When symptoms from which personal injury may be inferred are subjective only, medical testimony is required.").

In this case, the type of injury inferred from Plaintiff's subjective allegation as contained in the Amended Complaint is one that requires a medical expert to testify. As stated above, Plaintiff has not designated any medical expert to testify about such alleged injury, nor has she produced medical records which indicate the alleged symptoms were caused by the alleged post-February conduct. [Supp. Dec. of Amare, ¶ 10.] And, without

24

expert testimony, the jury would not be able to determine whether the claimed personal injury was either caused by Defendant's conduct much less the permanency of the injury. *See Narmo v. IBP, Inc.*, No. 8:00 CV 527, 2005 WL 675806, at *2 (D. Neb. Jan. 28, 2005) (holding, "Without expert assistance, no lay person would be able to determine whether a personal injury that is claimed by one of the Plaintiffs was either caused by [defendant's] actions or is permanent in nature."). Accordingly, there is no competent medical evidence or expert testimony that could provide a causal link between any medical issues and Defendants' alleged post- February conduct.

**3.    There are no compensatory damages resulting from non-emotional distress harm and stemming from Post- February 2017 Conduct.**

As detailed above, Plaintiff testified that she "switched" from the Ph.D. program to a Master of Science program in 2016. Her testimony is further confirmed by all of the record before this Court:

- In an email to John Roe on June 26, 2016, she stated she has visited the graduate school to be "known as a master's student;" in other words, to switch from Ph.D. program to a Master of Science program. [Filing No. 92-6.]

- On June 26, 2016, Plaintiff applied for the Master of Science program. [See Ex. W, Dep. of Plaintiff at 34:8-25.]

- In August 2016, in the Memorandum of Courses for admission to candidacy for the Master of Science degree, wherein Plaintiff and faculty collaboratively identified the courses she must take to graduate with a master's degree. Specifically, the Memorandum of Courses identified the following additional courses (courses she had not taken yet) that she has to take to graduate with a Masters: (1) thesis; (2) thermal and kinetics; (3) transport phenomena I, and (4) transport phenomena II. [Filing No. 85-2.]

25

- Consistent with the additional courses identified in the Memorandum of Courses, in fall 2016, Plaintiff took thermal & kinetics, transport phenomena I and master's thesis; in spring 2017, she took transport phenomena II and master's Thesis; and in summer 2017, she took master's thesis.  She then graduated in summer of 2017 from the University of Nebraska as she designed and in accordance with the Memorandum of Courses. [Filing No. 85-3, Transcript.]

- Moreover, in the admission application she submitted to Georgia Institute of Technology on November 19, 2016, specifically in the "Academic History" section, Plaintiff provided she is pursuing a ***master's degree at the University of Nebraska and plans to graduate in May 2017***. [See Filing No 85-13 at p. 2.]

Therefore, all of her claims for compensatory damages tied to her decision in the summer and fall 2016 to switch to a master's program and to pursue a Ph.D. at Georgia Tech cannot be linked to the Defendants' alleged post-February conduct and must be dismissed.

**B.     PLAINTIFF FAILED TO PRODUCE EVIDENCE TO PRECLUDE SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S CLAIM OF TITLE IX VIOLATION.**

This is a Motion for Summary Judgment, which requires the Plaintiff to proffer evidence that creates a genuine issue of material fact. Besides making unreasonable inferences and mere speculation, Plaintiff fails to proffer evidence that shows any of the elements required to prove these claims.

**1.     Plaintiff failed to establish that she was subjected to unwelcome harassment and that Defendant had notice of such harassment.**

Plaintiff unsuccessfully attempts to paint a picture that John Roe engaged in sexual harassment in violation of the University's directive to not engage in any intentional contact with one another directly or through a third party. It is insufficient for Plaintiff to label the stray interactions in common space as violation of a non-existent "no-contact directive."

Plaintiff relies on cases that are easily distinguishable from the circumstances of this case to argue a violation of a no-contact directive constitutes actionable sexual harassment under Title IX. In *Pogorzelska v. VanderCook Coll. of Music*, No. 19-CV-05683, 2023 WL 3819025, at *4 (N.D. Ill. June 5, 2023), the school found the accused had engaged in sexual misconduct when he sexually penetrated the Plaintiff, while she was intoxicated and fell asleep. Upon the conclusion of the investigation, the school provided, "in light of Title IX mandates, a no-contact order remains in place between you and [Plaintiff]. You should not speak to her, nor remain in the same area as her whenever possible." *Id.* Thereafter, the accused appeared via Facetime while the Plaintiff was sitting directly behind the person who was holding the phone, despite a previous instruction to the accused not to attend the performance. In addition, the accused sat near Plaintiff in class forcing her to change seats. It is in these circumstances—circumstances that are not present in this case—that the court decided it could not hold as a matter of law that such violations of a no-contact order do not constitute harassment.

In *Owens v. Louisiana State Univ.*, No. CV 21-242-WBV-SDJ, 2023 WL 2764760, at *12 (M.D. La. Mar. 31, 2023), the court was dealing with defendant's motion to dismiss—which applies a different standard than what will be applied in this case. In *Owens*—a case involving rape of the plaintiff—the plaintiff pled that the University did not respond at all to her report that the accused twice violated the no-contact order, which directed the accused to have no communication or contact with the plaintiff. Specifically, the plaintiff alleged that the accused violated the no-contact directive by having his girlfriend contact the plaintiff twice. It is under these circumstances—again, circumstances that are not present in this case—that the court held "Plaintiffs allegations, while thin, are sufficient to show that the Board was deliberately indifferent in its response, or lack thereof, to [plaintiff's] report that [the accused] twice violated the no-contact directive issued by LSU." *Id.*

In this case, the directive provided to Plaintiff and John Roe is different than the no-contract directive involved in the cases discussed above. In fact, Plaintiff admits and states multiple times that there was no "no-contact directive." Instead, the Plaintiff admits that Plaintiff and John Roe were told to not engage in any ***intentional contact*** with one another directly or through a third party. And, despite lengthy discovery, Plaintiff cannot show any intentional contact by John Roe directed towards her.

Plaintiff admits all the alleged encounters with John Roe were random encounters in a common space. Specifically, she does not dispute the following were the random encounters she reported to Strickman and Officer Fischer in March of 2017:

- Plaintiff said John Roe was walking into a doorway she was walking into where they became face to face and "stuck". She stated she felt John Roe was blocking the doorway and he said "hello". Jane Doe did not respond to John Roe and used a doorway next to this one to leave the area.
- Jane Doe explained how on three occasions, two in a hallway and one in a classroom, John Roe walked back and forth slowly by her. Jane Doe did not remember the exact days or times, but told me they occurred within the last two months inside Nebraska Hall where her research lab is. Jane Doe told me on these occasions he attempted to say "hello."

And, when Plaintiff was asked what she meant by the word "sneering," in the initial email she sent to Strickman, she stated: "I mean by sneering that I reported him [referring to the initial report in 2016]. I went through the process. And he's still around, and nothing has happened to him. He is in his office. He goes to his regular place probably. That's my understanding." [Ex. W, Dep. of Plaintiff at 120:25 – 121:4.]

Strickman did not sit idle. She met with John Roe to understand his perspective and John Roe responded to the inquiry into what Plaintiff reported as follows:

The events you informed me of both occurred 30 to 40 steps from my office and both were automatic reactions to the situation. I had, and have, no intention to make my former student feel uncomfortable. Please convey to her that I am sorry that my instinctive response to be polite and positive was misunderstood and had made her feel uncomfortable. I had no intension of doing so.

I had also intended to remove her from my skype contacts last fall, but

28

decided not to take any action that could be misunderstood under the circumstances (I am not sure what, or if anything, occurs when you remove a contact). Can you please inform her that I will be taking this action at the end of this week, and that under the circumstances this seems appropriate and is done without any ulterior motivation. It simply seems to be the correct thing to do under the current circumstances.

[Filing No. 85-9.] Accordingly, based on the totality of the circumstances of this case, this Court can conclude as a matter of law that Plaintiff has not and cannot show she was subjected to discrimination or harassment on the basis of her sex after February of 2017.

Moreover, any argument that the interaction between Plaintiff and John Roe in 2017 was severe, pervasive or offensive[1] is dispelled by her admission to Officer Fischer that John Roe did not threaten her, that John Roe did not engage in any intentional contact with her and that their interactions were random occurring in common space, that she did not need any immediate accommodation, and that she expressed to Officer Fischer that "she felt comfortable still doing her work and going to class."

### 2. BRUN's responses to March 2017 and September 2017 concerns were not clearly unreasonable in light of the known circumstances.

This Court can readily find that BRUN's response was not clearly unreasonable as a matter of law. In this case, Strickman responded immediately to Plaintiff's March of 2017 email and arranged for additional communication with Officer Fischer to further investigate the matter and ensure Plaintiff was feeling safe on campus. Thereafter, Strickman met with John Roe to get a complete picture of what was going on and also communicated with him via email. She also received and reviewed the report from Officer Fischer. Based on that, she concluded that there was no violation of the directive provided to Plaintiff and John Roe. Regardless, Strickman did instruct John Roe not to even acknowledge Plaintiff if he encounters her on campus.

---

[1] In their opening Brief, Defendants have thoroughly addressed the appropriate standard that is applicable to employee-student sexual misconduct and the cases cited therein are applicable and cannot be distinguished.

29

In fact, when Officer Fischer met with Plaintiff, on March 13, 2017, Plaintiff was thankful for the continued safety planning and left the meeting with no concerns. Specifically, Officer Fischer reported the following about his meeting with Plaintiff:

> At 1100 hours, I met with [Jane Doe] about her concerns. I told her I forwarded all information to Title IX and they did speak with [John Roe]. [John Roe] was not found in violation of anything and [John Roe] reiterated to Title IX he will continue to try not to run into [Jane Doe]. There were no safety concerns brought up. [Jane Doe] was thankful for the continued safety planning and left with no concerns. This case will remain closed.

[Filing No. 92-7.]

In addition, when Strickman received the September 27, 2017, email from Plaintiff, immediately she communicated with John Roe. Even if John Roe's email response was not directed to Plaintiff, Strickman told him not to even respond to emails to which John Roe and Plaintiff are carbon copied to and regardless of whether it involves the same project/article John Roe and Plaintiff worked on and co-authored.

Title IX requires that the University responds in a manner that is not deliberately indifferent. *Doe v. Dardanelle School District*, 928 F.3d 722, 725 (8th Cir. 2019) (holding deliberate indifference requires more than negligence and is meant to prevent second guessing of administrative decisions).

### 3.   Plaintiff failed to prove the additional element of causal nexus.

Plaintiff failed show the element of causal nexus, which is fatal to her Title IX claim. Instead, Plaintiff urges this Court to ignore Eighth Circuit decisions that have binding effect on this Court. The Eighth Circuit case law is clear that an educational institution is only deliberately indifferent if its actions cause or made the individual vulnerable to *actual* further harassment.  The "school district's deliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse, and that abuse 'must take place **in a context subject to the school district's control**.'" *Shrum ex. Rel. Kelly v. Kluck*, 249 F.3d 773 (citing *Davis*, 526 F.3d at 645) (emphasis added). Accordingly, Plaintiff is required "to demonstrate a '***causal nexus' between the college's conduct and***

*the student's experience of sexual harassment or assault*." *Id.* (citing *Culver-Stockton Coll.*, 865 F.3d at 1058) (emphasis added).

Likewise, in *K.T.*, the Eighth Circuit, addressing the plaintiff's post-notice actions, required the alleged deliberate indifference to cause the assault. In *K.T.*, the plaintiff alleged Culver-Stockton College was responsible for deliberate indifference in allowing an initial assault to occur and in its post-notice actions. She alleged as a result of the University's inaction she sustained "substantial mental and emotional distress . . . ." *Id.* at 1058. The Eighth Circuit held there was no "causal nexus between Culver-Stockton's inaction and K.T.'s experience sexual harassment," and found "[a]t most, these allegations link the College's inaction with emotional trauma K.T. claims she experienced following the assault." *Id.* "Thus, while K.T. was dissatisfied with the result, based on the allegations in the complaint, the response cannot be characterized as deliberate indifference that caused the assault." *Id.*

In this case, Plaintiff failed to allege and establish any actionable sexual assault or harassment after BRUN was allegedly provided notice of the concern in March 2017. In fact, it is impossible for Plaintiff to show any actionable sexual assault or harassment after the University received notice in March of 2017 and after it responded to the March of 2017 concern, as there are no allegations of contact or interaction between Plaintiff and John Roe for the remainder of her time at the University; and then Plaintiff left the University for Georgia Tech. Once Plaintiff was no longer a student, Title IX no longer applies because she was not taking part or attempting to take part in BRUN's educational programs.

## V.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request the Court grant their Motion for Summary Judgment.

Dated this 2nd day of January, 2024.

31

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA and TAMI
STRICKMAN, individually and in her
official capacity, Defendants

By:    /s/ Lily Amare
        Susan K. Sapp #19121
        Lily Amare #25735
        Cline Williams Wright
          Johnson & Oldfather, L.L.P.
        1900 U.S. Bank Building
        233 South13th Street
        Lincoln, NE 68508
        (402) 474-6900
        ssapp@clinewilliams.com
        lamare@clinewilliams.com

           AND

        Bren H. Chambers, #23150
        Associate General Counsel
        University of Nebraska
        3835 Holdrege Street
        Lincoln, NE 68583-0745
        (402) 472-1201
        bchambers@nebraska.edu

**CERTFICATE OF COMPLIANCE**

I, Lily Amare, hereby certify that this Reply Brief complies with the limits set forth in NECivR 7.1(d). Further, based on the Word Count function of Microsoft Word 2013-word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify this Reply Brief contains 8,996 words.

        /s/ Lily Amare
        Lily Amare

**CERTIFICATE OF SERVICE**

I hereby certify that on January 2, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties:

Karen Truszkowski
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
karen@temperancelegalgroup.com

Elizabeth K. Abdnour
Megan N. Mitchell
ABDNOUR WEIKER, LLC
500 E. Michigan Ave., Suite 130
Lansing, MI 48912
liz@education-rights.com
megan@education-rights.com


/s/ Lily Amare
Lily Amare

4892-7150-2737, v. 1

33