IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE,<br><br>        Plaintiff,<br><br>      vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA; and individuals TAMIKO STRICKMAN and JOHN ROE, individually and in their official capacities; and OTHER UNIDENTIFIED DEFENDANTS;<br><br><br>        Defendants. | **CASE NO. 4:21-CV-3049** |

---

**REPLY BRIEF IN SUPPORT OF BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA'S AND TAMIKO STRICKMAN'S MOTION TO EXCLUDE PLAINTIFF'S EXPERTS AND STRIKE THEIR OPINIONS**

---

Submitted by:

Susan K. Sapp, #19121
Lily Amare, #25735
CLINE WILLIAMS WRIGHT JOHNSON
   & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

       AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201

Dated: January 2, 2024    bchambers@nebraska.edu

1

The Board of Regents of the University of Nebraska ("BRUN" or "Board of Regents") respectfully submits this Reply Brief in Support of the Motion to Exclude Expert Witnesses and strike their opinions [Filing No. 74] ("Motion").

### I. INTRODUCTION

As a preliminary matter, Plaintiff has withdrawn Dr. Frank Ochberg as an expert witness in this matter and expressed she "does not object to Defendants' motion to exclude and strike his testimony." [Filing No. 87 at p. 22.] Accordingly, Defendants respectfully ask this Court to exclude and strike Dr. Frank Ochberg and strike his proposed opinions.

As to the remaining experts, the crux of Plaintiff's opposition to Defendants' Motion is based on an erroneous understanding of Plaintiff's obligation under the Federal Rules of Evidence. Specifically, Plaintiff fails to understand that, as the party offering the expert testimony, she has the burden to establish that such testimony is admissible under FED. R. EVID. 702 ("Rule 702") and *Daubert*. The *Daubert* analysis applies not just to scientific testimony, but to all proposed expert testimony, including testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999). Instead of carrying her burden, Plaintiff argues *Daubert* clarifies that Rule 702 allows an expert witness to offer a "wide latitude of opinions, including those that are not based on firsthand knowledge or observation." [Filing No. 87 at p. 6.] Plaintiff relies heavily on the "broad latitude," "flexible" standards, and "considerable leeway" afforded to the trial court in determining issues of admissibility to survive this Motion. Plaintiff misstates the legal standard for the use of expert testimony in a civil proceeding.

It is correct that the admissibility of expert testimony under FED. R. EVID. 702 is within the sound discretion of the trial court, meaning:

> . . . *Daubert's* general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." It ***requires*** a valid . . . connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently

into question, . . . , the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.

*Kumho Tire Co., Ltd.*, 526 U.S. at 149 (1999) (internal citations and quotations omitted; cleaned up) (emphasis added).

However, Plaintiff's argument that the standard under *Daubert* for determining reliability of principles and methodology provided by an expert is a "flexible one" and her application of this standard to the experts in this case is erroneous. Specifically, this Court should reject Plaintiff's argument that she is entitled to provide expert testimony despite such testimony exceeding the boundaries of the Federal Rules of Evidence and *Daubert*, and without subjecting such testimony to judicial analysis as to its reliability. *Daubert,* 509 U.S. 579, 594-595 (discussing, *not the flexibility in discretion of the judge to allow testimony in the absence of a reliable method*, but flexibility of analysis to look *beyond* whether principles and methods are "generally acceptable" under the previous standard to determine the ultimate reliability of the underlying principles and methods). Plaintiff's proffered experts and their respective opinions must comply with the Federal Rules of Evidence; and given the reality that the experts' factual basis, data, principles, methods, and their application are sufficiently called into question by the Defendants, this Court must determine whether the testimony complies with the applicable Federal Rules of Evidence. For the reasons set out below and in the opening Brief, testimony from both Lin-Chi Wang and Andrew Verzilli, along with their respective reports, should be summarily excluded from admission at trial.

## II. ARGUMENT

### A. WANG'S OPINIONS ARE NOT BASED ON RELIABLE METHODOLOGY, WILL CONFUSE THE JURY, AND WILL PREJUDICE THE DEFENDANTS.

Plaintiff admits Wang's specialized knowledge is offered "to help the trier of fact understand how a ***reasonable person*** in Strickman's position would have appropriately responded to Plaintiff's reports about John Roe's ongoing sexual harassment and stalking of her." [Filing No. 87 at p. 10 (emphasis added).] Plaintiff argues Wang is not "a legal expert"

3

and does not plan on providing a legal conclusion. [Filing No. 87 at p. 10.] In the same breath, Plaintiff argues:

> The core issue in this case is whether BRUN was deliberately indifferent to Plaintiff's reports. Plaintiff intends to use Wang for the purpose of assessing the appropriateness of UNL's response, which will in turn help the trier of fact determine whether UNL acted with deliberate indifference.

[Id.] In a roundabout way, Plaintiff admits Wang will apply the "reasonable person" standard to showcase BRUN acted with *deliberate indifference* in violation of Title IX—which is the application of a legal standard and proposal of legal conclusion.

Wang's opinion will not aid the trier of fact, and in fact, will confuse the jury and prejudice the Defendants. Other than the conclusory statement that Wang's opinions are based on reliable methodology, it is clear from the expert report and Wang's testimony that there is no method, reliable or *otherwise*.

In analyzing the soundness of an expert opinion under *Daubert*, "among the factors to consider is whether the 'expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). "Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case." *Concord Boat Corp.*, 207 F.3d at 1056. *See also Marmo v*, 457 F.3d at 758 (quoting *Gen. Elec. Co.*, 522 U.S. at 146) ("A court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert'"); *Neb. Plastics, Inc. v. Holland Colors Ams.,*

4

*Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (If an "expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded.").

For instance, in *Bertroche v. Mercy Physician Assocs., Inc.*, the plaintiff offered an expert opinion from a doctor as it relates to "general principles of gender pay discrimination in the healthcare field as a whole." No. 18-CV-59 CJW-KEM, 2019 WL 7761809, at *6 (N.D. Iowa Oct. 28, 2019). The defendant filed a motion in limine to exclude such opinion. The court's analysis is instructive:

> Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In determining whether expert testimony is admissible, the Court is to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. Further, "[t]o satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Smith v. Bubak*, 643 F.3d 1137, 1140 (8th Cir. 2011) (citing *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010)). From the motions in limine, it does not appear that Dr. Jagsi's testimony will apply the facts at issue to the theories she intends to testify about. The Court does not doubt Dr. Jagsi's expertise as it relates to general principles of gender pay discrimination in the healthcare field as a whole. But this is not a trial on the healthcare industry. It is a trial on whether the defendant breached its contract with plaintiff and whether, based on the facts of this case, defendant paid plaintiff less than other physicians based on her gender. Because there is nothing to indicate that Dr. Jagsi will apply her reasoning and methodology to the facts of the case here, Dr. Jagsi's testimony is properly excluded.

*Id.* Based on that analysis, the court granted the defendant's motion to exclude the testimony of the doctor. *Id.*

In this case, through Wang's opinion, Plaintiff will be inviting the jury to impose liability under what amounts to a negligence standard based on purported general principles about how various individuals process Title IX reports. Specifically, Plaintiff will have Wang opine that Strickman's response was deliberately indifferent because a reasonable person would have responded a certain way to the alleged reports of sexual misconduct.

As Plaintiff correctly stated, the crux of this case is whether BRUN was deliberately indifferent to Plaintiff's reports. The Supreme Court of the United States has squarely

addressed whether a negligence standard can be used to meet the deliberate indifference element and has expressly held such standard cannot be used. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). Specifically, the Court held:

> [W]e declined the invitation to impose liability under what amounted to a negligence standard—holding the district liable for its failure to react to teacher-student harassment of which it knew or *should have* known. *Ibid.* Rather, we concluded that the district could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge.

*Id.* "Deliberate indifference is established when a school responds in a clearly unreasonable manner to harassment considering the circumstances known to it. It is a stringent standard of fault that cannot be predicated upon mere negligence. . . . Title IX is not a procedure for courts to second-guess disciplinary decisions made by school administrators." *Doe v. Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th 419, 423 (8th Cir. 2023) (internal citations and quotation marks omitted)

Therefore, similar to the outcome in *Bertroche*, Wang's opinion must be excluded. Wang's opinion is designed to simply "second-guess" the disciplinary decision made by Strickman and propose a standard which was expressly held ***not*** to apply in Title IX cases. Such opinions are irrelevant to this case, as the trial in this case is not whether BRUN was negligent in the way it handled Plaintiff's reports. *See Daubert,* 509 U.S. at 597 ("We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes."). It is established law that the gate keeping purpose of the court is to protect the jury from confusion and maintain judicial efficiency, and this case is best suited for the Court to exercise its important gate keeping role. *Id.*

The Court should decline to allow the Plaintiff to give the trier of fact an unlimited and unfettered leash to apply a negligence standard—especially given that the Plaintiff and Wang do not provide *any* method by which the trier of fact can apply their general principles to the facts of the case. There is no method or standard used by Wang for the trier of fact to determine whether BRUN was deliberately indifferent, nor can any method be applied when Wang:

- Did not even attempt to communicate with the relevant parties in this matter (Plaintiff, John Roe, Officer Eric Fischer, any BRUN official);
- Did not know the size of the University or the Title IX office at the University, and has never visited the University;
- Did not know the type of Title IX process that is utilized by the University;
- Did not gather any information regarding what Title IX policies or processes were utilized by the University or why any particular policies or processes were used;
- Disregarded critical evidence that was exchanged during the course of discovery;
- Has never served in a capacity where she had to evaluate whether an institution was deliberately indifferent to particular reports, or assess whether an institution's response was reasonable under the circumstances; and
- Has no experience investigating the question of whether a university has violated Title IX, or whether the policies or procedures of a university violate Title IX.

[Filing No. 85-17, Dep. of Lin-Chi Wang at 12:20-25, 13:1-4, 53:15-54:6, 86:4-9, 91:14 – 92:1, 94:12-95:17, 96:16-97:1, 97:16-99:21.] Therefore, this apparent attempt to circumvent *Daubert*'s requirement to demonstrate that "the testimony is the product of reliable principles and methods" and that "the expert has reliably applied the principles and methods to the facts of the case" by shifting it to the trier of fact must be rejected. *See* FED. R. EVID. 702(c) & (d).

Moreover, despite expressly stating Plaintiff is not offering Wang as a "legal expert," Plaintiff argues Wang's testimony will be used to assist the jury in understanding the "complex regulatory scheme at issue in this case" and provide "regulatory analysis and opinions regarding the implications of Title IX regulations and related guidance from the federal government," "including proper Title IX procedures required of federal funding recipients." [Filing No. 87 at pp. 15-16.] In other words, Plaintiff seeks to use Wang to provide an analysis of the law to the jury.

In this case, there is no complex regulatory scheme at issue. Nor is there any discussion of this complex regulatory scheme in Wang's report, not even any opinion as to how these complex regulatory schemes work particular to this case. Such opinion would certainly be peculiar given Wang's admission at her deposition that she has never served as counsel in Title IX, deliberate indifference cases, and that she does not have training or experience in determining or providing counsel as to whether an institution has violated Title IX or due process rights.

Furthermore, as thoroughly discussed in the opening Brief and Defendants' Brief in Support of their Motion for Summary Judgment, case law is clear as to the elements that the Plaintiff must prove to demonstrate BRUN violated Title IX. Specific to the element of "deliberate indifference," Plaintiff must show BRUN "turn[ed] a blind eye and d[id] nothing" in a "clearly unreasonable manner." *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir. 1999). *See also Doe v. Bd. of Trustees of the Nebraska State Colleges*, No. 22-1814, 2023 WL 5211568, at *3 (holding same).

Assuming solely for purposes of argument that there is some "complex regulatory scheme," it is widely accepted that experts may ***not*** provide legal opinions or conclusions. *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 32 F.3d 838, 841 (8th Cir. 2003) (stating, "[e]xpert testimony on legal matters is not admissible") (citing *United States v. Klaphake*, 64 F.3d 435, 438-39 (8th Cir. 1995)). Any assistance to the jury in

8

understanding the law should be left to the Judge. *Id.*

Wang's opinion is also being offered to improperly present to the jury a legal conclusion as to "whether UNL's response to Plaintiff's report was appropriate." [Filing No. 87, at 16; Filing No.92-1, Dep. of Wang at 112:11-23.] Wang admitted during her deposition:

> Sure. So I just want to clarify that I was asked to give an opinion as to appropriate response, not as to whether UNL's response violated best practice. So the question was did UNL respond appropriately to these reports. So that was the focus of my opinion, not as to whether the university violated best practice. So I just want to make sure that's clarified.

[Filing No. 92-1, Dep. of Wang 112:16-23.] Any expert opinion purporting to answer the question of whether "UNL responded appropriately" is a legal conclusion and would be clearly inadmissible. *Southern Pine Helicopters*, 32 F.3d at 841. An expert may not attempt to substitute their opinion for a determination reserved for the trier of fact.

Such presentation of opinion would be unfairly prejudicial. "Because 'expert evidence can be both powerful and quite misleading,' a trial court must take special care to weigh the risk of unfair prejudice against the probative value of the evidence under FED. R. EVID. 403." *Nichols v. Am. Nat. Ins. Co.*, 154 F.3d 875, 884 (8th Cir. 1998) (quoting *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 (internal quotations omitted)). The court in *Langenbau v. Med-trans Corp.,* lays out the analysis under Rule 403 and lists relevant cases:

> More specifically, as to Rule 403 "prejudice," the Eighth Circuit has explained:
>
> [U]nder Rule 403, the [challenged evidence's] probative value must be *substantially* outweighed by *unfair* prejudice. "Evidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning. Whether there was unfair prejudice depends on whether there was an undue tendency to suggest decision on an improper basis." United States v. Farrington, 499 F.3d 854, 859 (8th Cir.2007) (quotations omitted).
>
> *Muhlenbruch, 634 F.3d at 1001* (emphasis in the original); *Myers,* 503 F.3d at 682 ("Rule 403 'does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis.'" (quoting Wade v. Haynes, 663 F.2d 778, 783 (8th Cir.1981), *aff'd sub nom.* Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). The Advisory Committee Notes to Rule 403 explain that a decision on an "improper basis" is "commonly, though not necessarily, an emotional one." FED. R. EVID. 403, Advisory Committee Notes; *see*

9

> *also* United States v. Bell, 761 F.3d 900, 912 (8th Cir.2014) (same). Unfairly prejudicial evidence, inviting a decision on an improper basis, includes evidence that is "'so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.'" United States v. Adams, 401 F.3d 886, 900 (8th Cir.2005) (quoting United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir.1995)); *accord* United States v. Young, 753 F.3d 757, 768–69 (8th Cir.2014) ("[T]he district court violated Federal Rule of Evidence 403 because the testimony was so inflammatory that its resulting unfair prejudice outweighed its probative value.").

167 F. Supp. 3d 983, 992 (N.D. Iowa 2016).

Plaintiff's proposed opinions of Wang will do exactly what Rule 403 is attempting to prevent: they advise and suggest to the jury to find guilt based on an improper and unreliable opinion that other administrators at other schools may have responded differently. The inflammatory nature of the proposed opinions is obvious from the face of the proposed report and the inconsistent presentation of arguments in Plaintiff's Brief in Opposition, after realizing the wrench the *Daubert* standard threw in Wang's original proposed opinions. Specifically, Plaintiff intends to suggest that the jury should arrive at the conclusion that BRUN was deliberately indifferent because a "reasonable person" would have responded differently than Strickman did to Plaintiff's reports, but Plaintiff cannot offer such suggestion for lack of methodology, unreliability, and the multitude other reasons as addressed in the opening Brief.

"This Court 'must guard against' permitting expert witnesses to invade 'the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion.'" *Doe v. Bd. of Regents of Univ. of Nebraska*, No. 4:20CV3036, 2022 WL 3566990, at *3 (D. Neb. Aug. 18, 2022) (*Hirchak v. W.W. Grainger, Inc.*, 980 F.3d 605, 609 (8th Cir. 2020)). The jury will be able to assess the credibility of the fact witness testimony and determine whether BRUN was deliberately indifferent under the circumstances known to it at the time. As the party offering the expert testimony, Plaintiff has utterly failed to meet her burden of establishing that Wang's proposed opinions are admissible under FED. R. EVID. 702 and *Daubert*.

10

**B. VERZILLI'S OPINION IS WHOLLY UNSUPPORTED BY FACTS AND DATA, IS CONTRARY TO THE FACTS OF THE CASE, IS SPECULATIVE, AND CAN OFFER NO ASSISTANCE TO THE JURY.**

"While the factual basis of an expert opinion generally goes to its credibility rather than its admissibility, . . . expert testimony that is 'speculative, unsupported by sufficient facts, or contrary to the facts of the case' is inadmissible . . . ." *Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 970 (8th Cir. 2023) (citations omitted). *See Lancaster*, 75 F.4th at 970 (citing *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) (expert opinion that is "so fundamentally unsupported that it can offer no assistance to the jury" should be excluded.) In other words, "opinion testimony is admissible only if it is 'relevant to the task at hand.'" *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2023 WL 2696497, at *6 (D. Minn. Mar. 29, 2023) (citing *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786). "This means that the Court should consider whether the 'opinion offered by the expert is sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute.'" *Id.* (citing *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001)).

In *Lancaster*, the plaintiff desired a doctor expert to opine that the decedent's cancer was caused by his exposure to toxins at work. *Lancaster*, 75 F.4th at 969. The railroad's negligence played a part in causing his or her injury. *Id.* at 968. The defendant moved to exclude this expert. In assessing the *Daubert* motion, the district court explained:

> Under *Daubert*, district courts must make a "preliminary assessment of whether the reasoning or methodology underlying [an expert's] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (discussing Fed. R. Evid. 702). "Among the factors to consider is whether the expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). "[A]ny step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019) (citations omitted).

*Id.* at 969. The district court then found that the doctor's opinion lacked a reliable foundation, and it was premised on an erroneous reading of another expert report. *Id.* Specifically, the doctor expert assumed that that the decedent was exposed to above-background rates of asbestos, diesel exhaust, and silica dust. *Id.* However, the only evidence presented was that decedent had above-background exposure to silica dust and that the decedent had "the ***potential*** for exposures to diesel combustion fumes and asbestos." *Id.* at 969-70. The plaintiff appealed. *Id.* at 970.

The Eighth Circuit held the district court "did not abuse its considerable discretion by determining that [the Doctor Expert's] opinion lacked a sufficient foundation and that, in turn, his methodology for proving causation was unreliable." *Id.* at 971. In arriving at this conclusion, the Eighth Circuit explained:

> There is no direct evidence that [decedent] was exposed to asbestos 5 or diesel combustion fumes. 6 Even if a jury could infer that James had been exposed, there is no evidence of the level of exposure. While a quantifiable amount of exposure is not required to find causation between a toxic exposure and injury, *see Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 931 (8th Cir. 2001), there must be, at a minimum, "evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered," *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996). There is no such evidence here. *See Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 898 (8th Cir. 2008) (holding there was "simply too great an analytical gap" to support admissibility where expert lacked knowledge of the degree of plaintiff's exposure to toxin (citation omitted)).

*Id.* at 970-71.

In *Cole v. Homier Distrib. Co.*, Cole brought claims related to Homier's termination of their distributorship agreement. 599 F.3d 856, 859—60 (8th Cir. 2010). Cole's damages expert formed his opinion based on all of Cole's lost profits, but failed to account for the fact that the parties had a separate, continuing dealership agreement that Homier had not terminated. *Id.* at 865. Because the expert's "report indicates that he was either unaware of or disregarded these facts," his lost-profits analysis was "unsupported by the record." *Id.*

The court concluded that "exclusion of that analysis is proper, as it can offer no assistance to the jury." *Id.*

In this case, the question for the jury would be whether the Plaintiff suffered any damages because of Defendants' conduct occurring after February 28, 2017. On that issue, Verzilli's opinions are fundamentally unsupported and offer no assistance to the jury. The undisputed record before this Court illuminates that Verzilli's primary assumptions for his opinion lacks foundation and, therefore, his methodology for proving "loss of earnings as a result of the delay in the completion of her Ph.D. program" is unreliable and leaves too great an analytical gap between the facts of the case and his conclusion. [Filing No. 85-19, Dep, of Verzilli at 9:5-7.]

***First***, Verzilli's assumption that Plaintiff would have obtained her Ph.D. from the University in 2018, even though Plaintiff had not been involved in a Ph.D. program at the University since at least August of 2016, is contrary to the reality of and evidence in this case. Specifically, Plaintiff switched to a Master of Science program in the summer of 2016 and was then no longer in the Ph.D. program; therefore, there was no "delay" caused by alleged conduct occurring after February 28, 2017, which is the relevant time frame. Yet, Verzilli's opinion is based on an erroneous assumption that Plaintiff was enrolled in the Ph.D. program at the University of Nebraska and that Plaintiff would have obtained her Ph.D. in May of 2018. [Filing No.85-19, Dep. of Verzilli at 16:15-20; Supplemental Declaration of Amare, Ex. X, Dep. of Verzilli at 21:21-22:8.] Verzilli testified that he did not look at any educational records that indicated to him Plaintiff was on track to get her Ph.D. in 2018, and admitted he just assumed that she was.

In fact, Plaintiff admitted, under oath, that she "switched" to the Master of Science program in the summer of 2016, long before the relevant conduct post-February 28, 2017:

> Q. You started the process to ***switch from the Ph.D. program to a master's program at UNL*** in June of 2016; correct?
> A. ***June 2016. It was in the -- in that time domain.***

13

Q. I am sorry. What?

A. It was around that time domain.

Q. There's a June 26th, 2016, e-mail, Exhibit 42, written to [John Roe] indicating: I have gone to the graduate studies in order to be known as a master's student and graduate in December 2016. Do you recall sending him that e-mail?

A. Yes.

Q. And then Exhibit 43 is a graduate student application. Do you recall submitting your graduate student application in July of 2016?

A. Sorry. What is your question?

Q. Do you recall submitting a graduate student application for mechanical engineering and applied mechanics in July of 2016?

A. I think I submitted it at that time.

Q. And that was to be in the master's program; correct?

A. Yes.

. . .

Q. In fact, you applied to Georgia Tech November 19th, 2016; correct?

A. I remember I applied to Georgia Tech in fall 2016.

Q. And why did you apply to Georgia Tech's Ph.D. program in the fall of 2016?

A. I wanted to go to continue my Ph.D. because I was passionate to continue my study. And I applied to Georgia Tech because it's really high ranked. Now it's number five in the United States. It's a very high-ranked university. And I knew my background, and I knew that I would do well at Georgia Tech.

Q. So your understanding when you applied in the fall of 2016 is that Georgia Tech's Ph.D. program was higher ranked than UNL's?

A. Yes.

[Filing No. 85-12, Dep. of Plaintiff at 34:1 – 36:22.] After she switched to the Master of Science program, Plaintiff was no longer enrolled in the Ph.D. program and was not on track to attain such a degree at the University of Nebraska. [Supplemental Declaration of Dr. Lily Wang, ¶ 4 -7.]

Accordingly, Plaintiff's attempt to backdoor an assessment of damages for her own decision made in June of 2016, which had no connection to alleged conduct that occurred after February 28, 2017, should be rejected as it is wholly unhelpful to the trier of fact. *See e.g. In re Bair Hugger Forced Air Warming Devices Products Liability Litigation*, 9 F.4th 768, 778 (8th Cir. 2021) (discussing the exception to the general rule when an expert's opinion is

14

fundamentally unsupported); *Concord Boat Corp.*, 207 F.3d at 1055, 1056 ("Among the factors to consider when analyzing under *Daubert* is whether the 'expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute;'" and "even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case."); and *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

**Second**, at her deposition, Plaintiff admitted she attended the University of Nebraska on F-1 visa status. [Supp. Dec. of Amare, ¶ 3, Ex. W, Dep. of Plaintiff at 29:2 – 30:16.] Plaintiff's Application for Graduate Admission at the Graduate Institute of Technology provides she was a F-1 student. [See Filing No. 85-13, at p. 4.] F-1 visa allows an individual to enter the United States as full-time student at an accredited college or university. 8 C.F.R. § 214.3. F-1 students may engage in only certain types of off-campus employment, the length of which is limited by regulation. *See* 8 C.F.R. § 214.3(f)(9)-(12). Specifically, the maximum F-1 student may work after the completion of their studies, if authorized, is 36 months. *See Id.*

Verzilli failed to take into account Plaintiff's immigration status when he projected Plaintiff's loss of income had she graduated in 2018 with her Ph.D. He testified:

> Q. Do you know anything about plaintiff's residency or Visa status in the United States?
>
> A. I mean, she's working, so I assume she has the appropriate residency status. And that's all I can say.
>
> . . .
>
> Q. So do you have an understanding of the fact that she came to the United States with an F2 Visa?
>
> A. I don't have that. I didn't -- I don't have that document, so I am not -- and, again, she wasn't deposed yet. So...
>
> Q. Do you know what an F2 Visa entitles her to?

15

> A. No. I -- if I knew that she had an F2 Visa, I most likely would just look it up to see what it was, but I didn't as of today.
>
> Q. And then she -- do you -- are you aware she converted to an F1 Visa?
>
> A. I am not aware of that. I didn't -- I don't have that, those documents. I am just checking...
>
> Q. Did you know that after they graduate, they can only work a maximum of three years after they graduate?
>
> A. No.

[Supp. Dec. of Amare, ¶ 5, Ex. X, Dep. of Verzilli at 17:20 – 19:3.] Of significant note is that Verzilli agrees that Plaintiff's immigration status would change his opinion and that his report is incomplete without accurate information regarding Plaintiff's immigration status during the relevant period. To illustrate, Verzilli testified:

> Q. Would you agree that her loss of earning would be different if she was to spend her life in Iran as compared to the United States?
>
> A. Correct. If, as you have just indicated, there's a three-year period and we assume she would have finished in '18, went to work around June of '18, that takes us to June of 2021. That clearly would have one past lost earnings I could look at. And then going forward I'd have to see how that would be impacted. If -- I mean, it can be complicated. I'd have to set it up. But assuming -- if I had to assume had she stayed at the University of Nebraska, finished in '18, is only here for three years and that's it, then I'd have to look at, you know, engineers in Tehran and where she would be today compared to where she is now.
>
> . . .
>
> Q. And does your report fully set forth all of your opinions you intend to testify at trial?
>
> A. Yes. With the caveat of I -- you -- I may have to, you know, follow up about the issue of the Visa status. I mean, I don't -- I mean, I am not -- if that's something I have to make adjustment, I will make the appropriate adjustment. I am not -- I am not going to ignore that. I just -- it was something I was not aware of.

[Supp. Dec. of Amare, ¶ 5, Ex. X, Dep. of Verzilli 18:18-20:5, 19:17-20:5, and 40:25-41:8.]

Plaintiff argues that Verzilli will "appropriately adjust his opinion to reflect Plaintiff's F-2 Visa status prior to providing his testimony at trial." [Filing No. 87, at p. 18.] To date, Verzilli has not provided an updated report, and the deadline for expert disclosures has long since passed. Accordingly, Verzilli's testimony, which relies upon blatantly inaccurate

information, must be excluded. Verzilli's opinion should be summarily excluded as unsupported by the evidence under FED. R. EVID. 702(b) and *Daubert.*

***Third and finally***, there is no evidence Plaintiff would have moved to Texas had she graduated with a Ph.D. from the University of Nebraska, Lincoln. Indeed, Verzilli testified that he has no information about any plan Plaintiff may have had to stay in Nebraska, to move back to Iran, or move to any other state, including Texas, had she graduated with a Ph.D. from Nebraska. [Supp. Dec. of Amare, ¶ 5, Ex. X, Dep. of Verzilli 15:22-16:20.] Yet, Verzilli used salary data from Austin, Texas, clearly speculating as to the locality where Plaintiff would have earned a salary had she completed her Ph.D. program in 2018 in Lincoln, Nebraska. Such an opinion of loss of income and future earning is far too speculative to be admitted into evidence. *See e.g., Hogland v. Town & Country Grocer of Fredericktown Missouri, Inc.*, No. 3:14CV00273 JTR, 2015 WL 3843674, at *27 (E.D. Ark. June 22, 2015) (holding because there is *no evidence* supporting the expert's opinion of future earnings based on a career mobility theory that, based on his guess, the plaintiff would have moved to a different city or state, places that have higher paying jobs in her field, his testimony about that theory is far too speculative to be admitted into evidence).

### III. CONCLUSION

For the reasons set forth herein and in Defendants' opening Brief, Defendants respectfully request the Court grant their Motion to Exclude Plaintiff's experts and strike their respective opinions.

Dated this 2nd day of January, 2024.

17

                                        BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA and TAMI STRICKMAN, individually and in her official capacity, Defendants

By:   /s/ Lily Amare
Susan K. Sapp #19121
Lily Amare #25735
CLINE WILLIAMS WRIGHT
 JOHNSON & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, NE 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

        AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

## CERTFICATE OF COMPLIANCE

    I, Lily Amare, hereby certify that this Reply Brief complies with the limits set forth in NECivR 7.1(d). Further, based on the Word Count function of Microsoft Word 2013 word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify this Reply Brief contains 6,363 words.

                                                                    /s/ Lily Amare
                                                                    Lily Amare

**CERTIFICATE OF SERVICE**

        I hereby certify that on January 2, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties who have entered an appearance in this case as well as electronically transmitted.

| | |
|---|---|
| Karen Truszkowski<br>TEMPERANCE LEGAL GROUP, PLLC<br>503 Mall Court #131<br>Lansing, MI 48912<br>karen@temperancelegalgroup.com | Elizabeth K. Abdnour<br>Megan N. Mitchell<br>ABDNOUR WEIKER, LLC<br>500 E. Michigan Ave., Suite 130<br>Lansing, MI 48912<br>liz@education-rights.com<br>megan@education-rights.com |

/s/ Lily Amare
Lily Amare

4871-0110-7866, v. 1