IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, TAMIKO STRICKMAN, and individuals, individually and in their official capacities; JOHN ROE, and individuals, individually and in their official capacities; and OTHER UNIDENTIFIED DEFENDANTS,<br><br>Defendants. | **4:21CV3049**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Defendants' Motion for Summary Judgment. (Filing No. 73.) For the reasons explained below, the motion will be granted.

**PROCEDURAL BACKGROUND**

Plaintiff Jane Doe sued the Board of Regents of the University of Nebraska ("BRUN"), Tamiko Strickman ("Strickman"), and John Roe (in both their official and individual capacities), and other unidentified individuals, asserting claims arising out of Plaintiff's allegations that she was sexually harassed by Roe. (Filing No. 13.) Plaintiff's first two claims, which were specifically against BRUN, were for violations of Title IX based on alleged deliberate indifference to sex discrimination and retaliation. (Filing No. 13.) Plaintiff also asserted § 1983 claims against all Defendants, arguing that their actions violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution. (Filing No. 13.)

BRUN and Strickman (collectively, "Defendants"), filed a motion to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). Senior United States District Judge John Gerrard granted the motion, in part, dismissing Plaintiff's Title IX retaliation claim and § 1983 claims against BRUN. (Filing No. 26.) Plaintiff's § 1983 claim against Strickman based on alleged violations of the Equal Protection Clause was also dismissed.[1] (Filing No. 26.) Therefore, the only claims that remain in this suit are Plaintiff's Title IX deliberate indifference claim against BRUN, and Due Process claim against Strickman, in her individual capacity.

**STATEMENT OF FACTS**

Plaintiff was a student at the University of Nebraska—Lincoln (the "University") from approximately the summer of 2014 through August of 2017. (Filing No. 13; Filing No. 78-1; Filing No. 85-3.) When she started at the University, Plaintiff planned to obtain her Ph.D. (Filing No. 78-1; Filing No. 85-12.) In June and early July of 2016, Plaintiff submitted a Graduate Student Application to gain admission to the Master of Science in Mechanical Engineering and Applied Mechanics program at the University. (Filing No. 85-1.) Plaintiff's Graduate Student Application was approved and effective the summer of 2016. (Filing No. 78-1.) Plaintiff was asked at her deposition when she "started the process to switch from the Ph.D. program to a master's program" at the University. (Filing No. 85-12.) Plaintiff answered that it was in the June, 2016 time domain.[2] (Filing No. 85-12.) On August 18, 2016, Plaintiff submitted a revised Memorandum of Courses for admission to candidacy for a Master of Science degree. (Filing No. 78-1; Filing No. 85-2.) After beginning the Master of Science program, Plaintiff was not on a Ph.D. track and did not submit a Program of Study for a Ph.D. program, which must be filed with Graduate Studies prior to completion of half of the coursework for a Ph.D. program. (Filing No. 101-1.) In 2016, Plaintiff's husband also entered a master's degree program at the University. (Filing No. 85-12.)

Roe was a Professor in the Department of Mechanical and Materials Engineering at the University and was assigned as Plaintiff's advisor. (Filing No. 13; Filing No. 78-2.) On or about June 21, 2016, the University's Office of Institutional Equity and Compliance ("IEC"), which was responsible for enforcing Title IX and conducting investigations into Title IX complaints, received a

[1] In his order, Judge Gerrard also determined that Defendants' conduct occurring prior to February 28, 2017, is time-barred and may not be used as the basis for Defendants' liability. (Filing No. 26.)

[2] In her declaration offered in opposition to summary judgment, Plaintiff disputes that she "switched" to a master's program, and rather claims that she "added" a master's program while also remaining in the Ph.D. program.

report from Laurie Bellows ("Bellows") that Plaintiff reported to her that Roe sexually harassed and retaliated against her.[3] (Filing No. 13; Filing No. 78-2.) Strickman, who served as the Associate to the Chancellor and Title IX Coordinator at the University, reached out to Plaintiff on June 21, 2016 about the complaint. (Filing No. 78-2.) Strickman and Plaintiff scheduled to meet about the matter on June 23, 2016. (Filing No. 78-2.) On June 23, 2016, Plaintiff met with Strickman and made the following allegations: (1) Roe kissed her in December of 2014; (2) Roe told her he loved her and wanted to kiss her, and kicked her legs in the summer of 2015; (3) Roe sent Plaintiff a link to a romantic movie in September of 2015; and (4) Roe removed her from first author to second author on a journal Plaintiff and a group of other students were writing in retaliation for rejecting his sexual advances. (Filing No. 78-2.) Strickman told Plaintiff at the meeting that the University Police Department was available to her to talk to her about any safety concerns she had. (Filing No. 78-2.)

On June 24, 2016, Plaintiff communicated to IEC that she wanted to file a formal complaint against Roe. (Filing No. 78-2.) From June 24, 2016, through August 12, 2016, Strickman investigated Plaintiff's complaint. (Filing No. 78-2.) On July 5, 2016, Strickman informed Roe of Plaintiff's complaint and instructed him not to retaliate against Plaintiff. (Filing No. 78-2.) Strickman directed Plaintiff and Roe not to engage in any intentional contact with one another directly or through a third party. (Filing No. 78-2, Filing No. 103-3 at 69:25-70:7.) Roe was also instructed not to e-mail Plaintiff directly. (Filing No. 103-3 at 73:6-19.)

Strickman also worked with the Department of Engineering to remove Roe as Plaintiff's advisor, and in June or July 2016, Plaintiff was assigned a new advisor. (Filing No. 78-2.) On July 26, 2016, Plaintiff met with Strickman and Officer Eric Fisher ("Investigator Fisher") from the University's police department and reported that she had no safety concerns at that time because she had a new office, new advisor and new team. (Filing No. 78-2, Filing No. 80-12 at 99:2-100:11.)

On or about August 12, 2016, Strickman finalized her investigation and issued her findings. (Filing No. 78-2.) In letters dated August 12, 2016, Strickman notified both Plaintiff and Roe of her decision, which outlined her findings and recommendations for discipline. (Filing No. 78-2.) Strickman determined the greater weight of the evidence showed Roe violated BRUN Policy, RP-2.1.8 which

[3] From 2016 through 2018, the University had a policy against sexual misconduct. (Filing No. 78-3; Filing No. 78-4.) The University had a "University of Nebraska—Lincoln Response to Allegations of Student Sexual Misconduct" policy. (Filing No. 78-3; Filing No. 78-4.) Additionally, the University's Student Code of Conduct provided that "no person shall be deprived of the privileges of this institution because of sex," and further states that the "University will investigate reported allegations of sexual misconduct and may take appropriate remedial action." (Filing No. 78-4.)

prohibits sexual misconduct. (Filing No. 78-2.) Strickman also found that the greater weight of the evidence showed Roe's decision to move Plaintiff from first to second author was not retaliatory. (Filing No. 78-2.) Instead, Strickman concluded that the greater weight of the evidence showed Roe's decision to remove Plaintiff from first author was based on Plaintiff's subpar work product on the paper relative to the work of the co-author on the paper. (Filing No. 1-11, Filing No. 78-2.) Based upon the findings and due to the delay in Plaintiff's coursework caused by changing her advisor, Strickman recommended the graduate school cover tuition and fees for the remaining six (6) credit hours Plaintiff needed to complete the Master of Science program. (Filing No. 78-2.) Strickman outlined Roe's consequences as follows: "You shall undergo Title IX sexual harassment training within 30 days of this recommendation becoming final. Further, you shall no longer serve in any capacity as Complainant's advisor or play any role in decisions related to Complainant's academic endeavors." (Filing No. 80-6.)

On November 19, 2016, Plaintiff applied for Graduate Admission at Georgia Institute of Technology ("Georgia Tech"), with a degree objective of Ph.D. to begin in the Fall 2017 semester. (Filing No. 85-13.) In her application, Plaintiff stated that she was pursuing a master's degree at the University, with expected graduation in May of 2017. (Filing No. 85-13.) Plaintiff testified in her deposition that she applied to Georgia Tech because she "wanted to go to continue my Ph.D. because I was passionate to continue my study. And I applied to Georgia Tech because it's really high ranked. Now it's number five in the United States. It's a very high-ranked university. And I knew my background, and I knew that I would do well at Georgia Tech." (Filing No. 80-12 at 36:13-18.)

On March 7, 2017, Plaintiff contacted Strickman and stated: "I needed to talk to you for some issues. I think based on our agreement, [Roe] was supposed to not be in contact with me. But in the past weeks, he has started again to communicate with saying Hello with smile to me and expecting to answer and disturbing looks. As I feel really disturbed and unsafe because of this, I wanted to report this to you and ask for your help on it. Thanks for your time." (Filing No. 80-7.) Within 15 minutes, Strickman replied to the email and stated: "Thank you for the email [Plaintiff]. [Roe] was directed to have no direct contact with you meaning: one on one conversation, advising you (etc.) I will reach out to him and ask him to refrain from saying hello and/or smiling at you. Please feel free to contact me if you have any additional questions/concerns." (Filing No. 80-7.) Plaintiff then responded: "Thanks for your reply. Actually, I do not feel comfortable. Because it is not a hello and smile and look of a person who respects me. It feels bad. Because I can differentiate between normal and abnormal behavior.

Thanks again." (Filing No. 80-7.) On the same day, Strickman replied to the email and asked: "Would you like to go over additional safety planning with investigator [Eric] Fischer?" (Filing No. 80-7.) Plaintiff expressed her wish to go over additional safety planning. Strickman then communicated with Investigator Fischer by email and advised him that Plaintiff wanted to coordinate a safety plan with him. (Filing No. 80-7.) Investigator Fischer then communicated with Plaintiff and asked her for a time to meet. (Filing No. 1-20; Filing No. 85-7.)

On March 10, 2017, Plaintiff met with Investigator Fischer, which Investigator Fischer documented and communicated to Strickman on the same day. (Filing No. 80-8.) Investigator Fischer reported to Strickman as follows:

> On 03/10/2017 at approximately 1100 hours, I met with [Plaintiff] in reference to some new concerns she has. [Plaintiff] began explaining some "disturbing behaviors" of [Roe] beginning in January of 2017 (2nd week). [Plaintiff] said [Roe] was walking into a doorway she was walking into where they became face to face and "stuck". [Plaintiff] told me she felt [Roe] was blocking the doorway and he said "hello". [Plaintiff] did not respond to [Roe] and used a doorway next to this one to leave the area. [Plaintiff] was upset at this because she was under the impression [Roe] is to have no contact with her. [Plaintiff] went on to explain how there were three occasions, two in a hallway and one in a classroom, where [Roe] walked back and forth slowly by her. [Plaintiff] did not remember the exact days or times, but told me they occurred within the last two months inside Nebraska Hall where her research lab is. [Plaintiff] told me on these occasions he attempted to say "hello", but [Plaintiff] would not respond. [Plaintiff] was upset and disturbed by these contacts because of the no contact he is supposed to have. In review of RMS, [Roe] has no active no contact orders nor does [Plaintiff]. [Plaintiff] told me she has not received any threats, emails, calls, or messages from [Roe] and the aforementioned events were what disturbed her. [Plaintiff] told me she felt comfortable still doing her work and going to class. [Plaintiff] had no threats or threatening behavior to report. This information was passed along to the Title IX office for review of their case involving the two. I reviewed [Plaintiff's] safety plan and safety resources she has available to her. No safety issues were found at this time. [Plaintiff] did not request any immediate accommodations.

(Filing No. 80-8). Plaintiff testified at her deposition that she had no reason to doubt the accuracy of what Investigator Fischer wrote in his report about what she reported to him. Plaintiff also testified that she did not request any immediate accommodation. (Filing No. 103-1 at 124:18-126:21.)

On March 12, 2017, Strickman met with Roe. (Filing No. 78-2). Strickman informed Roe what Plaintiff reported. Strickman instructed Roe to refrain from saying hello and smiling at Plaintiff if he encounters her again. (Filing No. 78-2). Roe provided the following statement:

> The events you informed me of both occurred 30 to 40 steps from my office and both were automatic reactions to the situation. I had, and have, no intention to make my former student feel uncomfortable. Please convey to her that I am sorry that my instinctive response to be polite and positive was misunderstood and had made her feel uncomfortable. I had no intension of doing so. I had also intended to remove her from my skype contacts last fall, but decided not to take any action that could be misunderstood under the circumstances (I am not sure what, or if anything, occurs when you remove a contact). Can you please inform her that I will be taking this action at the end of this week, and that under the circumstances this seems appropriate and is done without any ulterior motivation. It simply seems to be the correct thing to do under the current circumstances.

(Filing No. 80-9.) Based on the facts and circumstances of the matter and upon investigation, Strickman did not believe John Roe violated the no-contact directive. (Filing No. 103-3 at 129:22-130:19.) There was no report of interaction between Plaintiff and Roe for the remainder of Plaintiff's time as a student at the University. (Filing No. 78-3 at 37.)

Plaintiff alleges that she did not make the decision to drop her Ph.D. program and transfer to Georgia Tech until July 2017. (Filing No. 90-3.). On August 12, 2017, Plaintiff graduated from the University with Master of Science in Mechanical Engineering and Applied Mechanics, with specialization in Materials Engineering and with a minor in Chemical Engineering. (Filing No. 80-3.) Plaintiff began her Ph.D. program at Georgia Tech in August of 2017. (Filing No. 80-14.)

On September 27, 2017, after Plaintiff left the University, Plaintiff reported to Strickman that on September 25, 2017, Roe contacted her. (Filing No. 80-10.) Strickman did not reply to Plaintiff's email, but on the same day, communicated to Roe the following: "[Plaintiff] informed me that you contacted her regarding a case in NUTech. I am assuming this involves the project you both worked on. I do not know if you contacted her or not but please ensure you do not contact [Plaintiff] under any circumstances. If you need to communicate with her in any form, please contact Dr. Walker or me. If you have any questions, please feel free to contact me." (Filing No. 80-11.) Roe responded to Strickman, stating, "I did not contact [Plaintiff]. I did respond to Zane Gernhart at NUTech saying 'Thanks Zane for looking into this. [Roe]' which I assume is what she is referring to. The e-mail is attached." (Filing No. 80-11.) The email exchange showed Roe was responding to Zane Gernhart's email addressed to the researchers of the article that Plaintiff, Roe and other students wrote and published. (Filing No. 80-11.) Strickman's only direct reply to Plaintiff's email was an acknowledgment of its receipt.

Plaintiff testified at her deposition that from July 2016 to the present, Roe has never texted or called or emailed her other than when she was cc'd on the group email in September 2017, and that other than saying hello or perhaps smiling around March 2017, Roe has never said another word to her. (Filing No. 80-12 at 142:14-143:4). Plaintiff has not seen Roe since she left the University. (Filing No. 80-2 at 143:2-4.)

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042 (quotation omitted).

## DISCUSSION

### 1) Deliberate Indifference

Plaintiff contends that Defendants were deliberately indifferent under Title IX because the University failed to adequately address alleged ongoing harassment associated with her reports of March 7, 2017 and September 27, 2017. Plaintiff asserts the University should have done more --

offered additional accommodations to prevent this harassment, such as moving offices, coordinating work schedules or implementing additional safety measures. (Filing No. 88 at 14.)

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1618(a). Title IX prohibits educational institutions that receive federal funds—the "grant recipient"—from discriminating on the basis of sex, and, under this statute, sex discrimination includes sexual harassment. *Du Bois v. Bd. of Regents of the Univ. of Minn.*, 987 F.3d 1199, 1202-03 (8th Cir. 2021). *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (noting "a school district can be held liable in damages in cases involving a teacher's sexual harassment of a student").

Where a plaintiff's claim is based on sexual harassment of a student by a teacher, the educational institution may be liable if "an official of the grant recipient with authority to address harassment complaints had actual notice of the teacher's alleged misconduct, and the official's inadequate response amounted to deliberate indifference to the discrimination." *KD v. Douglas Cnty. Sch. Dist. No. 001*, 1 F.4th 591, 597-98 (8th Cir. 2021) (citing *Cox v. Sugg*, 484 F.3d 1062, 1067 (8th Cir. 2007)).

A recipient of federal funds may only be liable for damages arising from its own misconduct. *Davis v. Monroe County Board of Educ.,* 526 U.S. 629, 641 (1999). To succeed in a Title IX action, a plaintiff must establish that the defendant was "(1) deliberately indifferent, (2) to known acts of discrimination, (3) which occurred under its control." *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. at 290–91. A response to reports of actual harassment demonstrates deliberate indifference only when the response is clearly unreasonable in light of the known circumstances. *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at 648)[4]. Deliberate indifference includes "an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. at 290, and such indifference "must

[4] The Defendants continue to argue that the applicable legal standard is whether the harassment was so "severe, pervasive, and objectively offensive." This issue was discussed in Judge Gerrard's order on Defendants' motion to dismiss. (Filing No. 26) (explaining it does not apply in a Title IX case involving teacher-on-student harassment).

either directly cause the abuse to occur or make students vulnerable to such abuse ....” *Shrum ex rel. Kelly v. Kluck*, 249 F.3d at 782.

A school is not liable under Title IX for prior harassment if the grant recipient takes timely and reasonable measures to end the harassment. *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999). However, if it learns “that its measures have proved inadequate, it may be required to take further steps to avoid new liability." *Id*. Deliberate indifference “is a stringent standard of fault.” *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019). Actions of officials that are “merely inept, erroneous, ineffective, or negligent,” are not deliberately indifferent. *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).

When assessing deliberate indifference under Title IX, courts must examine the adequacy of the response in light of the “seriousness and credibility of the complaint” that puts school officials on notice. *Gordon ex rel. Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1082–83 (S.D. Iowa 2000) (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 64 (D. Me. 1999)). This analysis does not invite second guessing school officials through the application of hindsight. A lack of response must, in the circumstances, be inadequate to the point it amounts “to an official decision by the recipient [school district] not to remedy the violation”, the “premise” of remedies available under Title IX.” *Gordon ex rel. Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d at 1082–83 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

By example, in *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir. 1999), the court concluded that the school district and principal did not act with deliberate indifference after the principal became aware of a sexual relationship between a teacher and student, because they did not “turn a blind eye and do nothing.” *Id.* Instead, they investigated the allegations and, once they obtained “conclusive proof of that relationship,” initiated termination proceedings.” *Id.* The school district and the principal were entitled to judgment as a matter of law. *Id.*

**A. March 7, 2017 report**

When Plaintiff made her March 7 report to Strickman that she felt “really disturbed and unsafe” by Roe’s conduct toward her in common areas of the building (Filing No. 80-7), Strickman undoubtedly had a duty to act under the circumstances. *See Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 824 (7th Cir. 2003). Plaintiff has shown that she gave notice

to an appropriate person and given the prior finding of sexual harassment by Roe the previous year, Plaintiff's e-mail carried "seriousness and credibility." *See Gordon ex rel. Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d at 1082–83. BRUN had actual knowledge of alleged acts of harassment.

Plaintiff argues that BRUN was deliberately indifferent because the Defendants failed to adequately address Roe's alleged ongoing harassment. However, Plaintiff has not produced enough evidence to raise a genuine issue of material fact as to the element of deliberate indifference. After examining the University's response to the complained-of conduct, this court determines that the school district's actions were not so clearly unreasonable as to amount to deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at 649 ("In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.")

On receipt of Plaintiff's March 7, 2017 email, Strickman acted immediately and replied to Plaintiff within about fifteen minutes. (Filing No. 80-7.) The University promptly investigated the matter. It took remedial action by reinforcing the no-contact directive, through Strickman telling Roe that he should not engage in the type of conduct Plaintiff complained of. (Filing No. 78-2.) Specifically, she told him not to engage by smiling or attempting to say "hello" when he saw Plaintiff around campus. (Filing No. 78-2.) Strickman also offered for Plaintiff to meet with Investigator Fischer about a safety plan, which Plaintiff accepted. (Filing No. 78-2.) The meeting took place on March 10. (Filing No. 80-8.) Fischer's report is undisputed that Plaintiff told him that, at that time "she has not received any threats, emails, calls, or messages from [John Roe]," and that she felt "comfortable still doing her work and going to class." (Filing No. 80-8, Filing No. 103-1 at 124:18-126:21.)

Ultimately, Strickman made a determination about the report based on the facts and circumstances and concluded that a no-contact directive had not been violated by Roe. (Filing No. 103-3 at 129:22-130:19.) Although Plaintiff was dissatisfied with Strickman's response, and Strickman did not email Plaintiff again about the actions taken on the report, Defendants did not "turn a blind eye and do nothing." *See e.g. Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d at 610. Additionally, Strickman's response did not lead to continued harassment. Plaintiff submitted no further complaints relating to Roe for the remainder of her time at the university. (Filing No. 78-2). The evidence shows that Plaintiff did not have any further interaction with Roe, until she was copied on an email from him in September 2017. (Filing No. 78-3 at 37).

A reasonable fact finder could not conclude that the University had been deliberately indifferent. Because the University's response to the March 7, 2017 report was not 'clearly unreasonable,' it cannot have acted with the requisite deliberate indifference to incur Title IX liability. See *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at 648–49); *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d at 824.

**B. Later report**

On September 27, 2017, after Plaintiff graduated and had left the University, Plaintiff reported to Strickman that on September 25, 2017, Roe contacted her by email. The email exchange in question showed that an individual had reached out to several researchers about a jointly-authored article, including Plaintiff, and Roe used "reply all" when responding to the third party. Even if Plaintiff could show standing, i.e. that Defendants' actions prevented her from returning to finish a different degree for which she had already acquired substantial credit, there is no evidence that BRUN was deliberately indifferent to the alleged harassment. Although Strickman did not explain her response to Plaintiff, she quickly investigated and addressed the issue with Roe and learned the circumstances of the communication. Strickman reiterated to Roe not to contact Plaintiff "under any circumstances," and to only communicate with Plaintiff via Strickman or Dr. Judy Walker, if he needed to communicate with Plaintiff.

On each occasion that Strickman received a complaint about Roe, the uncontradicted evidence is that she investigated and took corrective action. Plaintiff has not presented evidence that the response of school officials was inadequate and amounted to deliberate indifference to the discrimination. Defendants' responses, under the circumstances, was not unreasonable or inadequate to the point it amounted to an official decision "not to remedy the violation." *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Even if this evidence was somehow sufficient to constitute deliberate indifference, there is also no evidence that the Defendants' actions subjected Plaintiff to harassment. For BRUN to be held liable under Title IX, the deliberate indifference must subject its students to harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at 644-45. It must, at a minimum, "cause[] students to undergo harassment or make them liable or vulnerable to it." *Id.*; *See also Shrum ex rel. Kelly v. Kluck*, 249 F.3d at 782 ("[D]eliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse."). A jury could not conclude that Defendants' actions during the relevant time period

caused Plaintiff to undergo harassment. Following Strickman's response to Plaintiff's report, Roe never texted, called or emailed Plaintiff. (Filing No. 80-12 at 142:14-143:4).

**2) Due Process Claim**

Plaintiff also brought constitutional claims against the defendants under 42 U.S.C. § 1983. The claims for due process against Strickman remain. Plaintiff alleged in her amended complaint that (A) Strickman violated her procedural due process rights under the Fourteenth Amendment by failing to follow UNL policies in response to her March 7 report; and (B) Strickman's deliberate indifference violated her substantive due process rights by subjecting her to Roe's sexual harassment and depriving her of her liberty interest in bodily integrity. (Filing No. 11).

The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citing *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999)). There is no dispute that Strickman acted under the color of state law,

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 2. The Due Process Clause "has two components: the procedural due process and substantive due process components." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). When reviewing either type of claim, the Court must first analyze the threshold question of whether the defendant's conduct violated a protected life, liberty, or property interest. *Id.*

Defendants now argue that Strickman does not have a viable due process claim because (1) Plaintiff did not have a protected life, liberty or property interest; (2) Strickman did not violate Plaintiff's substantive due process; (3) Strickman did not violate any process or procedure that was constitutionally "due; and (4) Strickman is entitled to qualified immunity. Plaintiff apparently acknowledges that she does not have a viable due process claim against Strickman.[5] In her brief in

---

[5] This Court's local rules provide that the "[f]ailure to file an opposing brief shall not be considered to be a confession of the motion, but shall preclude the nonmoving party from contesting the moving party's statement of facts." NECivR 7.1(b)(1)(C). In this case, however, Plaintiff did not fail to file an opposing brief. Rather, she elected to not make an argument in opposition to the dismissal of the due process claim.

opposition to Defendants' summary judgment motion, Plaintiff states the following regarding the due process claim: "Based on a thorough review of Defendants' arguments and cited law, Plaintiff makes no arguments regarding whether Defendant Strickman violated her constitutional rights." (Filing No. 88 at 26).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016). If a movant has supported its motion for summary judgment, the party opposing the motion "may not simply rest on the hope of discrediting the movant's evidence at trial." *United States v. 3234 Washington Ave. N.*, 480 F.3d 841, 844 (8th Cir. 2007). Here, Plaintiff has not shown or attempted to show that Strickman violated her due process rights or that a genuine issue of fact remains for trial on that issue.

The Court analyzes Plaintiff's claim as one of both procedural and substantive due process and determines that Strickman is entitled to summary judgment.

**A. Procedural Due Process**

Unlike the substantive due process provision, which "protects individual liberty against certain government action regardless of the fairness of the procedures used," a procedural due process claim requires a plaintiff to establish both "that [her] protected liberty or property interest is at stake . . . . [and] that the defendant deprived [her] of such interest without due process of law." *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 816-17 (8th Cir. 2011). "These claims turn on "(1) whether the state actor's decision impacted a protected liberty or property interest, and if so, (2) what process was constitutionally 'due.'" *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 581 (8th Cir. 2021) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332-33, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976))

"Due process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.' " *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d at 817 (quoting *Mathews v. Eldridge*, 424 U.S. at 334). In deciding whether a plaintiff received due process, the Court must consider whether he or she had the "opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* When determining whether a university's procedures are constitutionally adequate, the Court must "consider the relevant governmental and private interests," including "the private interests affected by official

action, the risk of an erroneous deprivation through the procedures used, the probable value of additional or substitute procedural safeguards, and the government's interest, including the burdens that additional safeguards would entail." *Doe v. Univ. of Ark. – Fayetteville*, 974 F.3d 858, 866 (8th Cir. 2020).

**1. Protected interest**

To establish a violation of procedural due process, a plaintiff must first show he has been deprived of a constitutionally protected life, liberty, or property interest. *Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011). Accordingly, the Court first reviews the grounds for due process violations in the Amended Complaint to determine if a constitutionally protected life, liberty, or property interest is involved. "A protected property interest exists where a plaintiff has a legitimate claim of entitlement to a benefit that is derived from a source such as state law." *Schueller v. Goddard*, 631 F.3d 460, 462-63 (8th Cir. 2011) (quotation omitted). Plaintiff had alleged that she was deprived of her "interest in bodily integrity and her property interest in education." (Filing No. 13, ¶ 118).

With respect to a person's interest in bodily integrity, in this context, the Eighth Circuit has stated that "[s]exual harassment by state actors violate[s] the Fourteenth Amendment and establishes a section 1983 action." *Cox v. Suggs*, 484 F.3d 1062, 1066 (8th Cir. 2007). However, there is no genuine issue of material fact with respect to the fact that after Plaintiff's March 7 report, Plaintiff was not sexually harassed by Roe. Regardless of the sufficiency of Strickman's investigation, there was no report of interaction between Plaintiff and Roe for the remainder of Plaintiff's time as a student at the University. (Filing No. 78-3 at 37.) Plaintiff was not deprived of her interest in bodily integrity due to any action or inaction by Strickman following the March 7 report.

Turning to the second grounds alleged as due process violation, Plaintiff does not explain how she has a constitutionally protected liberty or property interest in continuing or returning to an academic program as a university graduate student, or how such interest was deprived in her case. "In two decisions, the Supreme Court has 'assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard.'" *Doe v. Univ. of Nebraska*, 451 F. Supp. 3d 1062, 1108 (D. Neb. 2020) (quoting *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)) *See* also *Board of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 91-92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (assuming without deciding the existence of protected interest in medical degree at public university). The Court expressly

stated that it would not reach the issue of the plaintiff's assumed property interest because the plaintiff's claim failed even if the Court were to assume such a right. *Id*. The Eighth Circuit has done similarly. *Keefe v. Adams*, 840 F.3d 523, 533 (8th Cir. 2016) (questioning whether due process cause of action existed after academic dismissal, where student was allowed to transfer his credits to another academic program); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594-97 (8th Cir. 2007) (dismissal from nurse anesthesia program after leave of absence); *Richmond v. Fowlkes*, 228 F.3d 854, 859 (8th Cir. 2000) (academic dismissal); *Schuler v. Univ. of Minn.*, 788 F.2d at 515-16 (academic dismissal from doctoral degree). *But cf. Greenhill v. Bailey*, 519 F.2d 5 (8th Cir. 1975) (where academic dismissal from medical school was accompanied by notification to national association that student lacked "intellectual ability," which would effectively preclude him from continuing his studies elsewhere, he was deprived of significant liberty interest and was entitled to informal hearing before administrative body which dismissed him). The Nebraska Supreme Court called into doubt whether an individual has a protected liberty or property interest in postsecondary education and noted that the U.S. Supreme Court "has not held that postsecondary education rises to a fundamental right." *Doe v. Bd. of Regents of Univ. of Nebraska*, 280 Neb. 492, 530, 788 N.W.2d 264, 293 (2010), overruled on other grounds by *Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017)). Regardless of Plaintiff's unsupported claim that she has a protected property interest in continuing her graduate education at the University after she graduated with her Master's degree, the undisputed evidence in this case does not show that she was deprived of such interest without constitutionally sufficient process.

**2. Violation and sufficient process**

Even if Plaintiff established that a protected life, liberty, or property interest was at stake, Strickman did not deprive her of this interest without due process of law.

First, Strickman's actions during the relevant time period did not limit Plaintiff in her ability to continue her graduate education. To the extent that Plaintiff now declares that her *decision* to attend Georgia Tech occurred subsequently and as a result of Strickman's actions or inactions in 2017, (Filing No. 90-3) this declaration is directly contrary to all of the other evidence, including her statements in her deposition and other records of her change of academic program in 2016 and application to Georgia Tech on November 19, 2016. The Eighth Circuit has addressed "the troublesome issue of whether summary judgment may be granted when one of the parties after giving a deposition later files an affidavit with directly contrary statements." *City of St. Joseph, Mo. v. Sw. Bell Tel.,* 439 F.3d 468, 475

(8th Cir. 2006) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363 (8th Cir. 1983)). “If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.” *City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d at 475–76 (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d at 1363). After beginning the Master of Science program, Plaintiff was not on a Ph.D. track and did not submit a Program of Study for a Ph.D. program, which must be filed with Graduate Studies prior to completion of half of the coursework for a Ph.D. program. (Filing No. 101-1.) Plaintiff previously testified that her 2016 application to Georgia Tech was for the purpose of continuing her Ph.D., stating “I applied to Georgia Tech because it’s really high ranked.” (Filing No. 80-12 at 36:13-18.) The Court determines that there is no genuine issue of material fact as to Plaintiff’s ability to continue her Ph.D. as she had already taken actions to discontinue that course of study the University prior to the relevant time period. Plaintiff completed her Master’s degree and continued her graduate education at Georgia Tech. (Filing No. 90-3). Any protected constitutional right was not deprived by Strickman.

Furthermore, to the extent Plaintiff may contend that Strickman violated the policies of the University, lack of compliance alone will not necessarily violate Plaintiff’s right to procedural due process even if Plaintiff was deprived of a constitutionally-protected interest. "[T]he factual issue of the University's compliance or noncompliance with internally prescribed procedural rules and regulations need not be resolved if … a finding that the University failed to comply is not legally relevant to either [the plaintiff’s] procedural or substantive due process claims." *Schuler v. Univ. of Minnesota*, 788 F.2d 510, 515 (8th Cir. 1986); *See Batra v. Board of Regents of Univ. of Nebraska*, 79 F.3d 717, 720 (8th Cir. 1996). In the context of the undisputed facts regarding Plaintiff’s March 7 report and Strickman’s response, the University's alleged noncompliance with its own investigation procedures did not violate Plaintiff’s right to procedural due process. Strickman conducted an informal investigation and after communicating with Plaintiff, Roe, and Investigator Fischer, determined that Roe had not violated the no-contact directive. Investigator Fischer reported that Plaintiff had not received any threats, emails, calls, or messages from [Roe], and

> [Plaintiff] told me she felt comfortable still doing her work and going to class. [Plaintiff] had no threats or threatening behavior to report. This information was passed along to the Title IX office for review of their case involving the two. I reviewed [Plaintiff’s] safety plan and safety resources she has available to her. No safety issues were found at this time. [Plaintiff] did not request any immediate accommodations.

(Filing No. 80-8). Plaintiff testified at her deposition that she had no reason to doubt the accuracy of what Investigator Fischer wrote in his report about what she reported to him. (Filing No. 103-1 at 124:18-126:21.) Strickman confirmed that there were no safety concerns, and no further complaints arose after Strickman directed Roe not to smile or greet Plaintiff, until the email sent after Plaintiff had graduated from the University. (Filing No. 78-2). Any constitutional process due under the circumstances, which are undisputed, was effectively carried out.

**B. Substantive Due Process**

In her second amended complaint, Doe alleges, in part, that Strickman's deliberate indifference violated her substantive due process rights by subjecting her to Roe's sexual harassment and depriving her of her liberty interest in bodily integrity. (Filing No. 13).

In the context of a § 1983 claim of unconstitutional sexual abuse by a teacher at an institution that receives Title IX funding, "individual liability of a supervisory school official should be measured 'by the standards of the institution's Title IX liability established in *Gebser*.'" *Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274). In other words, school district officials can be liable under § 1983 if they are deliberately indifferent to acts committed by a teacher that violate a student's constitutional rights. *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000). To establish § 1983 liability, a plaintiff must show that the supervisory official with authority to address sexual misconduct complaints had actual notice of a pattern of unconstitutional conduct, showed deliberate indifference to those acts, and such failure proximately caused injury to the plaintiff. *Id.*

As the court granted summary judgment against Plaintiff on her claim for deliberate indifference, Plaintiff has also failed to establish a genuine issue of material fact regarding substantive due process with respect to Strickman. Strickman is entitled to summary judgment on this issue.

**3) Claims Against John Roe and other unidentified defendants**

Plaintiff failed to serve John Roe within 90 days of filing the Complaint, as required by Fed. R. Civ. P. 4(m). Plaintiff has not denied this and has not taken any action to resolve this problem. Accordingly, Plaintiff's claims against John Roe will be dismissed.

During this litigation, Plaintiff did not identify the "other unidentified defendants" she sued. Accordingly, Plaintiff's claims against the "other unidentified defendants" will be dismissed.

Accordingly,

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Filing No. 73) is granted.
2. Judgment will be entered by separate document.

Dated this 3rd day of September, 2026.

BY THE COURT:

Susan M. Bazis
United States District Judge